**MYCOGEN PLANT SCIENCE, INC., and Agrigenetics, Inc., Plaintiffs,**

v.

**MONSANTO COMPANY, Dekalb Genetics Corporation, and Delta and Pine Land Company, Defendants.**

**No. CIV.A.96–505–RRM.**

United States District Court, D. Delaware.

Sept. 8, 1999.

Josy W. Ingersoll, and Richard H. Morse, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; Douglas E. Olson, F.T. Alexandra Mahaney, and Jeffrey W. Guise, Lyon & Lyon, La Jolla, California; Gerald Sobel, and Joel Katcoff, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, New York; counsel for plaintiffs.

Richard L. Horwitz, Joanne Ceballos, Potter Anderson & Corroon, Wilmington, Delaware; John F. Lynch, Craig M. Lundell, Melinda L. Patterson, and Susan K. Knoll, Arnold, White & Durkee, Houston, Texas; counsel for defendants.

**OPINION**

McKELVIE, District Judge.

TABLE OF CONTENTS

I. FACTUAL AND PROCEDURAL BACKGROUND 205
 A. The Status of the Case .......................................... 205
 B. Background Information on *Bacillus Thuringiensis* ................ 206
 C. Background Information on Genetic Engineering ................... 207
 D. Mycogen's Patents ............................................. 209
 E. Monsanto's Patent ............................................ 214
 F. Claim Construction ............................................ 215
 G. Jury Trial .................................................... 216
 H. Jury Verdict ................................................. 235
 I. Post–Trial Motions ............................................ 236

II. DISCUSSION 236
 A. What is the Standard for Granting Judgment as a Matter of Law? ..... 236
 B. Should the Court Grant Mycogen's Motion for JMOL that the Claims of the '600 and '862 Patents Are Not Invalid Due to Prior Invention? 237
 C. Is Mycogen Entitled to Judgment as a Matter of Law that Defendants' Accused Genes and Gene Products Infringe the Asserted Claims of the '600 and '862 Patents? ........................................ 242
 D. Are the Asserted Claims of the '600 and '862 Patents Invalid for Obviousness and Anticipation? .................................... 251
 E. Are the Claims of the '600 and '862 Patents Invalid for Failure to Satisfy the Best Mode Requirement? ............................... 252
 F. Are the Claims of the '600 and '862 Patents Invalid Due to Indefiniteness? .................................................... 254
 G. Are the Claims of the '600 and '862 Patents Invalid for Lack of Enablement? ................................................... 257

H. Should the Court Grant Mycogen's Motion for a New Jury Trial?...... 260
I. Should the Court Grant Defendants' Motion for Attorneys' Fees? ..... 269
J. Should the Court Grant Defendants' Motion to Amend Judgment?..... 272

III. CONCLUSION 273

This is a patent case. Plaintiff Mycogen Plant Science, Inc. owns U.S. Patent No. 5,567,600 ("the '600 patent") and U.S. Patent No. 5,567,862 ("the '862 patent") which are directed to a synthetic gene inserted into plants to make plants insect-resistant. Michael J. Adang, Elizabeth E. Murray, Thomas A. Rocheleau, and Donald J. Merlo are the inventors. Plaintiff Agrigenetics, Inc. is a Mycogen subsidiary. In a complaint filed in October 1996, Mycogen and Agrigenetics contend Monsanto Company, DeKalb Genetics Corporation, and Delta and Pine Land Company infringe the '600 and '862 patents, and that they are contributing to and inducing infringement of these patents. Defendants have answered denying the allegations and asserting affirmative defenses. Defendants also counterclaim for a declaratory judgment of non-infringement and invalidity of the '600 and '862 patents.

On February 3, 1998, a jury returned a verdict finding that the defendants' products do not literally infringe the contested claims of the '600 or '862 patents. The jury also found that the contested claims of the '600 and '862 patents are anticipated and therefore invalid because the subject matter was invented at Monsanto before the invention date of plaintiff's patents.

The parties moved for judgment as a matter of law and have filed other post-trial motions. This is the court's decision on all pending post-trial motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Status of the Case*

The court draws the following facts from the evidence presented at trial.

Plaintiff Mycogen Plant Science, Inc. is a Delaware corporation with its principal place of business in San Diego, California.

Mycogen owns the '600 patent and the '862 patent, which are directed to a synthetic gene inserted into plants to make plants insect-resistant. Agrigenetics, Inc., a Mycogen subsidiary, is a Delaware corporation with its principal place of business in San Diego, California. In this opinion, the court refers to the plaintiffs collectively as "Mycogen."

Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri. Defendant DeKalb Genetics Corporation is a Delaware corporation with its principal place of business in DeKalb, Illinois. Defendant Delta and Pine Land Company is a Delaware corporation with its principal place of business in Scott, Mississippi. In December 1998, Monsanto acquired DeKalb which became a wholly-owned subsidiary of Monsanto.

On October 22, 1996, Mycogen filed the complaint in this case contending defendants infringe and induce or contribute to infringement of Claims 1–24 of the '600 patent and Claims 1–24 of the '862 patent. Mycogen also alleged that defendants willfully infringe both patents. Defendants answered denying the allegations and asserting several affirmative defenses, including that Mycogen's patents are unenforceable because Mycogen allegedly willfully misled the Patent and Trademark Office ("PTO") by failing to disclose material information to the PTO, and that the '600 and '862 patents are invalid for failure to comply with 35 U.S.C. §§ 101, 102, 103 and 112. Also, defendants counterclaimed that the '600 and '862 patents are invalid for failure to comply with 35 U.S.C. §§ 101, 102, 103 and 112, including for prior invention, lack of enablement, failure to disclose best mode, and indefiniteness.

On September 30 and October 1, 1997, this court held the part of the trial necessary to construe disputed claim language of the '600 and '862 patents, in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The court subsequently issued an opinion construing the patent claims. *See Mycogen v. Monsanto,* D. Del. C.A. No. 96–505–RRM, memo. opin., McKelvie, J. (December 29, 1997) (D.I.343).

From January 20 to February 3, 1998, the court held a ten-day jury trial on the issues of infringement, willful infringement and invalidity. Before the close of evidence at trial, Mycogen withdrew its claims for willful infringement. On February 3, 1998, the jury returned its verdict. The jury found that defendants' products do not literally infringe the asserted claims of the '600 and '862 patents. The jury also found the contested claims of the '600 and '862 patents are anticipated, and therefore, invalid because their subject matter was invented at Monsanto before the invention date of Mycogen's patents. The jury did not enter a decision on whether Monsanto actively induced others to make, use, sell, or offer to sell infringing products, or whether Monsanto actively induced farmers to infringe by using infringing products. The jury did not reach a decision but noted "N/A" to the following questions: (1) whether any of the contested claims of the '600 and '862 patents are invalid because the specification of the patents would not have enabled a person of ordinary skill in the art as of September 9, 1988, to make use of the claimed invention without undue experimentation; (2) whether the '600 and '862 patents are invalid because the inventors failed to adequately disclose in the patent specification what they believed as of September 9, 1988, to be the best mode for practicing their invention; and (3) whether the '600 and '862 patents are invalid because they do not clearly and distinctly claim the subject matter of the invention.

On February 5, 1998, the court entered judgment in favor of defendants.

To better explain the court's decision on the pending motions, the court first provides the reader with background on two scientific topics central to this case: (1) *Bacillus thuringiensis*, a naturally-occurring bacterium; and (2) genetic engineering.

B. *Background Information on Bacillus Thuringiensis*

The court draws the following facts from the court's claim construction opinion and from the evidence presented at trial.

*Bacillus thuringiensis ("Bt")* is a naturally-occurring bacterium found in soil. *Bt* possesses an unusual property; it produces a protein that kills certain crop-destroying insects. This protein is known as a "pesticidal protein toxin," "pesticidal protein," or "toxic crystal protein." When eaten by certain insects, the protein dissolves the insects' stomach linings, causing the insects to die. While the *Bt* protein is a natural pesticide, it is not harmful to humans, animals or beneficial insects like bees and ladybugs.

The *Bt* protein is particularly deadly for insects like the European corn borer. This worm-like insect feeds on corn plants, eating its way into stalks and ears. The European corn borer can kill a plant outright or dramatically reduce the size and number of kernels that grow on an ear. This pest costs American farmers as much as an estimated $1 billion a year in lost crops.

For years, farmers have been spraying their crops with pesticides like the *Bt* protein as well as other chemicals. Spraying, however, is not always effective because some insects, including the European corn borer, tunnel into plants soon after they hatch, or stay on the underside of leaves, where the spray does not reach them. In addition to being ineffective, spraying adds to farmers' costs and the spraying of some

pesticides raises environmental and health concerns.

Scientists have long considered the idea of introducing genes from different organisms into crops and livestock. Developments in genetic engineering focused the scientific community's attention on whether plants could somehow be genetically-modified to resist attack by insect pests. Advances in agricultural biotechnologies made it possible to create plants which produce *Bt* pesticidal proteins. Thus, these genetically-modified plants have their own built-in, or endogenous, protection from insects. Issues related to these biotechnological advances are at the heart of this case.

Initially, scientists experimented with inserting into plant cells the native *Bt* gene that produces the *Bt* pesticidal protein. The native *Bt* gene refers to the naturally-occurring gene as found in the bacterium. While scientists succeeded in inserting native *Bt* genes into plant cells, they found that these new genetically-modified plants were not producing enough *Bt* pesticidal protein to kill insects. In scientific terms, the level of expression of the native *Bt* genes inserted into the plants was too low.

To solve the problem of low *Bt* expression, scientists devised ways to increase the level of *Bt* expression in plants. They eventually succeeded by modifying the native *Bt* gene, as detailed below. Scientific success led to commercial success. The U.S. Environmental Protection Agency gave its first approval to a plant genetically-engineered to biologically control insects on May 5, 1995, when it approved a genetically-modified potato.

By 1996, the EPA approved insect-resistant corn for commercial use. In 1996, U.S. farmers planted very few genetically-modified crops. By 1999, genetically-modified corn accounted for no less than one-fourth of the corn grown by U.S. farmers. *See* Carol Kaesuk Yoon, "Pollen From Genetically Altered Corn Threatens Monarch Butterfly, Study Finds," *New York Times,* May 20, 1999 (estimating that in 1999, *Bt* corn to be cultivated on an estimated ten million to twenty million acres out of an eighty million acre corn crop nationwide); "Doubling of Land Area Growing Genetically Modified Crops," *Agence France–Presse,* February 26, 1998, (estimating that in 1998, genetically-modified corn to be cultivated on eight million hectares [19.75 million acres], chiefly in the United States); *see also* "Food for Thought," *Economist,* Jun. 19, 1999, (estimating that genetically-modified crops account for as much as 55% of U.S. soybean, 50% of U.S. cotton and 40% of U.S. corn production.).

The patents-in-suit involve a method aimed at solving the problem of low *Bt* expression in genetically-modified plants. To help the reader understand this method and the issues underlying this case, the court provides the following background information on genetic engineering.

### C. Background Information on Genetic Engineering

Organisms, like plants and animals, are made up of cells. Genes are units of DNA (deoxyribonucleic acid) which encode the necessary information for cells to reproduce and to produce specific proteins.

Genes are comprised of DNA, an acronym for deoxyribonucleic acid. DNA consists of two long chains or strands that wrap around each other in a shape known as a double-stranded spiral helix. Visually, a molecule of DNA resembles a twisted ladder. The sides of the ladder are connected by rungs made up of pairs of molecules called nucleotides or bases. Four nucleotides, adenine ("A"), guanine ("G"), cytosine ("C") and thymine ("T"), form the particular DNA make-up of genes. A particular DNA molecule can be graphically represented by listing the nucleotide sequences making up that DNA molecule.

Because of the nucleotides' chemical make-up, A will only pair with T, and C will only pair with G. This strict complementary pairing means that the order of the nucleotides on one side of a DNA rung

determines the order on the other side of the rung. Therefore, each rung of the ladder is composed of one pair consisting of A and T, or C and G. Each rung is called a nucleotide pair, and the order in which these nucleotide pairs appear on the DNA ladder constitutes the genetic code for the cell.

DNA directs cells to make proteins through a two-step process of transcription and translation. In the first step, transcription, information is transferred from DNA to an RNA, or ribonucleic acid, molecule. RNA that codes for a protein is called messenger RNA ("mRNA").

RNA is a long single strand of linked nucleotides similar to DNA, except RNA contains the nucleotide Uracil ("U") in place of Thymine. In transcription, specific nucleotide sequences on the DNA determine where the RNA copy begins and ends.

In the second step, translation, the nucleotide sequence of the mRNA is translated into the amino acid sequence of the corresponding protein. For this translation work, a complex structure known as a ribosome reads the mRNA nucleotide sequence and translates it into amino acids. These amino acids are then assembled into proteins. In this way, ribosomes carry out protein synthesis.

Ribosomes read a nucleotide sequence in sets of three nucleotides, known as codons. Each codon directs the ribosome to select a certain amino acid. For example, GCT is a codon directing the ribosome to select the amino acid, alanine. Just as nucleotides are the basic units of DNA, amino acids are the basic units of proteins.

A protein can contain few or many amino acids. For example, some *Bt* pesticidal proteins contain more than 600 amino acids. Thus, a given series of codons specifies a sequence of amino acids comprising a particular protein.

While there are 61 possible codons, there are only 20 amino acids.[1] Some amino acids can be specified by more than one codon. In other words, one codon can be substituted for another in the gene without changing the amino acid and resulting protein. For instance, the amino acid, alanine, is specified by four different codons: GCT, GCG, GCC and GCA. Two very different series of codons could produce the exact same series of amino acids. In fact, most amino acids are specified or coded by more than one codon.[2]

Scientists employ special tables known as codon usage tables to determine the frequency with which certain codons appear in plants and other organisms. For example, Table 1 of the '600 and '862 patents contains a listing of all 20 amino acids along with the various codons which specify these amino acids. Table 1 then compares the frequency with which the codon appears in three different organisms: dicot plants, the *Bt* gene and monocot plants.

The terms, "dicot" and "monocot," are used frequently in this opinion. These terms refer to two plant categories. A plant is classified as monocot or dicot depending on how many leaves it produces when it sprouts from the seed. If the plant has only one leaf when it first emerg-

---

1. There are 61 codons because a codon is a sequence of three nucleotides. For mRNA, there are four nucleotide possibilities, A, G, C and U. Thus, three nucleotides each consisting of four possibilities, A, G, C or U, is represented mathematically as $4^3$ ($4 \times 4 \times 4$) which equals 64 possible codons. Of the 64 possible codons, however, three codons, UAA, UAG and UGA, do not correspond to amino acids. Thus, there are 61 codons. *See, e.g., McGraw–Hill Encyclopedia of Science & Technology,* "Gene" at Vol. 7, page 740 (1997).

For information on genetics, *see In re O'Farrell,* 853 F.2d 894, 895–899 (Fed.Cir.1988).

2. Scientists variously refer to this as "redundancy" or "degeneracy" in the genetic code. The term, "unique," refers to an amino acid coded by only a single codon. *See, e.g., Amgen Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 1207–08 n. 4, (Fed.Cir.), *cert. denied,* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991).

es from the soil, it is a monocot; if the plant has two leaves, it is a dicot. For example, tomato, tobacco and cotton are dicots; corn, barley, rice and wheat are monocots.

Knowing that different codons can specify the same amino acid, scientists attempted to solve the problem of low *Bt* expression in plants by changing the codons in the native *Bt* gene, without changing the resulting amino acids. Scientists recognized that organisms prefer certain codons over others for specifying particular amino acids. For example, while the amino acid, alanine, is specified by four different codons, GCG, GCA, GCT and GCC, the codons appear disproportionately. To illustrate this point, GCA appears 50% of the time that alanine is specified in *Bt* genes, while GCG only appears 12% of the time that alanine is specified in *Bt* genes.

Scientists sought to create a *Bt* gene that would have a codon frequency more like plants, but produce high levels of pesticidal *Bt* protein. The following table illustrates how scientists approached their goal of making the *Bt* gene more plant-like. The table reports the frequency of codon usage for the amino acid, alanine, in dicot genes, *Bt* genes and monocot genes. The number represents the percent of the time a codon appears in a host when alanine is specified.

| Amino Acid | Codon | Dicot Genes | *Bt* Genes | Monocot Genes |
|---|---|---|---|---|
| Alanine | GCG | 6% | 12% | 22% |
| Alanine | GCA | 25% | 50% | 16% |
| Alanine | GCT | 42% | 32% | 24% |
| Alanine | GCC | 27% | 6% | 38% |

As seen above, GCA appears 50% of the time in the *Bt* gene when alanine is specified. However, in a dicot plant gene, GCA only appears about 25% of the time. Two other alanine codons, GCC and GCT, appear more frequently in dicot genes (27% and 42% respectively) than they do in *Bt* genes (6% and 32% respectively).

Thus, by changing GCA codons in the *Bt* gene to either GCC or GCT, the new *Bt* gene becomes more plant-like because dicot plants prefer GCC or GCT over GCA. Modifications, such as these, result in higher expression of the pesticidal *Bt* protein in the plants containing this synthetic *Bt* gene, compared to those plants containing the native *Bt* gene.

Scientists also discovered that the nucleotide sequence AT appears in *Bt* genes more frequently than it appears in plant genes. They thought that this factor, along with the existence of other identifiable sequences, might be the cause of low *Bt* expression in plants. Who made this discovery, when it was made and how this discovery was used to design an insecticidal *Bt* gene are all key elements of this case.

### D. *Mycogen's Patents*

#### 1. *General Background on the '600 and '862 Patents*

As explained at the outset, this case involves two Mycogen patents: the '600 and the '862 patents. The court offers brief background information on another Mycogen patent, U.S. Patent No. 5,380,831 ("the '831 patent"), which is closely-related to the '600 and '862 patents. The '831 patent is the predecessor patent to the '600 and '862 patents. All three patents are entitled "Synthetic Insecticidal Crystal Protein Gene." The specifications for all three patents are almost identical and the three patents share many terms and phrases. The first page of the '600 patent indicates it is a continuation-in-part of the '831 patent, while the first page of the '862 patent indicates it is a division of the '831 patent. *See Mycogen v. Monsanto,* C.A. No. 96–505–RRM, memo. opin.,

McKelvie, J. (D.Del. December 29, 1997) (D.I.343) at 4–5.

In broad terms, the '831 patent claims a method of designing a synthetic *Bt* gene to make plants insect-resistant. Expanding on the '831 patent, the '600 patent claims a method of designing a synthetic *Bt* gene which includes the following four steps:

(a) Analyzing the coding sequence of the *Bt* gene;

(b) Modifying the *Bt* gene;

(c) Inserting the synthetic *Bt* gene into a plant cell; and

(d) Maintaining the plant cell under conditions suitable to allow replication.

The '862 patent claims the plant cell produced by the method disclosed in the '600 patent. Thus, all three patents are based on the same concept of modifying *Bt* genes. The '600 and '862 patents are continuations-in-part of the '831 patent, as represented in the chart below:

| '831 Patent | '600 Patent | '862 Patent |
|---|---|---|
| Method of designing a synthetic *Bt* gene. | Method of designing synthetic *Bt* gene, by analyzing coding sequence; modifying the *Bt* gene; inserting gene into plant; and maintaining synthetic *Bt* gene in plants. | Plant cell produced by the '600 method. |

The effective filing date for both the '600 and '862 patents is September 9, 1988, the filing date of U.S. Application No. 242,282. The inventions claimed in the '600 and '862 patents were constructively reduced to practice as of the filing date of this application. At that time, the inventions had not been actually reduced to practice.

On October 22, 1996, the Patent and Trademark Office issued the '600 and '862 patents to Mycogen, as assignee. The abstract of both patents reads:

> Synthetic *Bacillus thuringiensis* toxin genes designed to be expressed in plants at a level higher than naturally-occurring *Bt* genes are provided. These genes utilize codons preferred to highly expressed monocot or dicot proteins.

### 2. *The Specifications of the '600 and '862 Patents*

The patent specifications for the '600 and '862 patents discuss the use of preferred codons to make the synthetic *Bt* gene more plant-like. Table 1 of both patents is a codon usage table for dicot proteins, *Bt* proteins, the synthetic *Btt* gene and monocot proteins. (*Btt* refers to *Bacillus thuringiensis* var. *tenebrionis*, a strain of *Bt* bacterium from which the synthetic *Bt* gene was made.) At column 22, lines 19 to 44 of the '600 patent, and at column 21, line 53 of the '862 patent, the specifications give an example of using preferred codons to design a synthetic *Btt* gene. The specifications read, in relevant part, "[i]n designing a synthetic gene encoding the *Btt* crystal protein, individual amino acid codons found in the original *Btt* gene are altered to reflect the codons preferred by dicot genes for a particular amino acid."

The specifications also discuss removing codon sequences believed to inhibit *Bt* expression. For example, column 4, lines 17 to 23 of both patents state:

> [C]onsideration is given to the percentage $G + C$ content of the degenerate third base (monocotyledons appear to favor $G + C$ in this position, whereas dicotyledons do not). It is also recognized that the XCG nucleotide is the least preferred codon in dicots whereas the XTA codon is avoided in both monocots and dicots.

At column 10, line 67 of both patents, the specifications further state that "[i]n dicots, XCG is always the least favored codon, while in monocots this is not the case. The doublet TA is also avoided in

codon positions II and III in most eukaryotes, and this is true of both monocots and dicots."

A eukaryote is an organism whose cells have a nucleus containing the genetic material, surrounded by cytoplasm, contained within a cell membrane. Examples include animals, plants, protozoa, and fungi. In eukaryotes, the DNA is packaged in chromosomes in the nucleus. Prokaryote refers to a single-celled organism with no nucleus, like bacteria. The DNA of prokaryotes, usually a circular loop, is not separated into chromosomes.

The specifications of both patents, at column 12, lines 9 to 12, state that "[i]n designing a synthetic gene for expression in plants, attempts are also made to eliminate sequences which interfere with the efficacy of gene expression," such as the plant polyadenylation signal sequence AATAAA. The term "plant polyadenylation signal sequence," or "polyA sequence," refers to one way plants read certain nucleotide sequences to terminate mRNA synthesis.

A plant cell naturally reads polyadenylation signal sequences as a termination signal while a bacterium, like *Bt*, does not. Thus, a plant cell might misread a polyadenylation signal sequence in the *Bt* gene and terminate the synthesis of mRNA prematurely. In this case, an incomplete protein results.

Beginning at column 23, line 58 of the '600 patent and at column 23, line 18 of the '862 patent, the specifications provide that "an elevated A+T content with the *Btt* coding region may be contributing to a low expression level in plants. Consequently, in designing a synthetic *Btt* gene, the A+T content is decreased to more closely approximate the A+T levels found in plant proteins." Additionally, the specifications state that "the natural *Btt* gene is scanned for sequences that are potentially destabilizing to *Btt* RNA. These sequences, when identified in the original *Btt* gene, are eliminated through modification of nucleotide sequences." The specifications identify "plant polyadenylation signals" including "AATAAA, AATGAA, AATAAT, AATATT, GATAAA, [and] AATAAG" as potentially destabilizing sequences. ATTTA is not identified as a plant polyadenylation signal on this list.

### 3. *The Claims of the '600 and '862 Patents*

The claims of the '600 patent are directed to methods of designing a synthetic *Bt* gene by modifying the coding sequence of a *Bt* gene causing it to be more highly expressed in plants; inserting this synthetic gene in a plant cell; and maintaining that cell. The claims of the '862 patent are directed at the resulting plants, plant cells, and its progeny plants, cells and seeds.

The '600 patent consists of twenty-four claims. They may be organized into four sets of six claims each. The first set of claims consists of claims 1–6; the second set, 7–12; the third set, 13–18, and the fourth set, 19–24. (A table depicting highlights of the '600 patent is provided below.)

The first claim of each set, that is, Claims 1, 7, 13 and 19, discloses a method of designing a synthetic *Bt* gene. The claimed method involves four steps: (a) an "analyzing" step; (b) a "modifying" step; (c) an "inserting" step; and (d) a "maintaining" step. Claim 1 is representative of all four sets. It reads as follows:

A method of designing a synthetic *Bacillus thuringiensis* gene to be more highly expressed in plants, comprising the steps of:

(a) analyzing the coding sequence of a gene derived from a *Bacillus thuringiensis* which encodes a pesticidal protein toxin;

(b) modifying a portion of said coding sequence to yield a modified sequence which contains a greater number of codons preferred by the intended plant host than did said coding sequence prior to modification, said modification comprising reducing the number of codons having CG in codon positions II and III

in a region between plant polyadenylation signals in said coding sequence;

(c) inserting said modified sequence into the genome of a plant cell; and

(d) maintaining said plant cell under conditions suitable to allow replication of said plant cell to produce additional plant cells having said modified sequence in the genome of said additional plant cells, wherein said synthetic *Bacillus thuringiensis* gene is expressed to produce a pesticidal protein toxin.

Claims 7, 13, and 19 are identical to claim 1, except for step (b) which differs. How step (b) differs is explained below.

The second claim of each set, Claims 2, 8, 14, and 20, claims the DNA coding sequence produced by the method disclosed in the first claim of the set. Claim 2 is representative of all four sets. It reads as follows:

A DNA coding sequence produced by:

(a) analyzing the coding sequence of a gene derived from a *Bacillus thuringiensis* which encodes a pesticidal protein toxin; and

(b) modifying a portion of said coding sequence to yield a modified sequence which contains a greater number of codons preferred by the intended plant host than did said coding sequence, said modification comprising reducing the number of codons having CG in codon positions II and III in a region between plant polyadenylation signals in said coding sequence.

Again, Claims 8, 14 and 20 are identical to Claim 2, except for differences in step (b), described below.

The third claim of each set, Claims 3, 9, 15, and 21, claim the method described in the first claim, limited by the requirement that "at least about 32% of the codons in the coding sequence of the native *Bt* gene have been modified."

The fourth claim of each set, Claims 4, 10, 16, and 22, claims the method described in the first claim, limited by the requirement that "about 11% of the nu-

cleotides in the coding sequence of the native *Bt* gene have been changed."

The fifth and sixth claims in each set, Claims 5–6, 11–12, 17–18, and 23–24, claim the DNA sequence described in the second claim, limited by the same two requirements set out by the third and fourth claim of each set as explained above.

Step (b) of Claims 1–2, 7–8, 13–14 and 19–20 contains two limitations which apply to all four sets of claims. Each claim contains either a "greater number" limitation (Claims 1–2, and 13–14) or a "frequency" limitation (Claims 7–8, and 19–20), and each claim contains an "XCG" limitation (Claims 1–2, and 7–8) or an "AATGAA" limitation (Claims 13–14, and 19–20).

The "greater number" limitation is the phrase appearing in Claim 1. This refers to "a modified sequence which contains a greater number of codons preferred by the intended plant host." The "XCG" limitation also appears in Claim 1. This refers to a modification comprising "reducing the number of codons having CG in codon positions II and III in a region between plant polyadenylation signals in said coding sequence."

In step (b) of Claim 19, the "frequency" and "AATGAA" limitations appear, instead of the "greater number" limitation and the "XCG" limitation. Claim 19(b) reads as follows:

(b) modifying a portion of said coding sequence to yield a modified sequence which has a frequency of codon usage which more closely resembles the frequency of codon usage of the plant in which it is to be expressed than did said coding sequence prior to modification, and wherein said modification results in fewer occurrences of the sequence AATGAA in said modified sequence than in said coding sequence.

As for the '862 patent, Claims 1, 7, 13 and 19 claim the plant cells produced by the methods disclosed in the '600 patent.

Claims 2–5, 8–11, 14–17, and 20–23 are dependent claims. Claims 2–5 are representative of these dependent claims:

Claim 2. Progeny cells of the cell of Claim 1.

Claim 3. A plant comprising progeny cells according to Claim 2.

Claim 4. A progeny plant of the plant of Claim 3.

Claim 5. A seed of a plant of Claim 3 or Claim 4.

● HIGHLIGHTS OF '600 PATENT — FOUR SETS OF SIX CLAIMS EACH ●

| Set 1-Claim 1–6 | Set 2—Claims 7–12 | Set 3—Claims 13–18 | Set 4—Claims 19–24 % |
|---|---|---|---|
| Claim 1 method of designing a synthetic *Bt* gene comprising: (a) analyzing; (b) modifying the coding sequence to yield a modified sequence which contains a greater number of codons preferred by the plant with the modification comprising reducing the number of codons having CG in codon positions II & III between plant polyadenylation sequences, XCG; (c) inserting; (d) maintaining. | Claim 7 method of designing a synthetic *Bt* gene comprising: (a) analyzing; (b) modifying the coding sequence to yield a modified sequence which has a frequency of codon usage which more closely resembles the frequency of codon usage of the plant, said modification comprising reducing the number of codons having CG in codon positions II & III between plant polyadenylation sequences, XCG; (c) inserting; (d) maintaining. | Claim 13 method of designing a synthetic *Bt* gene comprising: (a) analyzing; (b) modifying the coding sequence to yield a modified sequence which contains a greater number of codons preferred by the plant with the modification resulting in fewer occurrences of the sequence AAT-GAA; (c) inserting; (d) maintaining. | Claim 19 method of designing a synthetic *Bt* gene comprising: (a) analyzing; (b) modifying the coding sequence to yield a modified sequence which has a frequency of codon usage which more closely resembles the frequency of codon usage of the plant, and with the modification resulting in fewer occurrences of the sequence AAT-GAA; (c) inserting; (d) maintaining. |
| Claim 2 DNA Coding Sequence of Claim 1 produced by: (a) analyzing (b) modifying the coding sequence to yield a modified sequence like Claim 1(b) above which contains a greater number of codons preferred by the plant with the modification comprising reducing the number of codons having CG in codon positions II & III between plant polyadenylation sequences, XCG | Claim 8 DNA Coding Sequence of Claim 7 produced by: (a) analyzing (b) modifying the coding sequence to yield a modified sequence like Claim 7(b) which has a frequency of codon usage which more closely resembles the frequency of codon usage of the plant, said modification comprising reducing the number of codons having CG in codon positions II & III between plant polyadenylation sequences, XCG | Claim 14 DNA Coding Sequence of Claim 13 produced by: (a) analyzing (b) modifying the coding sequence to yield a modified sequence like Claim 13(b) above which contains a greater number of codons preferred by the plant with the modification resulting in fewer occurrences of the sequence AAT-GAA | Claim 20 DNA Coding Sequence of Claim 19 produced by: (a) analyzing (b) modifying the coding sequence to yield a modified sequence like 19(c) above which has a frequency of codon usage which more closely resembles the frequency of codon usage of the plant, and with the modification resulting in fewer occurrences of the sequence AAT-GAA |
| Claim 3 claims the method described in Claim 1, | Claim 9 claims the method described in Claim 7, | Claim 15 claims the method described in Claim | Claim 21 claims the method described in Claim |

| | | | |
|---|---|---|---|
| limited by the requirement that "at least about 32% of the codons in the coding sequence of the native *Bt* gene have been modified . . ." | limited by the requirement that "at least about 32% of the codons in the coding sequence of the native *Bt* gene have been modified . . ." | 13, limited by the requirement that "at least about 32% of the codons in the coding sequence of the native *Bt* gene have been modified . . ." | 19, limited by the requirement that "at least about 32% of the codons in the coding sequence of the native *Bt* gene have been modified . . ." |
| **Claim 4** claims the method described in Claim 1, limited by the requirement that "about 11% of the nucleotides in the coding sequence of the native *Bt* gene have been changed . . ." | **Claim 10** claims the method described in Claim 7, limited by the requirement that "about 11% of the nucleotides in the coding sequence of the native *Bt* gene have been changed . . ." | **Claim 16** claims the method described in Claim 13, limited by the requirement that "about 11% of the nucleotides in the coding sequence of the native *Bt* gene have been changed . . ." | **Claim 22** claims the method described in Claim 19, limited by the requirement that "about 11% of the nucleotides in the coding sequence of the native *Bt* gene have been changed . . ." |
| **Claim 5** claims the DNA coding sequence described in Claim 2, limited by the requirement of Claim 3 that "at least about 32% of the codons in the coding sequence of the native *Bt* gene have been modified . . ." | **Claim 11** claims the DNA coding sequence described in Claim 5, limited by the requirement of Claim 7 that "at least about 32% of the codons in the coding sequence of the native *Bt* gene have been modified . . ." | **Claim 17** claims the DNA coding sequence described in Claim 14, limited by the requirement of Claim 13 that "at least about 32% of the codons in the coding sequence of the native *Bt* gene have been modified . . ." | **Claim 23** claims the DNA coding sequence described in Claim 20, limited by the requirement of Claim 19 that "at least about 32% of the codons in the coding sequence of the native *Bt* gene have been modified . . ." |
| **Claim 6** claims the DNA coding sequence described in Claim 2, limited by the requirement of Claim 4 that "about 11% of the nucleotides in the coding sequence of the native *Bt* gene have been changed to yield said modified sequence." | **Claim 12** claims the DNA coding sequence described in Claim 8, limited by the requirement of Claim 10 that "about 11% of the nucleotides in the coding sequence of the native *Bt* gene have been changed to yield said modified sequence." | **Claim 18** claims the DNA coding sequence described in Claim 14, limited by the requirement of Claim 16 that "about 11% of the nucleotides in the coding sequence of the native *Bt* gene have been changed to yield said modified sequence." | **Claim 24** claims the DNA coding sequence described in Claim 20, limited by the requirement of Claim 22 that "about 11% of the nucleotides in the coding sequence of the native *Bt* gene have been changed to yield said modified sequence." |

(Emphasis in table added by underlining.)

### E. *Monsanto's Patent*

At trial, Monsanto argued that Monsanto scientists David Fischhoff and Fred Perlak invented the invention before Michael Adang and Elizabeth Murray invented it. Accordingly, the court provides background on Fischhoff and Perlak's work leading to their invention.

On February 24, 1989, Monsanto filed a patent application, U.S. Patent Application Serial No. 315,355, with the PTO. This application eventually matured into the '365 patent. Fischhoff and Perlak prepared four different draft applications on September 19, 1988, October 5, 1988, December 7, 1988 and February 7, 1989 before Monsanto filed the final application with the PTO. The December 7, 1988 draft application was the first to include a codon usage table.

The '365 patent is entitled "Synthetic Plant Genes." According to the abstract,

it discloses a "method for modifying structural gene sequences to enhance the expression of the protein product" and "novel structural genes which encode insecticidal [*Bt*] proteins." The method disclosed in the '365 patent increases production of the *Bt* toxin by replacing *Bt* gene sequences believed to reduce *Bt* expression in plants with sequences believed to enhance *Bt* expression in plants. Thus, the '365 patent involves the selective modification of *Bt* genes to make them compatible with plants, thereby resulting in insect-resistant plants.

In a continuation application, dated April 26, 1995, Monsanto distinguished its invention from Mycogen's '831 patent by emphasizing that Monsanto's invention focused on making changes in the 240 region of the *Bt* gene. Monsanto stated that its invention was "directed to the discovery that when one eliminates certain sequences and when one increases plant preferred codons, that some changes are more important than others and that certain locations in the *Bt* gene are more important to change to achieve *Bt* gene expression than other locations." Monsanto compared this to the '831 patent which "does not distinguish any region of the *Bt* gene from any other region of the *Bt* gene."

The PTO issued the '365 patent on March 19, 1996.

In terms of commercial applications, Monsanto designs various insect-resistant gene products and cells based on the invention claimed in the '365 patent. These Monsanto products, at issue in this case, include: NewLeaf® Potato, Cry3B2 corn, Cry2Bcorn, Cry1A(c)/Cry1F cotton, Stoneville cotton, and IrmI corn gene products. Monsanto has licensed its YieldGard® Corn Products, also at issue in this case, to third parties, including Cargill Hybrid Seeds, DeKalb, Golden Harvest Seeds, Inc., Northrup King Co., and Pioneer Hi–Bred Int'l.

## F. Claim Construction

The court has issued a memorandum opinion setting forth its construction of phrases in the claims of the '600 patent and '862 patent. Accordingly, it will only briefly summarize its decision here. *See Mycogen v. Monsanto,* C.A. No. 96–505–RRM, memo. opin., McKelvie, J. (D.Del. December 29, 1997) (D.I.343).

With respect to the claims of the '600 patent, the court found:

1. The phrase " 'more highly expressed,' refers to the level of messenger RNA produced by the synthetic gene."

2. The phrase " 'derived from a *Bt*,' means taken, obtained, received, traced, replicated, or descended from *Bt*."

3. The word " 'maintaining,' means keeping the plant cell in tissue or as part of a plant, so long as conditions continue that allow the plant cell to divide and multiply."

4. The phrase " 'greater number of codons preferred,' is satisfied where the newly-created synthetic gene has a higher number of those codons whose frequency in the native *Bt* gene was lower than their frequency in the intended plant host, and where the synthetic gene has an overall distribution of codon usage that is closer to that of the intended plant host."

5. The phrase " 'said modification comprising reducing the number [of XCG codons],' means only that the overall modification must include a reduction in the number of XCG codons, not that each change of an XCG codon to a non-XCG codon must satisfy the 'greater number' or 'frequency' limitation."

The court also construed certain phrases and words in the claims of the '862 patent. The court determined that the claim construction given for the '600 patent applied to the same phrases and words used in the '862 patent. Additionally, the court construed the phrase, " 'progeny cells,' to refer to multiple generations of cells," and

the phrase " 'progeny plant' to refer to plants that encode a pesticidal protein toxin."

### G. *Jury Trial*

From January 20 to February 3, 1998, the court held a ten-day jury trial on the issues of infringement and invalidity. The court summarizes the testimony and other evidence below.

#### 1. *Mycogen's case-in-chief*

Among the issues Mycogen set out to prove at trial is that scientists at Agrigenetics first conceived of a method to modify *Bt* genes so that these modified *Bt* genes could be put into plants to make them insect-resistant. Mycogen asserted that scientists at Agrigenetics conceived of the inventions claimed in the '600 and '862 patents in November 1985, earlier than Monsanto conceived of its inventions claimed in its '365 patent.

Similarly, Mycogen asserted that Agrigenetics was the first to file a patent application for this invention and that Agrigenetics exercised the legally-required diligence from the time of the invention's conception to the filing of the patent application with the PTO. Mycogen also asserted that while Monsanto got good results in its *Bt* gene modification experiments, Monsanto did not know the reason for these good results. In other words, Monsanto did not know the recipe for its invention.

Mycogen asserted Monsanto derived the subject matter claimed in the '600 and '862 patents from Agrigenetics and that Monsanto placed a plant preferred codon table in its patent application in response to information Monsanto obtained improperly from the Agrigenetics' patent application. Monsanto reviewed this application on November 1, 1988 as part of Monsanto's overall evaluation of Agrigenetics' assets because Monsanto wanted to make an offer to purchase Agrigenetics. While Monsanto received Agrigenetics' permission to review its patent application, Monsanto did

so with the agreement that the application information would not be used to enhance Monsanto's own efforts in developing a *Bt* gene. Monsanto completed its evaluation and made an offer which Agrigenetics refused. Mycogen asserted that Monsanto violated this agreement by using the confidential information in the patent application. Mycogen also asserted that prior to placing a plant preferred codon usage table in its patent application, Monsanto had abandoned the idea of modifying the *Bt* gene with plant preferred codons.

As its first witness in its infringement case, Mycogen called Dr. Jerry Caulder, Mycogen's first president and chief executive. Caulder testified about his role in developing Mycogen into a biotechnology company offering alternatives to the use of chemicals as a method of insect control in agricultural production. According to Caulder, Mycogen scientists explored the creation of insect-resistant genes as one such alternative. Caulder testified that one of the reasons Mycogen acquired Agrigenetics in 1992 was because Agrigenetics scientists had worked on inserting genes into plants and Mycogen needed to find a method for inserting genes into seed.

On cross-examination, Caulder testified that while he did not know Mycogen's "exact progress," he was aware that Mycogen was working in the area of corn transformation capability in 1994. According to Caulder, "corn transformation capability" means "the ability to transform corn" by, for example, inserting a *Bt* gene into corn seed. DeKalb's counsel asked Caulder about an August 8, 1994 memorandum written by Leo Kim, Mycogen's head of research, purporting to discuss things Mycogen wanted to accomplish, among them to "[o]btain corn transformation capabilities by internal development, license or contract." After reviewing the memorandum, Caulder testified that "we [Mycogen] were obviously working toward it [obtaining corn transformation capabilities by internal development, license or contract]. [I]n a very small company, we don't care if

we develop it internally, license it or contract, as long as we have the ability to do it."

Mycogen next called Dr. Joseph O. Falkinham, III, a professor of microbiology and genetics at Virginia Polytechnic Institute. Falkinham first testified about genetics principles and methods for inserting *Bt* genes into plants. He testified about two methods of inserting *Bt* genes into plants: (1) microprojectile bombardment, which uses a device known as a gene gun, and (2) electroporation. According to Falkinham, a gene gun literally "shoots" *Bt* genes into cells. Electroporation involves adding an electric charge to a solution containing plant cells which renders them permeable to *Bt* genes.

Falkinham testified about the '600 and '862 patents. According to Falkinham, these patents teach that the problem of low *Bt* expression "can be overcome by making the *Bt* genes use codons more like a plant." Scientists can make a *Bt* gene sequence more plant-like by changing the codons without changing the amino acid in the protein.

Falkinham testified that these two patents teach that "there are some codons that very rarely occur in plant genes." He identified these as codons ending with C and G. Falkinham referred to these codons as "XCG," where the variable X represents either A, T, G, or C. According to Falkinham, the '600 and '862 patents teach that gene codons can be made more plant-like by eliminating XCG sequences and polyadenylation sequences. Falkinham testified that XCG sequences should be eliminated because XCG codons rarely occur in plants.

According to Falkinham, the patents teach that polyadenylation sequences, also known as polyA sequences, defined as "short sequences" consisting of "about six nucleotides," should be eliminated because, while polyadenylation sequences are used to code for amino acids in bacteria like *Bt*, they cause premature termination of protein synthesis in plants. On cross-examination, Falkinham also testified that Claims 1 through 12 of both patents do not require removal of the polyadenylation sequence AATGAA.

Falkinham testified that in his opinion, defendants' commercial genes and gene products infringe the '600 and '862 patents. According to Falkinham, the process for designing Monsanto's BollGard® cotton gene infringes claims of the '600 patent. Specifically, the process infringes all the elements of Claim 2 of the '600 patent because Monsanto undertook a "back translation process" which satisfies Claim 2's analyzing and modifying steps. A "back translation process" involves deriving all possible DNA sequences based on the known amino acid sequence for a protein.

Falkinham testified that the BollGard® cotton gene sequence contains: (1) a greater number of codons preferred by the intended plant host as required by Claim 2; and (2) a reduced number of XCGs. According to Falkinham, about 32% of the codons in the BollGard® cotton gene have been changed in a manner that infringes Claims 5, 11, 17 and 23 of the '600 patent. At least 11% of the nucleotides in the BollGard® cotton gene have been changed in a manner that infringes Claims 6, 12, 18 and 24 of the '600 patent. Falkinham testified that the BollGard® cotton gene has an AATGAA sequence removed, which infringes Claims 14 and 20 of the '600 patent. He also testified that the BollGard® cotton gene has a frequency of codon usage more closely resembling a plant which infringes Claim 8 and 20 of the '600 patent. In sum, Falkinham testified that the BollGard® cotton products, include the BollGard® cotton gene and cells, infringe Claims 2, 5, 6, 8, 12, 14, 17, 18, 20, 23 and 24 of the '600 patent.

According to Falkinham, the BollGard® cotton gene and gene products infringe Claims 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 13 and 14 of the '862 patent.

According to Falkinham, Monsanto's YieldGard® corn gene, NewLeaf® potato gene, Northrup King *Bt* 11 event gene, Stoneville cotton gene and Monsanto's and Delta's gene products all infringe claims of the '600 and '862 patents. Specifically, the NewLeaf® potato gene and potato products infringe Claims 2, 5, 6, 8, 11 and 12 of the '600 patent and Claims 1, 2, 3, 4, 5, 7, 8, 9, 10 and 11 of the '862 patent. The Northrup King *Bt* 11 event gene and plants infringe Claims 2, 5, 6, 14, 17, 18, 8, 11, 12, 20, and 23 of the '600 patent and Claims 1–5, 7–11, 13–17 and 19–23 of the '862 patent. The Stoneville cotton gene and plants infringe Claims 2, 5, 6, 8, 11 and 12 of the '600 patent and Claims 1–5 and 7–11, 13–17 and 19–23 of the '862 patent.

According to Falkinham, DeKalb's *Bt* gene and gene products, (DEKALBt™ Corn Product) including seeds, infringe Claims 2, 5, 6, 8, 11 and 12 of the '600 patent and Claims 1–5, 7–11 of the '862 patent.

Falkinham testified that the defendants' noncommercial gene and gene products infringe claims of the '600 and '862 patents. Specifically, Monsanto's noncommercial Cry1A(c) and Cry1F products and genes infringe Claims 1–24 of the '600 patent and Claims 1–3, 6, 7–9, 12, 13–15, 18, 19–21 and 24 of the '862 patent. Monsanto's noncommercial IRM1 products and genes infringe Claims 1–12 of the '600 patent and Claims 1–3, 6, 7–9 and 12 of the '862 patent. Falkinham testified that Monsanto's noncommercial Cry2B products and genes infringe Claims 2, 5, 8, 11, 12, 14, 17, 18, 20, 23 and 24 of the '600 patent and Claims 1–5, 7–11, 13–17, 19–23 of the '862 patent. Monsanto's noncommercial P2A and P2B products and genes infringe claims of the '600 patent and claims of the '862 patent. Monsanto's noncommercial 3B2 corn products and genes infringe claims of the '600 patent and claims of the '862 patent.

Mycogen called Dr. Elizabeth Murray to testify. By way of background, Agrigenetics researched the possibility of increasing insect resistance in plants by creating a synthetic *Bt* gene during the mid- to late–1980's. Two Agrigenetics scientists, Murray and Dr. Michael J. Adang, Murray's supervisor, primarily carried out this research. They are co-inventors of the '600 and '862 patents. Adang, Murray and other Agrigenetics scientists working on *Bt* expression levels referred to their discoveries and documented their research in their laboratory notebooks and in various publications.

Murray testified that she started working at Agrigenetics in October 1985, shortly after completing her Ph.D. dissertation at the University of Kansas. By this time, Agrigenetics had succeeded in putting native *Bt* genes into plants. However, the plants' *Bt* gene expression was low. In November 1985, Murray and Adang discussed experiments she wanted to conduct for the purpose of identifying the reason for this low *Bt* gene expression. Murray told Adang she believed "the coding sequence itself of the *Bt* gene was the problem" and that they "would have to go through and modify the coding sequence of the *Bt* gene in order to improve its expression." She and Adang decided to focus on modifying a specific region of the gene by changing the ratio of AT and GC without changing the resulting amino acid.

At trial, Mycogen introduced into evidence a one paragraph abstract with an accompanying Agrigenetics "Manuscript and Abstract Review Form" to demonstrate that on November 8, 1985, Adang, Murray and other Agrigenetics scientists wrote an abstract for presentation at an April 1986 symposium at the University of California at Los Angeles. This abstract, entitled "Novel Applications of a *Bacillus thuringiensis* Crystal Protein for Insect Control," reads in relevant part:

> A continuing challenge in controlling pest insects is the development of plants resistant or tolerant to insect attack. One approach to accomplishing this objective is to express proteins that are

deleterious to insects in plants. Insect pathogens such as *Bacillus thuringiensis* provide a source for these toxin genes.... We have observed significant levels of truncated *B. thuringiensis* peptides synthesized in callus and immature shoot tissue. Work is in progress to further evaluate the expression of this gene in tobacco and other plants.

Murray testified that she had a "recipe" for modifying the *Bt* gene in 1985. According to Murray:

[The] recipe was to analyze the sequence of the gene, to modify it to reflect the usage of the codons of a plant gene and to balance the ratios of occurrence of GC and AT, those two pairs. It was also to increase the expression of the RNA. And we included the idea that it had to express RNA as well as the two genes on either side of it, and we had the conception we should remove polyadenylation signals that were used in plants and, as part of that, we felt that we should include avoiding the codons that plants avoided using.

Murray testified that the specific codons that "plants avoided using" referred to XCGs and CGs in general. She testified that she knew plants avoided using these codons based on her reading of an article published in *FEBS Letters* in March 1983 titled "Are Plant Genes Different?" by Grantley W. Lycett, *et al.* Murray cited the Lycett article on page 123 of her Ph.D. dissertation, "Molecular Biology of the Ricin [a castor bean protein] Multigene Family." She successfully defended her dissertation in September 1985, just before starting at Agrigenetics. Murray testified that she believed she relied on a codon usage table published in the Lycett article for information she needed to modify the *Bt* gene.

On cross-examination, Murray testified that from 1985 into 1987, she and Adang also tried to make the native *Bt* gene work in plants; Adang wanted to make "incremental improvements" to show that it worked. She testified that while she had

the idea in 1985 to create a synthetic *Bt* gene by removing certain sequences of the gene to make it more plant-like, she did not write down, document or implement this idea until the summer of 1987. At that time, she began to create the codon usage table that became part of the '600 and '862 patents.

On August 27, 1987, Murray made the first notations in her laboratory notebook about altering the coding sequence of the *Bt* gene. Murray wrote the "general idea is we should change the coding sequence of the *Bt* gene to make it look more like a plant gene." On this same date, she also wrote in her laboratory notebook that "I learned how to use the computer to do an analysis of the codon usage." According to Murray, she spent two days making the codon usage table that eventually appeared in the Mycogen patents. Murray testified that nothing in her laboratory notebook suggests she was working on codon usage tables from August 27, 1987 until January 19, 1988. On January 19, 1988, Murray first wrote about designing a synthetic gene in her laboratory notebook, noting "[w]e also discussed rebuilding the gene."

On cross-examination, Murray testified that at the time the Agrigenetics patent application was filed, she believed that the ATTTA sequence could contribute to RNA instability in the *Bt* gene. She testified that this finding had already been reported in the scientific literature. She testified that she "thought that [ATTTA] was one of the reasons the AT-richness of the genes might be unstable." She testified that when she read the literature she was excited because someone else was "confirming [her] idea and showing that AT-richness RNA is very unstable."

DeKalb's counsel asked Murray about a two-page Agrigenetics memorandum, dated February 29, 1988, from Les Hoffman to John Ingle. In this memorandum, Hoffman, an Agrigenetics scientist, wrote that he planned to "test the functionality of

suspected AT-rich motifs in the *Bt* gene," and that Murray favored the approach he proposed. Hoffman specifically identified the ATTTA sequence as a possible cause of mRNA instability, and referred to ATT-TA as a " 'sudden death' sequence." Hoffman also noted that:

> By identifying sequences which, when replaced, allow us to stabilize *Bt* RNA, we may be able to significantly increase *Bt* expression levels in plant cells without a complete gene reconstruction. This approach will require cooperation and a willingness to drop other avenues of research in the *Bt* area should "death sequence" elimination appear to be effective.

On cross-examination, Murray testified that she had seen this memo in 1988 and that Hoffman, with whom she worked, referred to ATTTA as "the sudden death sequence." According to Murray, she did not consider elimination of ATTTA to be the best mode of carrying out her invention in 1988 "[b]ecause if you modify a plant gene for codon usage, you have a [ tendency] to change those sequences anyway." She testified that she "felt the broadest claim of the patent would be to overall change the AT richness of the gene. by changing the codon usage and ... it [ATTTA] was included within the original conception of the idea that ... these sequences would be changed."

On cross-examination, Murray testified that at a March 3, 1988 meeting held to discuss *Bt*, Agrigenetics scientists "designed the specific pieces" to create the synthetic gene using selected sequences and wrote out "the sequence" and "base pair changes that would go forward." Murray wrote in her notebook that they "decided to push ahead with rebuilding [the] *Btt* gene based on codon usage tables" she had prepared.

### 2. *Monsanto's case-in-chief*

At trial, Monsanto asserted that Mycogen's patents are invalid due to prior invention under 35 U.S.C. § 102(g). According to Monsanto, the evidence shows that Fischhoff and Perlak invented its invention first, using a codon usage table prepared internally by Monsanto scientists. By October 30, 1986, Monsanto scientists had their blueprint to synthesize the *Bt* gene. By August 1988, they had their first successfully modified plant.

To reinforce its invalidity due to prior invention argument, Monsanto asserted that Mycogen originally named four inventors for the patents at issue. In 1998, however, Mycogen dropped two of these inventors from the patents. According to Monsanto, Mycogen dropped these two inventors because the work they did on the Mycogen invention occurred in 1988, some three years after Mycogen's alleged 1985 date of conception.

Monsanto also asserted that Mycogen's patents are invalid due to lack of enablement. *See* 35 U.S.C. § 112 (requiring an inventor to disclose the method of making a claimed invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art ·to which it pertains ... to make and use the same."). According to Monsanto, the specifications of the patents would not enable a person of ordinary skill in the art as of September 9, 1988, to make use of the claimed inventions without undue experimentation.

Monsanto denied Mycogen's assertions that Monsanto derived the subject matter claimed in the Mycogen patents from Mycogen and that Monsanto placed a plant preferred codon table in its patent application in response to Monsanto's review of the Agrigenetics patent application on November 1, 1988.

Just as Mycogen scientists experimented with ways to increase *Bt* expression levels in plants, Monsanto scientists conducted similar experiments. Two Monsanto scientists, Dr. David Fischhoff and Dr. Fred Perlak, headed this research effort. Just as Mycogen scientists documented their research in their laboratory notebooks and publications, so too did Monsanto scientists. Several witnesses referred

to laboratory notebooks and publications to support their testimony.

Monsanto called Perlak to testify. Perlak began his testimony by discussing his work with *Bt* genes during the 1980's. Perlak joined Monsanto in 1981. In that same year, Dr. Helen Whiteley, a researcher at the University of Washington in Seattle, made a major scientific breakthrough by isolating a piece of DNA and successfully moving it from *Bt* to *E. coli*, a strain of bacterium. Perlak testified that he met Fischhoff when both were working at Monsanto in 1983. Perlak's role focused "on the *Bt* genes themselves" while Fischhoff focused on the "plant work."

Perlak testified that he and fellow Monsanto scientists conducted several experiments from 1984 through the early part of 1986 to attempt to get the native *Bt* gene to express in tobacco plants. These experiments failed; as Perlak testified, "we had come up against a very tough gene to express." Similarly, experiments conducted with a truncated *Bt* gene were unsuccessful. As he testified, "we were still very disappointed in the overall levels of gene expression."

Perlak testified about a memorandum prepared by Fischhoff on October 30, 1986 and pasted into Fischhoff's laboratory notebook. According to Perlak, this memorandum represents a summary of the different ideas he and Fischhoff had for solving the problem of low *Bt* expression in plants. Perlak testified that the memorandum identifies "AT-rich regions" in the *Bt* gene sequence as destabilizing regions and that it specifically refers to the sequence ATTTA.

Perlak testified that the memorandum defines "polyadenylation signal sequences as the consensus sequence AATAA," and "variance[s]" of this sequence. Perlak testified that the definition of polyadenylation signal sequences for plants means "six nucleotides" containing "at least five A or T residues." According to Perlak, "if one out of the five [in a sequence] is AG or AC, it still fits into the definition of a potential plant polyadenylation signal sequence." Perlak testified that his definition of polyadenylation sequences encompasses the AATGAA sequence.

Perlak testified that this memorandum lists two approaches to solving the problem of getting increased *Bt* expression in plants. One approach involves identifying and modifying the most AT-rich regions of the gene sequence because these regions cause instability in plant cells. The second approach involves looking at the entire gene sequence and creating a synthetic gene. As the memorandum explained, "[e]xtension of this strategy to total synthesis of *Btk* toxin gene, a predetermined sequence in base composition is also possible." (*Btk* refers to a strain of bacterium known as *Bacillus thuringiensis* var. *kurstaki.*)

Perlak testified that following the posting of this document to Fischhoff's laboratory notebook, he and Fischhoff began working on these two approaches for increasing *Bt* expression. According to Perlak, he used a Monsanto-produced codon usage table, dated February 15, 1984, to make changes either to a portion of a gene sequence, or to an entire gene sequence. Perlak testified that the codon usage table on which he relied "was within Monsanto, published as an internal document, put together by a number of researchers, led [b]y Steve Rogers." He testified that this codon usage table was "indispensable" for his work on the synthetic gene. Perlak testified that this table's abstract identified certain codons, like CGX, XCG and XTA, as codons seldom found in plants. According to Perlak, this information guided him "away from using XCG, XTA, CGX [codons] and guide[d][him] toward plant preferred codons."

Perlak testified that he and Fischhoff worked on designing genes through "probably the end of August 1987." Referring to his laboratory notebook, Perlak identified a September 8, 1987 summary statement describing a synthetic *Bt* gene they

had designed. This statement noted the problem was "poor expression of *Btk* toxic gene plants ... [r]egions of AT-rich induced instability, ... [o]verall, AT too rich. Little used codons by plants found in the gene ... Solution is clear. Order a new gene synthesized to use plant preferred codons." Perlak testified that he had "absolutely no doubt" that this solution entailed his using Monsanto's codon usage table, dated February 16, 1984, to design the gene. According to Perlak, he made over 350 changes from the native *Bt* gene in his redesign effort.

Perlak testified that by December 29, 1987, he had completed design of the coding region for a *Bt* toxin; which he described as the "genetic material that encodes the protein that kills insects." According to Perlak, it "just need[ed] to be put in a vector that could transport this into a plant cell." Vectors are DNA molecules used to carry or shuttle the gene into the plant. *See, e.g., Ajinomoto Co. Inc. v. Archer–Daniels–Midland Co.,* 1996 WL 621837, *6 (D.Del. Oct.21, 1996).

Perlak testified that Monsanto contracted with outside researchers in the United Kingdom to assemble the synthetic genes in three pieces following Perlak's design. As the outside researchers assembled the pieces, they were shipped back to Perlak's St. Louis laboratory where he put the three pieces together.

Perlak testified that by May 9, 1988, Monsanto had designed three genes, known as the 5370, 5357 (also known as 5377), and 5383 genes. According to Perlak, the design for the 5377 gene began in October 1986, when they "made the gene on paper."

According to Perlak, three Monsanto employees, Nancy Mathis, Gene Layton and Toni Armstrong, handled the responsibility of actually getting the synthetic genes into plants. Perlak testified that they succeeded in growing transgenic plants which were ready to be tested for increased *Bt* expression in early August 1988. Perlak recalled that around August 12, 1988, Dr. Roy Fuchs, the analyst responsible for this testing, told him: "Congratulations. You've done it. We now have plants that can express *Bt* at very high levels." Perlak testified that the analyses showed the 5377 and 5383 genes were expressing *Bt* protein in plants.

According to Perlak, the 5377 gene forms the basis of Monsanto's current YieldGard® product and the 5383 gene forms part of the current BollGard® product. Perlak testified that the successful test results were obtained in advance of the filing date of the Mycogen patent applications on September 9, 1988. He also testified that he did not rely on any Mycogen information for his work on the '365 patent.

On cross-examination, Perlak testified that he had no recollection of producing any draft applications of the '365 patent prior to August 1988. When asked why he did not include a codon usage table in the '365 patent application until December 1988, Perlak responded "[t]here was no need" to put the codon usage table in the application because "[i]t was an inherent part of our invention. [There] was never any intent not to include it within the actual patent application." Perlak testified that the AATGAA sequence is "not specifically" written down on the October 30, 1988 memorandum. Perlak testified that this table does not specifically mention *Bt* genes. Perlak also testified that he did not talk to anyone at Monsanto about a November 1988 trip to Colorado by certain Monsanto employees, including himself, to review Agrigenetics' patent applications.

Sylvia Ann McPherson, a Monsanto scientist from January 1983 to October 1989, testified at trial about her work with Dr. Steve Rogers between 1983 and 1985, and about the development of Monsanto's codon usage table during that time. She testified that she worked in Rogers' lab when Monsanto employees "started looking at genes and putting together a table." McPherson testified that she saw the table

after it was completed. According to McPherson, she saw Rogers, Perlak and Fischhoff refer to Rogers's codon usage table while discussing ways to increase *Bt* expression in plants during an August 1987 meeting in which she participated.

On cross-examination, McPherson testified that she used Monsanto's codon usage table for the first time in 1988, and that the table she used did not have a column for *Bt* genes. On redirect, she testified that while she worked in Perlak's lab, she did not work on the same gene as Perlak. According to McPherson, Perlak used Monsanto's codon usage table for his work.

Dr. Harry J. Klee, a former Monsanto scientist who had an office adjacent to Perlak during the 1986 to 1987 time period, testified about a year-end summary document, dated December 19, 1986. This summary, prepared by his group, referred, among other things, to: (1) problems Monsanto scientists were encountering with *Bt* expression; and (2) the objective of designing a synthetic *Bt* gene to overcome these problems. The summary noted the group would "soon begin a program of large scale site-directed mutagenesis to restructure segments of the gene (while still maintaining the toxin protein sequence) which we suspect are responsible for RNA instability."

Klee testified that this summary reflected "plans to build the synthetic gene at the end of December [1986]," which "means that [they] would have discussed all of the details of the construction of this prior to that December 1986 time frame." Klee also testified about his familiarity with Monsanto's codon usage table, explaining it was created in early 1984, and that "[w]henever we thought about problems with expression, that's one of the first things that we would have looked at: Whether there were codons that were unusual in the context of plant genes."

Dr. Roy Fuchs, Monsanto's analyst who informed Perlak in August 1988 of the successful *Bt* expression test results, testified. Fuchs testified about notes from his laboratory notebook, dated August 10, 1988. According to Fuchs, on that date, he ran several tests to determine whether a synthetic 5377 gene inserted into a tobacco plant produced increased *Bt* levels. Fuchs wrote beside the test results: "Super!," "Perfect!," and "Novel Demonstration! Novel Information! Novel Constructs!" Fuchs testified that this data "proved that we had succeeded, that the synthetic gene worked and worked exceptionally well in plants." According to Fuchs, by August 1988, Monsanto had "produced over a hundred transgenic plants containing a synthetic gene that killed insects."

Monsanto's next witness was Dr. Linda Hanley–Bowdoin, a former Monsanto post-doctoral associate who shared an office with Perlak. Hanley–Bowdoin testified that when she began work in April 1987, she knew Perlak had an ongoing project to attempt to increase plant *Bt* expression by changing certain DNA sequences. According to Hanley–Bowdoin, Perlak worked on *Bt* sequence analysis in 1987. In particular, he highlighted in yellow on a computer print-out those sequences that he thought might be problematic in the gene. Hanley–Bowdoin testified that she observed Perlak using Monsanto's codon usage table which was taped onto a bookcase in their shared office.

Dr. Stephen G. Rogers, a Monsanto scientist, testified about his work for Monsanto during the 1980's. According to Rogers, in the fall of 1983 he began to look at what factors affected the expression of certain genes in plants. He knew that "if you did a survey of plant genes, there were certain, what we call codon signals, that could be used to specify amino acids that would eventually make proteins." Rogers further testified that based on this knowledge he compiled a codon usage table that "was generated probably in 1983 and finally got published within the company in 1984." Rogers testified that at a meeting in September or October 1986, he met with

Fischhoff to discuss Fischhoff's *Bt* research. Rogers recalled that at this meeting, they "began to think about removing these sequences [AT-rich sequences], replacing them with other less AT-rich sequences," but "mak[ing] the same protein at the end." According to Rogers, Fischhoff would carry this out by referring to Monsanto's codon usage table to "us[e] codons from plants to replace these AT-rich ones to maintain the protein sequence."

Monsanto called Fischhoff, a co-inventor of the '365 patent. Fischhoff testified that since starting at Monsanto in 1983, his work focused on *Bt* and *Bt*-related technology. According to Fischhoff, in 1983, he began working with Perlak on isolating and adapting a native *Bt* gene to insert into plants to increase insect-resistance. By 1984 or the early part of 1985, Fischhoff and Perlak learned that the native *Bt* genes "just didn't work in plants." By early 1986, they realized that truncated genes, or native genes they had cut in half, would not work well enough to be commercially viable.

According to Fischhoff, he learned XCGs were not preferred by plants based on his reading of Monsanto's codon usage table prepared by Rogers. He testified that he used only this table and no other codon usage table to build Monsanto's synthetic *Bt* gene. He testified that this table "shows the percentages of codons that are used in plant genes." According to Fischhoff, he and Perlak "referred to this [table] repeatedly during the course of [their] design work to pick the codons that we would use, as well as to avoid the ones we wouldn't use."

Fischhoff testified that he regards October 30, 1986 as the date of conception for Monsanto's invention. To him, October 30, 1986 signified:

the date on which I really memorialized all of our [his and Perlak's] thoughts on paper and set about drafting the final version, what we would call now a conception document, that outlined the

problem, the issues in the *Bt* genes, what we had seen before, what the symptoms were, then our ideas for the solution, namely resynthesizing, come up with a synthetic *Bt* gene that would fix all those problems.

Fischhoff testified that on this same date, he wrote a memorandum to this effect, pasted it into his laboratory notebook and distributed copies to others. According to Fischhoff, having started the process of designing a synthetic gene, he and Perlak "primarily focused on identifying those specific pieces within the gene that needed to be removed" in 1987. By the end of 1987, Fischhoff testified that "we [he and Perlak] had two different synthetic genes designed, one physically in hand as a piece of DNA, and then two more physically in hand in early 1988 as pieces of DNA."

According to Fischhoff, by early 1988, he and Perlak had designed three synthetic genes which Monsanto colleagues subsequently inserted into plants. In both the 5377 and the 5383 genes, Fischhoff and Perlak removed XCG and AATGAA sequences "as part of [their] solution." In each gene, they "changed about twenty percent of the nucleotide[s]" which for the 5377 gene amounted to "about sixty percent of the codons" and for the 5383 gene amounted to "about fifty percent." Fischhoff testified that August 10, 1988 marked the date of the first tests conducted on plants with the inserted synthetic *Bt* gene. Test results proved the synthetic solution they had devised was a success. In August 1988, they began working on their patent application.

Fischhoff also testified about the '600 and '862 patents. According to Fischhoff, he "was really surprised even shocked" when the PTO issued these patents. He was surprised because only then did he learn that the PTO had issued to another party patents covering the invention claimed in Fischhoff and Perlak's patent application. Also, when he "had a chance to study the claims [of the '600 and '862

patents] and saw that what they really seemed to say was take out one XCG or one AATGAA from [a] *Bt* gene and you get higher expression in plants, [he] couldn't believe it." Fischhoff testified that he conducted tests to determine whether the methods described in Mycogen's patents worked. He tested two types of genes. He removed 11 or over half the 19 CG codons and all of the AATGAAs. He put the genes in tobacco and potato plants and tested hundreds of plants. The result of the test was that the genes were no different from the native genes.

Fischhoff testified in detail about the various steps he took in carrying out these tests, including having them reviewed by two outside experts, Dr. Joachim Messing, a microbiologist, and Dr. Dallas Johnson, a statistician.

According to Fischhoff, he traveled to Colorado in November 1988 as part of a Monsanto team, evaluating intellectual property of Agrigenetics. He testified, however, that he did not see a copy of Agrigenetics' patent application because Monsanto's patent attorneys did not want him "contaminated by that information." He testified that in 1987, he and Perlak knew both the causes of the *Bt* expression problem and the solution to those problems and had written down their design for a synthetic *Bt* gene.

During cross-examination, Fischhoff testified that one of the purposes of his Colorado trip was to evaluate for Monsanto various assets of Agrigenetics, including Agrigenetics's patent applications. According to Fischhoff, Monsanto eventually made an unsuccessful bid for these assets. He testified that his technical input with respect to this November 1988 trip was not related to the synthetic *Bt* gene.

On cross-examination, Fischhoff testified that he also traveled to Madison, Wisconsin in the summer of 1988 to evaluate Agrigenetics's *Bt* assets. Mycogen's counsel asked Fischhoff about this evaluation trip in the context of comments written in

Fischhoff's employee performance evaluation, dated March 3, 1989, which noted "this evaluation led to a deeper understanding of the *Bt* patent arena." Fischhoff testified that this evaluation led to a deeper understanding of the Bt patent arena "[t]o the extent that we learned the subject matter of some Agrigenetics patents in *Bt* that we hadn't been aware of."

On cross-examination, Fischhoff testified that in designing Monsanto's synthetic *Bt* genes, "we sought to reduce the frequency of codons that rarely occurred in plant genes ... part of that also increased the frequency of codons that were utilized more in plant genes. So I'd say that we were working on frequency of codon usage."

Monsanto next called Dr. Joachim Messing, a professor of microbiology at Rutgers University and director of the Waksman Institute of Microbiology. Messing testified that the claims of the Mycogen patents teach that one can either take out XCGs or AATGAA. In his opinion, however, the patents do not specify which particular XCGs or AATGAAs to remove. Messing further testified that "[i]f you take out XCG's, the claims require that you add a more preferred codon. If you don't add one, you would have to make two changes. [But] if you replace the XCG with a preferred codon, it's only one change."

He testified that the gene in the example in the patent has 19 XCG codons. As the claims of the patents and the specifications do not identify which one or how many XCGs to remove, one could remove from 1 to 19 of those codons. He calculated that the total of the possible combinations for removing from one to all nineteen of those codons is 8.9 billion.

Messing reviewed the tests done by Fischhoff to see if the strategies in the claims actually work to increase the expression in a plant. He testified that the tests demonstrated that if one simply followed the claims to take out XCGs and

AATGAAs, they would not work. When asked whether Monsanto's measurements of the results of the tests were sensitive enough to have shown expression if removal of the XCGs and double As would have worked, he confirmed they were and noted the tests were sufficiently sensitive to show significant results for other genes.

With regard to codon usage tables, Messing testified that Mycogen used a "Murray rubisco codon usage table" to prove infringement in this case. Messing testified that rubisco refers to a group of genes occurring in all plants; these genes contain what is known as a rubisco protein. According to Messing, Mycogen compared a synthetic $Bt$ gene, known as the Stoneville cotton gene, to a native $Bt$ gene, using a rubisco codon usage table. This comparison showed the Stoneville cotton gene becoming more plant-like. Messing testified that when a cotton table or dicot table from the '600 and '862 patent is used for this comparison, the Stoneville cotton gene appears less plant-like.

Messing also compared results for the New Leaf potato gene and the Northrup King YieldGard® corn gene. He testified the result obtained "depends [on] what codon usage table we would use." In other words, differing codon tables can give different results, that is more plant-like or less plant-like, for the same gene.

Messing testified that he reviewed the laboratory notebooks of Mycogen scientists experimenting with $Bt$ expression levels. Based on his review, he did not see anything that "would have started this line of experimentation by taking out a particular XCG and testing whether it would work or not." Messing testified that Murray's tests did not provide any conclusive results and, therefore, she did not have a solution for the problem of low $Bt$ expression. Moreover, in Messing's opinion, Murray's experiments "[did]n't have anything to do with a synthetic $Bt$ gene."

Monsanto read excerpts of the deposition testimony of Larry Swaney, a Monsanto attorney who accompanied Fischhoff on the Colorado trip in November 1988. Swaney retired from Monsanto in 1992. Swaney testified that: (1) he alone read the Agrigenetics' patent applications in a separate room at the law offices of Lawrence Greenlee, Esquire; (2) he took no notes regarding the patent applications; and (3) he did not disclose the information in the applications to anyone until after the information had become public knowledge.

### 3. DeKalb's case-in-chief

Next, DeKalb presented its case-in-chief. DeKalb stated that this case is about: (1) prior invention, that is whether Mycogen or Monsanto was the first to invent $Bt$ genes inserted into plants to make them insect-resistant; and (2) whether Mycogen satisfied the enablement requirement, that is whether Mycogen disclosed enough information in its patents about the inventions claimed to enable an average plant scientist to insert synthetic $Bt$ genes into corn seed.

DeKalb first called Dr. Catherine Mackey, DeKalb's vice president of research, to testify about the corn seed business in general and about DeKalb's work with fertile transgenic corn plants. Mackey testified that a fertile transgenic corn plant is "a corn plant that has had a gene transplant and that plant can make an ear with seed on it that can be used to make more plants."

Mackey testified that when she joined DeKalb in 1982, she began efforts to transfer $Bt$ genes into corn seed. According to Mackey, she was not aware of any scientist capable of transferring $Bt$ genes into corn seed as of September 1988. Mackey testified in detail about various experiments she and her colleagues conducted in 1989 that led to DeKalb's successfully transferring non-$Bt$ genes into corn seed. First, they removed embryos from corn seed, gave the embryos food and grew "cell clumps." Then they extracted corn cells from these clumps and grew them. Next, they inserted genes into these cells, using the gene gun.

According to Mackey, the gene gun functions like a shotgun in that a small gunpowder charge is used to shoot tiny tungsten pellets into corn cells. Prior to shooting, these pellets are coated with genes. Mackey testified that using the gene gun is a "pretty crude" process because "[y]ou are literally just shooting genes into these cells and hoping something happens." Most cells and genes do not survive the shooting.

According to Mackey, after shooting genes into the cell clumps, she and her colleagues found survivors in the form of successful gene transplants in the cell clumps. They worked on getting the gene transplant into a corn seed, as opposed to a cell clump, because corn seed is the commercial end product; it is what farmers want to purchase for planting. Mackey testified that, in order to do this, DeKalb scientists began to grow a corn plant from the cell clump. This corn plant initially grew but began to die before it reached maturity. DeKalb scientists performed a process "like a C section" on the plant to save the little seed that was in the dying corn plant's ear. They then used this seed to grow a plant which they nicknamed "Henry."

Mackey testified that "Henry" was the first plant into which she had successfully transferred genes. On December 22, 1989, she tested "Henry" and found the gene present in the plant. On this date, she knew she had made a fertile transgenic corn plant. Mackey testified that DeKalb is "selling descendants of Henry today."

According to Mackey, *The Plant Cell* journal published in July 1990 an article she and her DeKalb colleagues wrote, entitled "Transformation of Maize Cells and Regeneration of Fertile Transgenic Plants." *See* W. Gordon–Kamm *et al.* [including Mackey], "Transformation of Maize Cells and Regeneration of Fertile Transgenic Plants," *The Plant Cell* (Jul.1990) 603–618. This article describes their experiments with fertile transgenic corn plants. On August 10, 1990, *Science*

journal published an article entitled "Corn Transformed" in which Dr. Nam–Hai Chua of Rockefeller University praises DeKalb's work as a "significant achievement." *See* A. Moffatt, "Corn Transformed," *Science* (Aug.1990) 249:630. In its November/December 1990 edition, *BioWorld* referred to Mackey's achievement as "the first to report solid data on genetically engineered corn" and credited her with finding "one of the Holy Grails ... of monocot transformation." *See* "They Make It Happen," *BioWorld* (Nov./ Dec. 1990) at 36.

On cross-examination, Mackey testified that while DeKalb successfully transplanted a gene into corn, it was not a *Bt* gene. She testified that as of September, 1988, scientists did not have a way of inserting a *Bt* gene into corn. She testified that a company she identified as PSRI had "achieved fertile transgenic corn ... within the same month as we did."

DeKalb next called Dr. Michael Anthony Stephens to testify. Stephens is a DeKalb scientist who designed the DeKalb *Bt* gene, which is the synthetic *Bt* gene inserted into DeKalb's corn seed product. Stephens testified that in the first half of 1988, he began working on designing DeKalb's synthetic *Bt* gene.

According to Stephens, he had discussed codon usage and other factors with Dr. Roger Yokum, a DeKalb colleague. Yokum gave Stephens copies of some scientific papers which had codon usage tables. Stephens testified in detail about the method he used to design the DeKalb *Bt* gene. According to Stephens, he relied on codon usage tables published in the Murray article in 1989. *See* E. Murray, J. Lotzer, M. Eberle, "Codon Usage in Plant Genes," *Nucleic Acids Research* (1989). Stephens testified that Murray's 1989 article does not discuss *Bt* genes and that he did not get the idea for changing codon frequencies for *Bt* genes from this article.

Stephens testified that the two principal codon usage tables he used from Murray's 1989 article describe codon usage in the

CAB and rubisco genes.[3] According to Stephens, the CAB gene allows a plant to harness energy from the sun through photosynthesis. He testified that "it works well in the parts of the plant that we wanted the *Bt* gene to work well in." The rubisco gene is similar to the CAB in that it also plays a key role in photosynthesis. Stephens testified that he also used another codon usage table, known as the all-plants table, which was also published in Murray's 1989 article. Stephens also used codon usage tables published in other sources, such as an article by David M. Bashe and Joseph P. Mascarenhas, dated March 31, 1989. *See* D. Bashe & J. Mascarenhas, "Codon Usage Table for Maize Based on Sequences of 25 Nuclear Genes," *Maize Genetics Cooperation Newsletter* (1989).

Stephens testified that by March 21, 1990, he completed his design work "[for] all intents and purposes" on the DeKalb *Bt* gene. By the second half of 1991, he "had a complete gene," referred to as the DeKalb *Bt* gene or the HD73 gene. By March 26, 1993, he knew the gene performed successfully when the corn plant into which it had been inserted successfully resisted European corn borers.

Stephens testified that he reviewed Mycogen's European patent application sometime after its March 21, 1990 publication date. During his review, he did not notice the removal of the ATTTA sequence in the figure accompanying the patent applications. Additionally, Stephens testified that when he designed DeKalb's synthetic gene, he did not target ATTTA sequences because he did not know that they were potentially destabilizing sequences. He testified that in the native *Bt* gene, there are about ten ATTTA sequences and in the synthetic *Bt* gene he designed, there are four. According to Stephens, his removal of six ATTTA sequences was coincidental with the removal of the ATTTA sequences shown in the figure accompanying Mycogen's European patent application. He testified that he did not copy Mycogen's invention.

DeKalb called as a witness Dr. Daniel R. Gallie, an associate professor at the University of California at Riverside who specializes in protein production in plants. Gallie testified about the great difficulty of making fertile transgenic corn using any foreign genes. He testified that as of September, 1988, he did not know of any successful experiment to create a fertile transgenic corn plant, although scientists knew how to make fertile transgenic dicot plants, like tobacco and petunia. According to Gallie, it is "easy" to make fertile transgenic plants with dicots like tobacco, tomato, potato and petunia and "hard" to make fertile transgenic plants with monocots like corn and other cereal grains. Gallie testified that it is difficult to make a fertile transgenic corn plant, in part, because it is difficult to get corn to regenerate into a fertile plant when it has a foreign gene inserted in it. Gallie testified that in July 1990, he first learned that DeKalb scientists had successfully created a fertile transgenic corn plant when he read Mackey's article in *The Plant Cell* describing her experiments. Gallie testified that DeKalb's success constituted a "a landmark advance."

According to Gallie, while the Mycogen patents give one example of a transgenic dicot plant which is tobacco, the patents do not contain any working example of a fertile transgenic monocot plant, such as corn.

DeKalb's counsel asked Gallie about a Monsanto document, dated October 24, 1988, which notes that Monsanto had "corn cells transiently expressing the wild type *Btk* gene." According to Gallie, transient

---

3. CAB is an acronym for chlorophyll a/b binding protein. In her article, Murray uses the term "RuBPC SSU" in Table 7, entitled "Codon Frequencies in 20 Plant RuBPC SSU Genes." RuBPC SSU is an acronym for ribulose 1,5 biphosphate small subunit. *See* E. Murray, J. Lotzer, M. Eberle, "Codon Usage in Plant Genes," *Nucleic Acids Research*, (1989).

expression is not permanent. As Gallie testified, it is not "stably integrated or introduced" into the DNA of the plant cell and it cannot regenerate to produce seed later. Gallie testified that having transient expression in corn cells, as indicated by this document, is not the same thing as being able to make a *Bt* corn plant that is commercially viable.

Gallie testified that using different codon usage tables to determine whether the *Bt* gene is more or less plant-like can result in different codon percentages in the end product, the synthetic *Bt* gene. According to Gallie, "depending on which frequency [codon usage] table you decide to choose to redesign your synthetic gene, it gives you a different value as your target value." This is because, for example, the codon usage tables "all tell you that you must reduce the GCA, but they differ in the magnitude of how much you should reduce this." Gallie testified that he analyzed the DeKalb synthetic *Bt* gene using the all-plants codon usage table published in Murray's 1989 article. According to Gallie, using this codon usage table, the DeKalb synthetic *Bt* gene tests as less plant-like compared to the native *Bt* gene.

Gallie testified that Adang correctly listed the ATTTA sequence as a so-called "nastie" in an April 25, 1988 Agrigenetics document. While the ATTTA sequence does not always reduce protein production in plants, "it certainly is a good idea to remove them [ATTTA sequences], just in case." According to Gallie, the text of the '600 and '862 patents makes no mention of the desirability of removing ATTTA sequences. Gallie testified that the patents' text contains no guidance regarding what to do if a *Bt* gene was not working because of the presence of ATTTA. Gallie testified that Figure 1 of the Mycogen patents contains a listing of all 1,833 nucleotides for the one *Bt* gene example given in the patents. Gallie testified that there are approximately 200 changes between the native *Bt* gene and the synthetic gene shown in Figure 1. According to Gal-

lie, Adang removed twelve ATTTA sequences from the native *Bt* gene when he designed his synthetic gene. Gallie knows that twelve ATTTA sequences were removed because he "had to painstakingly go through ... Figure 1 and the following two pages of the patent ... when [he] looked at the patents, these ATTTA elements certainly didn't jump out at [him]."

DeKalb read into evidence the testimony of Carl Eibl, Mycogen's chairman and chief executive officer, given in another lawsuit on June 5, 1997. *See Mycogen Plant Science Inc. v. Monsanto,* Case No. 671890 (Cal.Super. Ct., Co. of San Diego). Eibl testified that:

> Unless you have that transgenic plant, you don't have the key to work with. You don't have the touchstone, if you will, to work with in order to come up with a commercially-viable plant. And in Mycogen Plant Science's case, which is very common for other seed companies in the United States, we don't have the capability to transform corn. We never have.

DeKalb played excerpts of the videotaped deposition testimony of Dr. Donald Merlo, a former Agrigenetics scientist who was one of the originally-named inventors of the '600 and '862 patents. According to Merlo, as of August 31, 1988, his last day at Agrigenetics, nobody at Agrigenetics or elsewhere had successfully made a fertile transgenic corn plant. Merlo testified that to his knowledge, DeKalb scientists made the first successful fertile transgenic corn plant.

Merlo testified that when he designed his synthetic *Bt* gene in 1991, he removed the ATTTA sequence "to be sa[f]e" after attending a seminar Adang gave, possibly in March 1991, at which Merlo learned about the possible desirability of removing ATTTA. Merlo testified that he did not know whether ATTTA is desirable or undesirable in a synthetic *Bt* gene and that he could not "recall anything specifically" that Adang said about ATTTA at the seminar. Merlo testified that in 1991, he did

not believe that reducing the AATGAA sequences or removing XCG codons would result in increased levels of *Bt* expression in plants. When asked whether it occurred to him to make a synthetic *Bt* gene in 1991 by removing only the XCG codon or the AATGAA sequence, Merlo answered "no."

Merlo testified that he also worked on plant expression cassettes. These are nucleotide constructs containing sequences which direct the plant cell to initiate transcription of the incorporated gene. *See, e.g., In re Goodman,* 11 F.3d 1046, 1048, n. 2. (Fed.Cir.1993). According to Merlo, he contributed information to the claims of the '600 patent "in the synthesis of a portion of the described gene" and "in the design and construction of vectors to introduce [the] gene into plants."

DeKalb then showed excerpts of the videotaped deposition testimony of Thomas A. Rocheleau, a former Agrigenetics technician who was one of the originally-named inventors of the '600 and '862 patents. Rocheleau testified that he first learned about the idea of rebuilding the *Bt* gene in the manner described in the '600 and '862 patents in early 1986. According to Rocheleau, his contribution to the '600 and '862 patents is summarized in Figures 2 and 3. Specifically, he "decided how to divide up the gene into blocks of a size that would be able to take the synthesized pieces so ... they couldn't be too large. Then [he] figured out how to reassemble those blocks into the synthetic gene." Rocheleau testified that "Figures 2 and 3 are the scheme that [he] came up with for putting together the blocks of that into a gene." Rocheleau testified that he "only underst[ands] the portion of the patent that [he was] responsible for, which is [Figures] 2 and 3."

### 4. *Mycogen's response*

Mycogen recalled Falkinham to respond to allegations of invalidity. Falkinham testified that in his opinion, Murray and Adang conceived the inventions claimed by the '600 and '862 patents in November,

1985 and diligently worked on reducing these inventions to practice after November, 1985. To support his opinion, Falkinham referred to notes written in Murray's laboratory notebook, dated October 22, 1985, stating specific sequences may cause problems in *Bt* expression and that these problems might be overcome by site-directed mutagenesis.

To further support his opinion, Falkinham referred to the November 1985 abstract that Murray and Adang wrote for the UCLA symposium and the paper they presented at this symposium in April 1986. Falkinham also referred to nuclease protection deletion experiments conducted by Murray in the October to November 1985 time period. Falkinham testified that "these experiments by Dr. Murray had as their objective looking [at] and identifying the sequences in the *Bt* gene that needed modification."

Falkinham testified that Adang "carr[ied] out sequence analysis of *Bt* genes and of plant genes all along this period of time to look at their codon usage in order to identify again what sequences needed modification." He referred to an October 1985 computer print-out which he described as a search Adang ran for soybean polyadenylation signals. He referred to a December 17, 1985 codon usage table employed by Adang. Falkinham testified that the table shows Adang was "looking specifically at the codons in the third position" and "he [was] actually looking at the amount of times A, T, G and C are used in particular positions in codons." He referred to an Agrigenetics document, dated November 5, 1985, depicting statistical graphs of a *Bt* gene which Adang prepared. According to Falkinham, this document shows AT-richness in the *Bt* gene. He also referred to Murray's Ph.D. dissertation which, according to Falkinham, shows Murray was "well aware of codon usage in plants."

According to Falkinham, Monsanto's experiments to try to increase *Bt* expression

by taking out only one XCG or one AAT-GAA, are not "valid" or "relevant" because the experiments are not capable of "giv[ing] any useful result . . . ." Falkinham testified that Monsanto's experiments, done for this litigation and described earlier in Fischhoff's and Messing's testimony, are not valid because Monsanto's measurement system was not sensitive enough to detect increases in the amount of Bt protein produced.

On cross-examination, Monsanto asked Falkinham whether Adang or Murray ever recorded that the codons in the native Bt gene should be replaced with plant preferred codons. Falkinham testified that he did not see "written down" in any document he reviewed a statement by Adang or Murray to the effect that what one should do is replace the codons in a Bt gene with preferred codons or more plant-like codons to get better expression.

Adang also testified as part of Mycogen's response. According to Adang, he and another colleague started Agrigenetics' Bt program in 1982. In November 1985, he was a senior research scientist and leader of Agrigenetics' Bt program. Adang testified that "we had the idea [for the invention claimed in the '600 and '862 patents] in November 1985." He described this idea as "us[ing] plant preferred codons and chang[ing] the codons of Bt genes, which are AT-rich, to plant codons, so the gene would be more plant-like and would be expressed in plants."

Adang testified that shortly before November 1985, "we had been analyzing the tobacco plants we had with Bt genes and we were observing less RNA than we expected. We also observed RNA that was shorter than we expected if it was working properly." He and Murray "together . . . came up with this idea . . . that we could fix Bt genes, change their AT-richness and make them work better in plants."

According to Adang, sometime in September or October 1985, Murray conducted an experiment to test for RNA, known as a northern blot, to assist them in making their observations. The northern blot depicted RNA from tobacco plants containing the Bt gene. From studying the northern blot, Adang and Murray realized the RNA was not long enough to make a toxic Bt gene and there was less RNA in the blot than they had expected. As Adang testified, "[s]o this told us we had a problem in the Bt gene." According to Adang, Murray first came up with the idea of removing XCG codons. Adang testified that in November 1985 he knew plant polyadenylation sites "cause RNA to be truncated."

Adang testified that he and his colleagues published a paper in 1985 discussing a Bt gene known as the HD73 crystal protein gene. In this paper, he indicated he knew the HD73 crystal protein gene was "AT-rich" and "there was a preference for A and T at [the] third position in the codon." In 1985, Adang carried out dipel searches. These are computer searches done to find polyadenylation signals in Bt genes. Similarly, he carried out searches on highly-expressed plant genes which revealed that polyadenylation signals are seldom found in these genes. By comparing these results, he determined that polyadenylation signals present in the Bt gene "probably caus[ed] . . . termination of the RNA." He also carried out computer searches to measure AT and GC richness in the Bt gene. Referring to computer searches dated December 17, 1985, Adang testified that he knew Bt codons preferred A and T nucleotides while plant codons preferred G and C nucleotides.

Referring to the November 6, 1985 draft of the April 1986 UCLA symposium abstract, Adang testified that he wrote "[i]t appears that for efficient expression of this toxin in tobacco plants, the coding sequence must be modified to eliminate premature termination of transcription." According to Adang, he deliberately deleted this sentence in the version of the abstract eventually published because "we felt it gave away our idea that we need to rebuild

the *Bt* gene to modify it so that it was highly-expressed in plants." Adang also testified that in the fall of 1985, he and Murray discussed using site-directed mutagenesis to modify a *Bt* gene to lower its AT content.

Asked by Mycogen's counsel if he wrote down this idea when he came up with it in the fall of 1985, Adang answered that he had "not found any documents that explicitly state all this, the entire context of this idea." He further testified:

> What I have found, and what I talked about here, is there is this evidence saying that we knew the *Bt* RNA was truncated. We knew the *Bt* gene was AT-rich. We knew that the *Bt* genes preferred AT codons. We knew we were getting some type of termination of transcription. And we knew how to fix it, through mutagenesis or building up stretches of the whole gene.

According to Adang, the "RNA analysis, the computer searches, the AT-richness, the ULLA abstract, ... all support, corroborate this invention of Dr. Murray's and mine."

Adang testified that during 1985 and 1986, he and Murray ran several experiments to try to "identify the worst regions of the *Bt* gene, that we could then go back and fix, putting in plant preferred codons." According to Adang, these experiments included RNA mapping done to determine the exact ends of the *Bt* RNA of transgenic plants. Adang thought that if the exact ends could be located, the termination signals would be nearby.

Adang, Murray and other Agrigenetics scientists also carried out electroporation experiments, deletion experiments and computer searches involving the native *Bt* gene. These searches and experiments were done for the purpose of "identifying the regions of the native *Bt* gene that were the worst, that caused this instability, this termination, this low expression, [then] we could go back and, using this plan for codon modification, chang[e] from AT-rich,

*Bt*-type codons to *Bt*-rich plant-type codons ...."

According to Adang, he and other Agrigenetics scientists decided to rebuild the entire gene in January 1988. Adang testified that he was personally involved in the design and construction of this synthetic *Bt* gene. He relied on Murray's codon usage table and suggestions from Rocheleau in his design and construction efforts. Agrigenetics scientists designed the synthetic gene in January and February 1988, "perhaps continuing into March 1988."

Adang testified that "we designed the gene along the pattern of plant codon usage to reduce the amount of AT [in] the *Bt* gene." According to Adang, removing the ATTTA sequence from a *Bt* gene is not necessary to achieve higher *Bt* expression in plants. Adang referred to a *Bt* HD73 gene which Agrigenetics constructed as an example of a synthetic *Bt* gene containing one ATTTA sequence that still has high *Bt* expression. According to Adang, this gene was put into soybeans, peanuts, canola and arabidopsis and "worked great. It killed lots of bugs."

Adang testified that Figure 1 of the '600 and '862 patents depicts the nucleotide sequence of Mycogen's synthetic *Bt* gene. According to Adang, one can examine this figure to determine what specific changes were made in the synthetic gene's design. For example, one could determine by visually scanning the figure or using a word processor program whether an ATTTA sequence was removed.

According to Adang, on April 22, 1988, he noted in his laboratory notebook that Murray created a codon usage table from various coding sequences she had compiled. Adang wrote that based on this table, he "calculated the number of changes needed to bring the *Btt* sequence to a more plant-like sequence. Codon usage will be only one consideration in the *Btt* gene design. Also % A + T, dinucleotide preference and gene regulatory sequences." Adang also wrote "[t]he *Btt* sequence was scanned for sequences such

as AATAAA and ATTTA that should be eliminated."

On April 25, 1988, Adang typed the word "NASTIES" at the top of a page and beneath it typed "AATAAA plant polyadenylation signals," with a list including the following sequences: AATAAA, AATGAA, AATAAT, AATATT, GATAAA, and AATAAG. He included a citation to an article by C.P. Joshi. *See* C.P. Joshi, "Putative Polyadenylation Signals in Nuclear Genes of Higher Plants: A Compilation and Analysis," *Nucleic Acids Research,* (1987), 15:9627–9640. Adang then pasted this page into his laboratory notebook. In his notebook, Adang also cited to a 1986 article in *Cell* by C. Shaw and R. Kamen which discussed ATTTA as an "RNA degradation signal." *See* Shaw and Kamen, "A Conserved AU Sequence from the 3' Untranslated Region of GM–CSF mRNA Mediates Selective mRNA Degradation," *Cell,* (1986) 46:659–667.

According to Adang, Agrigenetics closed in 1988 before he could test his synthetic *Bt* gene design. However, he felt confident it would express in plants. After losing his job at Agrigenetics, Adang eventually assembled the synthetic *Bt* gene while at the University of Georgia. According to Adang, scientists at CalGene successfully put this synthetic *Bt* gene into potatoes.

During cross-examination by Monsanto, Adang testified that he knew of no specific Agrigenetics document written in 1985 recognizing particular polyadenylation signals as causing mRNA instability. Adang testified that by the end of 1986, no document existed explicitly stating that he would use plant preferred codons to achieve greater *Bt* expression.

Monsanto's counsel asked Adang about the contents of minutes kept of *Bt* meetings held among Agrigenetics scientists from late–1985 to mid–1987. Adang testified that these minutes contain no mention of rebuilding the *Bt* gene (1) to make it more plant-like; (2) to have more preferred codons; or (3) to take out AATGAA

sequences. Similarly, Adang testified that none of these three observations were recorded in the notebooks of Murray, Rocheleau, Merlo or himself, the four originally-named inventors of the '600 and '862 patents. Asked about contents of minutes kept of a *Bt* meeting held among Agrigenetics scientists and consultants in April 1987, Adang testified that these minutes contain no mention of a plan to build a synthetic *Bt* gene. Adang also testified that as late as March 1987, he was still working to ascertain the specific "deleterious regions" of the *Bt* gene to fix. According to Adang, in March 1988 he first came up with a gene that was eleven percent changed. At that time he did not think that eleven percent was the minimal level to change.

During cross-examination by DeKalb, Adang testified that he removed all thirteen ATTTA sequences from the native *Bt* gene. According to Adang, at the time of filing the Agrigenetics application in 1988, he thought it was a "good idea" to remove the ATTTA sequence from the synthetic *Bt* gene. He testified that the ATTTA sequence is not disclosed as one of the "nasties," or potentially destabilizing sequence, in the text of the '600 patent in column 24, although "nasties" like AATGAA, AATAAT, AATATT, GATAAA, AATAAG, polymerase 2 termination sequences and CUUCGG hairpins are disclosed. Adang testified that at the time he signed his patent application, he did not know ATTTA was not included in the text of the '600 patent. According to Adang, if he "had seen that that sequence was not included in that list, I probably would have put it in there."

Adang testified that in a 1993 scientific paper he wrote while at the University of Georgia, he describes the ATTTA sequence "as a eukaryotic messenger RNA degradation signal" and as an element "which might destabilize the messenger RNA." *See* Michael J. Adang, *et al.,* "The Reconstruction and Expression of a Bacil-

lus Thuringiensis Cry3A Gene in Protoplasts and Potato Plants," *Plant Molecular Biology,* (1993), 21:1131–1145. Adang further testified that the fact that the ATTTA sequence was a death sequence in plants was no longer secret information by 1993.

On redirect, Adang testified that each of the thirteen changes he made to the ATTTA sequence is disclosed in Figure 1 of Mycogen's patents. As for the minutes of *Bt* meetings, he testified that he "never corrected" the minutes that were taken but occasionally referred back to them.

During its response, Mycogen called Dr. Jean Romero Sevenson, an Agrigenetics employee from April 1985 to August 1988. Sevenson testified about her work for Agrigenetics' *Bt* group, including discussions she had with Murray regarding Murray's *Bt* work. Sevenson testified that she recalled that sometime before March 1986, Murray told her "the problem was ... the gene needed to be fixed," and that what she had to do was "take the gene, and resynthesize it, so that the codon usage looks plant-like." Sevenson testified that she could not confirm that Murray had the idea for changing the *Bt* gene by removing any specific nucleotides as of 1986.

Mycogen read excerpts from the deposition testimony of Carolyn Ann Stock, a research associate at Agrigenetics from 1982 to 1988. Stock testified that she recalled having discussions with Murray in the fall of 1985 regarding Murray's work and Murray's focus on "the plant coding region as a potential way of boosting the expression of the gene in plants." Stock testified that in early 1987 she was working on identifying regions of the gene that needed to be more plant-like.

Mycogen called Dr. Theodore M. Klein, an original developer of the gene gun and the first person to use it to transfer genes into corn cells. Klein testified that he used the gene gun to make fertile transgenic corn and discussed the procedure involved in transforming corn. He also demonstrated how a gene gun is loaded and fired.

According to Klein, in the late–1987, early–1988 time period, the gene gun became generally available to scientists. By September 1988, he had developed publicly-available protocols for using the gene gun to shoot genes into corn cells. Klein testified that information concerning the procedures involved in transforming corn was available prior to September 1988 and gave as examples publicly-available articles he had authored. *See, e.g.,* T. Klein, *et al.,* "Factors Influencing Gene Delivery into Zea Mays Cells by High Velocity Microprojectiles," *Biotechnology,* (May 1988) at 559–563.

Klein testified that sometime during the summer of 1988, he spoke at a one-hour seminar at DeKalb where he met Mackey and other DeKalb employees. At this seminar, he discussed options for using a gene gun to make fertile transgenic corn plants. He testified that at DeKalb, he discussed a particular type of corn tissue, known as a type 2 callus, and a particular corn line. He also gave seminars at Monsanto and other places.

Klein testified that in his opinion, information available as of September 1988, including various articles, seminar presentations and other materials, was sufficient to instruct a plant scientist working in the area to carry out the steps needed to make a fertile transgenic corn plant. For example, he wrote articles on his use of the gene gun which were published and available to the scientific community as of September 1988. *See id.* Klein testified that his own work in making fertile transgenic corn plants involved "routine" experimentation except for his using the gene gun with embryogenic tissue.

On cross-examination, Klein testified that at the DeKalb seminar he gave in 1988, he did not tell DeKalb scientists the specific conditions needed to ensure success in making a fertile transgenic corn plant. Instead, he gave them options to consider. When asked if he could name a published article discussing the conditions

to grow cells that DeKalb used to make its fertile transgenic corn plant, Klein testified that he did not know. Klein also testified that Pioneer, which he identified as the world's largest seed company, and with whom he collaborated, had never published an article indicating that it had succeeded in making a fertile transgenic corn plant. Klein testified that he did not know if Pioneer had ever succeeded in making a fertile transgenic corn plant.

Mycogen read excerpts of the deposition testimony of William Brian Gurley, a University of Florida scientist. Gurley testified that he had a contractual relationship with Agrigenetics from approximately 1983 to possibly the late 1980's. According to Gurley, he performed "essentially one" experiment related to the *Bt* gene for Agrigenetics. In the spring of 1987, he participated in a meeting with Agrigenetics scientists, including Adang and Murray. Gurley testified that someone at this meeting mentioned resynthesizing a *Bt* gene by reducing the AT content of the gene or by focusing on codon usage. Gurley testified that someone mentioned specific codon sequences during the meeting. At another meeting held in the summer of 1987, Gurley testified that he discussed these same issues with Adang, Murray and other Agrigenetics scientists. According to Gurley, at this summer 1987 meeting, "it seemed obvious to the group and to me that the resynthesis of the gene now should be given very serious consideration."

### H. *Jury Verdict*

On February 3, 1998, the jury returned its verdict. It found no infringement with respect to all of the asserted claims of the '600 and '862 patents and found the asserted claims of the patents invalid on the grounds of priority of invention. The court details the jury's verdict, including the specific patent claims asserted and the accused products, as follows:

On the issue of literal infringement, the jury found:

● Mycogen did not show, by a preponderance of the evidence, that Monsanto's NewLeaf® Potato Product literally infringes Claims 2, 5–6, 8 and 11–12 of the '600 patent and Claims 1–5 and 7–11 of the '862 patent; that its Cry3B2 corn gene literally infringes Claims 2, 5–6, 8, 11–12, 14, 17–18, 20 and 23–24 of the '600 patent and Claims 1–5, 7–11, 13–17 and 19–23 of the '862 patent; that its Cry2B corn gene literally infringes Claims 2, 5–6, 8, 11–12, 14, 17–18, 20 and 23–24 of the '600 patent and Claims 1–5, 7–11, 13–17 and 19–23 of the '862 patent; its IRM1 corn genes literally infringe Claims 2, 5–6, 8 and 11–12 of the '600 patent and Claims 1–3 and 7–9 of the '862 patent; that its Cry1A(c)/Cry1F literally infringes Claims 2, 5–6, 8, 11–12, 14, 17–18, 20 and 23–24 of the '600 patent and Claims 1–3 of the '862 patent; that its Stoneville cotton genes literally infringe Claims 2, 5–6, 8 and 11–12 of the '600 patent and Claims 1–5, 7–11, 13–17 and 19–23 of the '862 patent.

● DeKalb's DEKALBt™ Corn Product did not literally infringe Claims 2, 5–6, 8 and 11–12 of the '600 patent and Claims 1–5 and 7–11 of the '862 patent;

● Delta and Pine Land did not literally infringe Claims 2, 5–6, 8, 11–12, 14, 17–18, 20 and 23–24 of the '600 patent and Claims 1–5, 7–11, 13–17 and 19–23 of the '862 patent by making, using, selling, or offering to sell the BollGard® cotton gene; and

● Cargill YieldGard™, Golden Harvest YieldGard™, Northrup King YieldGard™, and Pioneer YieldGard™ did not literally infringe Claims 2, 5–6, 8, 11–12, 14, 17–18, 20 and 23–24 of the '600 and Claims 1–5, 7–11, 13–17 and 19–23 of the '862 patents.

As for these findings, the jury specifically marked "No" for each asserted claim on its verdict form.

On the issue of validity, the jury found that the defendants have shown by clear and convincing evidence that:

- Claims 1–24 of the '600 and '862 patents are invalid because the subject matter was invented at Monsanto by Fischhoff and Perlak before the invention date of Mycogen's patents by Adang and Murray.

The jury marked "Yes" on its verdict form for claims 1–24 of each patent.

The jury did not answer whether the claims of the '600 and '862 patents were invalid on the grounds of lack of enablement, failure to disclose best mode, and indefiniteness. Rather, the jury marked "N/A" next to these questions on the verdict form.

On February 5, 1998, the court entered judgment based on the jury's verdict, pursuant to Federal Rule of Civil Procedure 58:(1) in favor of the defendants and against the plaintiffs on the claims in plaintiffs' complaint; (2) in favor of Monsanto and Delta and Pine Land, and against the plaintiffs on Monsanto and Delta and Pine Land's first counterclaim that the claims of the '600 and '862 patents are invalid; and (3) in favor of DeKalb and against the plaintiffs on DeKalb's counterclaim that the claims of the '600 and '862 patents are invalid.

### I. *Post–Trial Motions*

Mycogen moves for judgment as a matter of law ("JMOL") pursuant to Federal Rule of Civil Procedure 50, contending that: (1) there is not a sufficient legal evidentiary basis for a reasonable jury to find the '600 or '862 patents are invalid due to prior invention of the claimed inventions by Monsanto; (2) based upon the evidence, the only reasonable conclusion is that defendants' activities infringe the '600 and '862 patents; and (3) the '600 and '862 patents are not invalid for obviousness and anticipation. Mycogen also moves for a new trial, pursuant to Federal Rule of Civil Procedure 59.

Defendants also move for JMOL, pursuant to Federal Rule of Civil Procedure 50, contending that the '600 and '862 patents are invalid for (1) failure to comply with the enablement requirement; (2) failure to satisfy the best mode requirement; and (3) claim indefiniteness, all pursuant to 35 U.S.C. § 112.

Defendants also move to amend judgment, pursuant to Federal Rule of Civil Procedure 59(e). Specifically, Monsanto moves to amend the judgment to declare that Monsanto and Delta and Pine Land do not infringe the asserted claims of the '600 and the '862 patents, and to enter judgment in favor of Monsanto and Delta and Pine Land, and against plaintiffs on their counterclaims of invalidity and non-infringement of the '600 and '862 patents. DeKalb moves to amend the judgment to include the words "and not infringed by DeKalb" at the end of the judgment to reflect that DeKalb has not infringed the '600 and the '862 patents. Defendants also move for an award of attorneys' fees pursuant to 35 U.S.C. § 285, asking the court to find this an "exceptional case."

### II. DISCUSSION

The court now addresses the parties' post-trial motions.

### A. *What is the Standard for Granting Judgment as a Matter of Law?*

Federal Rule of Civil Procedure 50(a) provides that the court may determine an issue against a party where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Fed.R.Civ.P.* 50(a). *See also Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1376 (Fed. Cir.1998) (holding that movant "must prove that the jury's factual findings were not supported by substantial evidence or that the facts were not sufficient to support the conclusions necessarily drawn by the jury on the way to its verdict."); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir.1995), *cert. denied*, 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d

1049 (1996) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict").

■ The court may grant JMOL in favor of a party bearing the burden of proof only where (1) the movant "has established [its] case by evidence that the jury would not be at liberty to disbelieve;" and (2) "the only reasonable conclusion is in [the movant's] favor." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1065 (Fed.Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998) (citations omitted). *See also* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2535, at 325–328 (3d ed.1995) (noting courts often caution that granting JMOL for party bearing burden of proof is "reserved for extreme cases.").

■ The court must consider all the evidence and draw all reasonable inferences from the evidence in the light most favorable to the non-movant. *Richardson–Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed.Cir.1997); *Gomez*, 71 F.3d at 1083; *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 691 (3d Cir. 1993); *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). The court may not determine the credibility of witnesses and it may not "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin–Elmer*, 732 F.2d at 893. Rather, the court must determine "whether the record contains the minimum quantum of evidence from which a jury might reasonably afford relief." *GNB Battery Technologies, Inc. v. Exide Corp.*, 876 F.Supp. 582, 597 (D.Del.1995), *aff'd.*, 78 F.3d 605 (Fed.Cir.1996).

B. *Should the Court Grant Mycogen's Motion for JMOL that the Claims of the '600 and '862 Patents Are Not Invalid Due to Prior Invention?*

The jury found that Claims 1–24 of the '600 and '862 patents are invalid due to prior invention, as Fischhoff and Perlak invented the subject matter for Monsanto before Adang and Murray did for Mycogen. Mycogen moves for JMOL that the claims of the '600 and '862 patents are not invalid due to prior invention. Mycogen contends that there is no legally sufficient evidentiary basis for a reasonable jury to conclude that the '600 and '862 patents are invalid due to prior invention.

Here, the court considers whether there is legally sufficient evidentiary basis for a reasonable jury to reach this conclusion. In order to find this, the court will determine whether there is legally sufficient evidence for a reasonable jury to find that: (1) Monsanto's invention was within the scope of the claims of the '600 and '862 patents; (2) Monsanto was the first to reduce its invention to practice; (3) Monsanto demonstrated that its invention actually worked for its intended practice; and (4) Monsanto did not abandon, suppress or conceal its invention.

1. *What is the applicable legal standard for establishing that a patent is invalid due to prior invention?*

■ A person is entitled to a patent unless "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g). As the Federal Circuit has explained, "[p]riority goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed.Cir. 1993) (footnote and citations omitted).

■ Conception is the formation in the inventor's mind of a definite and permanent idea of the complete and operative invention, as it is to be applied in practice. *See Cooper v. Goldfarb*, 154 F.3d 1321,

1327 (Fed.Cir.1998); *Coleman v. Dines,* 754 F.2d 353, 359 (Fed.Cir.1985).

■ An actual reduction to practice occurs when the inventor: (1) constructs a product that is within the scope of the claimed invention; and (2) demonstrates that his invention actually worked for its intended purpose. *Estee Lauder Inc. v. L'Oreal S.A.,* 129 F.3d 588, 593 (Fed.Cir. 1997); *Scott v. Finney,* 34 F.3d 1058, 1062–63 (Fed.Cir.1994). *See also Cooper v. Goldfarb,* 154 F.3d at 1327. As the court instructed the jury, "reduction to practice of an invention cannot occur unless the person claiming to be the inventor actually understood and appreciated at that time that the results were in fact the practicing of the later-claimed invention." The court continued, "there can be no accidental reduction to practice." To establish an actual reduction to practice, corroboration is required. *Cooper v. Goldfarb,* 154 F.3d at 1329.

■ By filing its applications on September 9, 1988, Mycogen constructively reduced its invention to practice. Thus, Monsanto had two ways to establish itself as the prior inventor. Monsanto must have proven by clear and convincing evidence that: (1) it reduced its invention to practice before that date; or (2) it was the first party to conceive the invention and then exercised reasonable diligence in later reducing that invention to practice. *Price v. Symsek,* 988 F.2d at 1190. At trial, Monsanto focused its evidentiary presentations on showing that it reduced its invention to practice before September 9, 1988. Thus, the court will first determine if a reasonable jury could find that Monsanto showed by clear and convincing evidence that it reduced its invention to practice before September 9, 1988. Accordingly, the jury's finding of invalidity due to prior invention by Monsanto must be upheld if a reasonable jury could find that: (1) Monsanto made an invention that is within the scope of the claims of the '600 and '862 patents; and (2) Monsanto demonstrated

that its invention actually worked for its intended purpose.

### 2. *What are the inventions of the '600 and '862 patents?*

As a threshold issue, Monsanto's invention must be within the scope of the claims of the '600 and '862 patents. To be within the scope of the claims, the invention must be for the same or "substantially the same subject matter" as the '600 and '862 patents' inventions. *See, e.g., Cooper v. Goldfarb,* 154 F.3d at 1327; *Scott v. Finney,* 34 F.3d at 1062–63. Accordingly, the court begins by examining the invention of the '600 and '862 patents.

The testimony of Falkinham, Murray, and Adang, and the file history and text of the '600 and '862 patents, indicate that the '600 and '862 patents' inventions relate to a synthetic *Bt* gene that significantly improves the expression of insecticidal *Bt* proteins in transformed plants. For example, both patents' abstracts state: "Synthetic *Baccilus thuringiensis* toxin genes designed to be expressed in plants at a level higher than naturally-occurring *Bt* genes are provided."

The '600 and '862 patents teach that certain changes be made to the native *Bt* gene sequence to create the synthetic *Bt* gene. The patents' claims teach that these changes encompass three key limitations, as follows:

(1) The frequency limitation, that is, the requirement that the frequency of codon usage of the synthetic *Bt* gene more closely resemble that of the intended plant host;

(2) The XCG limitation, that is, the requirement that at least one XCG codon be removed when designing the synthetic *Bt* gene; and

(3) The AATGAA limitation, that is, the requirement that at least one AATGAA sequence be removed when designing the synthetic *Bt* gene.

3. *Could a reasonable jury find Monsanto's invention is within the scope of the claims of the '600 and '862 patents?*

The parties do not dispute, and the record shows, that Fischhoff and Perlak at Monsanto designed, built and tested synthetic *Bt* genes that contained the structure claimed in Mycogen's patents before Mycogen filed its patent applications on September 9, 1988. Similarly, the parties do not dispute, and the record shows, that the synthetic *Bt* genes designed at Monsanto had the three key claim limitations explained above. Therefore, the court finds that there is a legally sufficient evidentiary basis for a reasonable jury to find that Monsanto's invention falls within the scope of the claims of the '600 and '862 patents.

4. *Could a reasonable jury find that Monsanto was the first to reduce the invention to practice?*

Mycogen argues that Monsanto did not reduce its invention to practice because Monsanto's inventors failed to show that they understood and appreciated each of the three key limitations at the time they reduced their invention to practice. Mycogen also argues that a reasonable jury could not find that Monsanto proved by clear and convincing evidence that its actual reduction to practice was corroborated. The court addresses these arguments in turn.

a. *Did Monsanto appreciate the three claim limitations at the time its invention was reduced to practice?*

Here, the court determines whether there is a legally sufficient evidentiary basis to support the jury's conclusion that prior to September 9, 1988, Monsanto's inventors understood and appreciated each of these three key limitations.

i. *Frequency Limitation*

The court first examines the frequency limitation. Fischhoff testified that "we [he and Perlak] were working on frequency of codon usage" in designing their synthetic *Bt* genes. He testified that he and Perlak "sought to reduce the frequency of codons that rarely occurred in plant genes" and to "increas[e] the frequency of codons that were utilized more in plant genes."

Perlak testified that the codon usage table developed by Rogers in 1984 was "indispensable" for his work in designing the synthetic gene. He testified that the abstract of this table identified certain codons, like CGX, XCG and XTA, as codons seldom found in plants. According to Perlak, this information guided him "toward plant preferred codons."

Fischhoff's testimony confirms the inventors relied on Rogers's codon usage table, and explains how he and Perlak used it. For example, Fischhoff testified that he and Perlak referred to the table "to pick the codons that we would use, as well as to avoid the ones we wouldn't use."

In light of this evidence, the court determines that a reasonable jury could find that Fischhoff and Perlak appreciated the frequency limitation concept, when they reduced their invention to practice prior to September 9, 1988.

ii. *XCG Limitation*

The court next examines the XCG limitation. Both Fischhoff and Perlak testified that they relied heavily on Rogers's codon usage table. Perlak testified that this codon usage table's abstract identified certain codons, specifically XCG among others, as codons seldom found in plants. Both testified that they derived their idea to reduce the number of XCG codons in their synthetic *Bt* genes from Rogers's codon usage table. The court finds that these actions support a reasonable jury's finding that Fischhoff and Perlak used Rogers's codon usage table and carried out a deliberate strategy to remove XCG codons.

In light of this evidence, the court determines that a reasonable jury could find that Fischhoff and Perlak appreciated the XCG limitation concept when they reduced

their invention to practice prior to September 9, 1988.

### iii. *AATGAA Limitation*

The court next examines the AATGAA limitation. Perlak testified about Fischhoff's October 30, 1986 memorandum in which he identified "AT-rich regions" in the *Bt* gene sequence. Perlak testified that this memorandum defined "polyadenylation signal sequences as the consensus sequence AATAA," and includes "variance[s]" of this "sequence." Perlak testified that the definition of polyadenylation signal sequences for plants means "six nucleotides" containing "at least five A or T residues." According to Perlak, "if one out of the five [in a sequence] is AG or AC, it still fits into the definition of a potential plant polyadenylation signal sequence." Perlak testified that his definition of polyadenylation sequences specifically encompasses AATGAA. Fischhoff testified that for the 5377 and the 5383 genes, he and Perlak removed AATGAA sequences and XCGs "as part of [their] solution."

The court finds that in light of this evidence, a reasonable jury could find that Fischhoff and Perlak knew, prior to September 9, 1988, that one part of the solution to the problem of foreign gene expression in plants was to remove AATGAA sequences. Accordingly, the court determines that a reasonable jury could find that Fischhoff and Perlak appreciated the AATGAA limitation concept at the time they reduced their invention to practice prior to September 9, 1988.

Based upon the evidence set out above, the court finds that there is a legally sufficient evidentiary basis for a reasonable jury to find that Monsanto's inventors understood and appreciated the limitations of the claims of Mycogen's '600 and '862 patents. Accordingly, the court finds that there is legally sufficient evidence to support a reasonable jury's finding that Monsanto was the first to reduce its invention to practice.

### b. *Did Monsanto's invention actually work for its intended purpose?*

Here, the court determines whether there is a sufficient evidentiary basis for a reasonable jury to find that Monsanto demonstrated its invention actually worked for its intended purpose. Mycogen raises this issue by contending that Monsanto's prior invention was not corroborated.

■ "The purpose of the rule requiring corroboration is to prevent fraud." *Berry v. Webb*, 56 C.C.P.A. 1272, 412 F.2d 261, 266 (1969); *see Kridl v. McCormick*, 105 F.3d 1446 (Fed.Cir.1997). The Federal Circuit applies a "rule of reason" test to determine whether the inventor's testimony has been corroborated. *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed.Cir.1993). The court explained this rule in its jury instructions on corroboration, noting that proof of reduction to practice cannot be based simply upon the testimony of the claimed inventors. Rather, such testimony must be corroborated by other evidence. An evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached.

The testimony of others and the dated and witnessed laboratory notebooks of an inventor may be included in the jury's evaluation. *See, e.g., Berry v. Webb*, 412 F.2d at 267. Dated and witnessed laboratory notebooks are particularly appropriate evidence in an "organized research endeavor" in light of technical operations in laboratories. *Id. See also Grasselli v. Dewing*, 534 F.2d 306, 311 (CCPA 1976).

Fuchs testified that the test results he personally conducted on a tobacco plant inserted with a synthetic 5377 gene "proved that we [Monsanto] had succeeded, that the synthetic gene worked and worked exceptionally well in plants." According to Fuchs, by August 1988, Monsanto had made "over a hundred transgenic plants containing a synthetic gene that killed insects."

Hanley–Bowdoin, Klee and McPherson testified that Fischhoff and Perlak used Rogers's codon usage table when they designed their synthetic *Bt* genes. For example, Hanley–Bowdoin observed Perlak using this table which was taped onto a bookcase in their shared office. Rogers authenticated the table and explained its derivation. Rogers also testified that Fischhoff referred to the table to "us[e] codons from plants to replace these AT-rich ones to maintain the protein sequence." Various entries from laboratory notebooks also substantiated this testimony. For example, Fuchs referred to pages from his laboratory notebook, dated August 10, 1988, to show how he recorded his test results.

In light of this evidence, the court determines that there is a legally sufficient evidentiary basis for a reasonable jury to find that Monsanto corroborated its reduction to practice prior to September 9, 1988.

█ The court has determined that there is legally sufficient evidentiary basis for a reasonable jury to find that Fischhoff and Perlak appreciated all three key limitations at the time they reduced their invention to practice prior to September 9, 1988, and that Monsanto's reduction to practice was corroborated by other evidence. Accordingly, the court finds that there is legally sufficient evidentiary basis for a reasonable jury to find that the claims of the '600 and '862 patents were invalid due to prior invention by Monsanto before the filing date of Mycogen's patents, September 9, 1988.

Having found that there is legally sufficient evidence for a reasonable jury to find that Monsanto was the first to reduce its invention to practice, the court need not reach whether Monsanto was the first party to conceive the invention and then exercised reasonable diligence in later reducing that invention to practice.

c. *Did Monsanto derive its invention from Mycogen?*

Mycogen raises the issue of derivation in the context of Monsanto's argument that Mycogen's patents' claims are invalid for prior invention because Monsanto was the first to reduce the invention to practice. Mycogen argues in response that Monsanto derived its invention from Mycogen.

█ Patent law provides that a person is entitled to a patent unless "he did not himself invent the subject matter sought to be patented" 35 U.S.C. § 102(f). Section 102(f) applies when one derives the invention from another. *See Ex parte Billottet,* 192 U.S.P.Q. 413, 415–16, 1976 WL 21141 (PTO Bd.App.1976). Derivation is a defense to infringement that goes to the validity of the allegedly infringed patent. *See, e.g., Amax Fly Ash Cor. v. United States,* 206 Ct.Cl. 756, 514 F.2d 1041, 1047 (1975). To invalidate a patent for derivation of invention, "a party must demonstrate that the named inventor in the patent acquired knowledge of the claimed invention from another, or at least so much of the claimed invention as would have made it obvious to one of ordinary skill in the art." *New England Braiding Co., Inc. v. A.W. Chesterton Co.,* 970 F.2d 878, 883 (Fed.Cir.1992). Because the validity of Monsanto's patent is not at issue here, the court need not address Mycogen's derivation argument.

5. *Could a reasonable jury find that Monsanto did not abandon, suppress or conceal its invention?*

The court has found that there is a legally sufficient evidentiary basis for a reasonable jury to find that Monsanto was the first to reduce its invention to practice. Next, the court must consider whether there is a legally sufficient evidentiary basis for a reasonable jury to find that Monsanto did not abandon, suppress or conceal its invention. 35 U.S.C. § 102(g). After reducing its genes to practice, Monsanto filed a patent application in February 1989 based on that work. The filing of a patent application rebuts an assertion of abandonment. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d

1430, 1436 n. 5 (Fed.Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). The court finds that there is a legally sufficient evidentiary basis for a reasonable jury to find that Monsanto did not abandon, suppress or conceal its invention.

Mycogen has argued Monsanto was spurred to file its application after Mycogen filed its application. Spurring arises in the context of a claim that an inventor who reduced an invention to practice first and filed a patent application second, abandoned, suppressed or concealed his invention by reason of undue delay between reducing it to practice and filing an application. *Brokaw v. Vogel,* 57 C.C.P.A. 1296, 429 F.2d 476 (1970). Spurring goes to the reason for filing after a long delay: "[o]ften the first inventor has been spurred to file a patent application by the news of the second inventor's activities." *Paulik v. Rizkalla,* 760 F.2d 1270, 1275 (Fed.Cir.1985). Because a long delay is not at issue in this case, in light of Monsanto's filing date, the court need not address Mycogen's argument concerning spurring.

### 6. *What is the court's conclusion concerning the reasonableness of the jury's verdict?*

The court concludes that there is a legally sufficient evidentiary basis for a reasonable jury to find the following: that Fischhoff and Perlak appreciated all three limitations of the '600 and '862 patents' claims prior to September 9, 1988; that Monsanto's reduction to practice was corroborated by other evidence; and that no spurring or derivation took place. Accordingly, the court finds that a reasonable jury could find that defendants showed by clear and convincing evidence that the claims of the '600 and '862 patents were invalid due to prior invention under 35 U.S.C. § 102(g). The court, therefore, denies Mycogen's motion for judgment as a matter of law on this issue.

### C. *Is Mycogen Entitled to Judgment as a Matter of Law that Defendants' Accused Genes and Gene Products Infringe the Asserted Claims of the '600 and '862 Patents?*

The jury found that the defendants' products do not infringe the asserted claims of the '600 and '862 patents. Mycogen moves for JMOL contending that the only reasonable conclusion is that defendants' accused genes and gene products infringe the asserted claims of the '600 and '862 patents. Here, the court addresses whether a reasonable jury could have found that the defendants' accused genes and gene products do not infringe the asserted claims of the '600 and '862 patents.

### 1. *What is the applicable legal standard?*

In a case where the court is presented with patent validity and infringement issues, the Federal Circuit instructs that the court should decide both issues. *Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1582 (Fed.Cir.1983); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1540 (Fed.Cir.1983).

Patent law provides that "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefore, infringes the patent." 35 U.S.C. §§ 271, 154; *see, e.g., Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917) (noting the "only effect of [inventor's] patent is to restrain others from manufacturing, using or selling that which he has invented.").

Infringement occurs where the alleged infringer's product contains each element of at least one claim of the patent. *See Panduit Corp. v. Dennison Mfg. Co.,* 836 F.2d 1329, 1330 n. 1 (Fed.Cir.1987). The Federal Circuit teaches that the "issue of infringement raises at least two questions: (1) what is patented, and (2) has what is patented been made, used or sold by another." *Fromson v. Advance*

*Offset Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir.1983); *see also Rawlplug Co., Inc. v. Illinois Tool Works, Inc.,* 11 F.3d 1036, 1041 (Fed.Cir.1993). Accordingly, a court employs a two-step process to resolve infringement issues in this jury trial. First, the court determined the scope of the patent claims. The court resolved this step by construing the claims at issue, as a matter of law, in its claim construction opinion. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Having determined the scope of the claims, the court proceeded to the second step. The court instructed the jury as to the scope of the claims with the jury determining, as a factual matter, whether Mycogen proved by a preponderance of the evidence that the defendants' allegedly infringing activities fell within the scope of the claims.

2. *Is the only reasonable conclusion for a jury to reach that defendants' accused genes and gene products infringe the asserted claims of the '600 and '862 patents?*

Mycogen argues that it proved at trial by a preponderance of the evidence that defendants' accused genes and gene products infringe the asserted claims of the '600 and '862 patents. These accused genes and gene products include: Monsanto's NewLeaf® potato gene and gene products, Monsanto's Cry3B2 corn gene and gene products, Monsanto's Cry2B corn gene and gene products, Monsanto's Cry1A(c)/Cry1F gene and gene products, Monsanto's Stoneville Cotton gene and gene products, Monsanto's IRM1 corn gene and gene products, Delta and Pine Land's BollGard® cotton gene and gene products, DEKALBt™ corn gene and gene products and various third parties' genes and gene products including Cargill Hybrid Seeds, Golden Harvest Seeds, Inc., Northrup King Co. and Pioneer Hi–Bred Int'l.

Defendants have made arguments that only two of the twelve accused genes and gene products do not infringe the '600 and '862 patents. They have not argued that the other ten products do not infringe Mycogen's patents. With regard to infringement, defendants contend that the synthetic *Bt* genes for Monsanto's Stoneville gene and gene products and DeKalb's DEKALBt™ corn gene and gene products do not infringe the asserted claims of the '600 and '862 patents. The court addresses their arguments below.

a. *How is infringement determined?*

The parties do not dispute how one determines whether an accused synthetic *Bt* gene infringes the asserted claims of the '600 and '862 patents. One compares the codons contained in the nucleotide sequence of the accused synthetic *Bt* gene with the codons contained in the nucleotide sequence of the native *Bt* gene. This is done to determine if the modifications made to the accused synthetic *Bt* gene have caused it to fall within the elements of any of the asserted claims of the '600 and '862 patents. The parties do not dispute that if the accused synthetic *Bt* gene falls within all the elements of at least one of the asserted claims of the '600 and '862 patents, it infringes the patent. *See Panduit Corp. v. Dennison Mfg. Co.,* 836 F.2d at 1330 n. 1.

b. *Which codon usage table is used?*

The parties dispute which codon usage table should be used to determine infringement. Here the court resolves this dispute.

i. *What is a codon usage table?*

A codon usage table is a table that sets out for the various codons the percentage usage of each codon in a particular plant, *e.g.,* corn; or a group of plants, *e.g.,* dicots or monocots; or in a bacterium, *e.g.,* native *Bt.* A codon usage table provides essential information about whether the modified codons are plant preferred, or whether they make the nucleotide sequence of the synthetic *Bt* gene more closely resemble that of the intended plant host than does

the nucleotide sequence of the native *Bt* gene.

Codon usage tables are relevant in this case for two main reasons. First, when designing synthetic *Bt* genes that will express in plants, gene designers use codon usage tables to modify the native gene. Second, in deciding infringement claims, the fact finder must use a codon usage table to determine whether the changes made to the native Bt gene to create a synthetic *Bt* gene infringe the '600 and '862 patents.

The parties do not dispute that when comparing the codons of the synthetic *Bt* gene to the codons of the native *Bt* gene, one must use a codon usage table to determine whether an accused synthetic *Bt* gene falls within the elements of any of the asserted claims of the '600 and '862 patents. The parties dispute which codon usage table should be used to determine infringement.

Several different codon usage tables containing this information exist including: dicot codon usage tables, shown in Table 1 of the '600 and '862 patents and in Table 1 of the '365 patent; a maize codon usage table, known as the "maize.cod"; a rubisco codon usage table; a CAB codon usage table; and an "all-plants" codon usage table. These tables differ from each other because they contain codon usage data for different plants or groups of plants, and different plants report different percentages of codon use. Therefore, the codon usage data differs for different plants.

Mycogen argues the codon usage table actually employed by a gene designer to make a synthetic gene should be used to determine whether the gene infringes the '600 or '862 patents. Defendants argue that the codon usage table included in the '600 and '862 patents at Table 1, should be used to determine whether a synthetic gene infringes the '600 or '862 patents. This table reports data for dicot genes, monocot genes, native *Bt* genes and synthetic *Bt* genes.

ii. *Which codon usage table should be used to determine whether the defendants' products infringe?*

The court now considers which codon usage table should be used to determine whether the defendants' products infringe the '600 and '862 patents.

The claims of the '600 and '862 patents teach that the modifications made to the native *Bt* gene to create the synthetic *Bt* gene either increase the number of codons preferred by the intended plant host, or result·in a frequency of codon usage more closely resembling the plant host. Claims 1–6 and 13–18 of the '600 patent all refer to "a greater number of codons preferred by the plant," and Claims 7–12 and 19–24 refer to a "frequency of codon usage of the plant." The codon usage table employed by the designer shows which codons the designer understood the intended plant host preferred. Therefore, to ascertain which modifications made by a gene designer have transformed native codons into codons preferred by the intended plant host, one must know which codon usage table the designer employed to make the modifications.

Furthermore, the '600 and '862 patents do not require one practicing the invention to use the codon usage table printed as Table 1 in both patents. Rather, the '600 and '862 patents' specifications instruct one skilled in the art how to compile a suitable codon usage table for an intended plant host. For example, the specification states "the frequency of preferred codon usage ... can be calculated by averaging the frequencies of preferred codon usage in a large number of genes expressed by the host cell." Accordingly, the specification does not require the gene designer to use only Table 1.

The court finds that when determining whether a gene infringes the '600 or '862 patents, the fact finder should compare the synthetic gene's codons to the codon usage table actually used by the gene designer to modify the nucleotide sequence of the native *Bt* gene. The court reiterates the

following reasons: (1) to make the changes instructed by the '600 and '862 patents' claims, a gene designer would have to use a specific codon usage table; (2) the codon usage table actually used by the gene designer reflects the changes made to the codons to make them plant-preferred; and (3) the '600 and '862 patents do not require one practicing the invention to use the codon usage table provided in Table 1. Rather, the specifications instruct a gene designer how to compile a codon usage table to use when modifying the native *Bt* gene to make a synthetic *Bt* gene that will express in the intended plant host.

### c. *Is the only reasonable conclusion that the accused products infringe the '600 and '862 patents?*

 Mycogen presented testimony, principally from Falkinham, as well as deposition testimony and documents from various sources to show that all of the defendants' accused genes and gene products literally infringe all the elements of at least one claim from each of the '600 and '862 patents.

Mycogen presented many pages of documentary evidence to establish literal infringement and used Falkinham's testimony to highlight the literal infringement of the asserted claims of the '600 and '862 patents. Falkinham testified that the accused genes literally infringe the asserted claims based on his comparison of the nucleotide sequence of the accused genes with the asserted claims. He testified that the following fall within the scope of the asserted claims of the '600 and '862 patents: the number of plant preferred codons in the accused genes, the reduced number of XCG combinations, and the removal of the AATGAA sequence from the accused genes' nucleotide sequence.

Falkinham offered fact-based testimony with respect to infringement. This testimony was within his acknowledged area of expertise and uncontradicted by the defendants. Furthermore, the defendants had ample opportunity to cross-examine Falkinham in an attempt to disprove his infringement testimony.

In his testimony relevant to infringement, Falkinham dealt with straightforward factual matters. He calculated which codons were changed from the nucleotide sequence of the native *Bt* gene and which codons replaced them to make the synthetic *Bt* gene. He then used the codon usage table employed in the design of each synthetic *Bt* gene to determine if the accused synthetic *Bt* genes and gene products met the claim elements of the '600 and '862 patents as set out above. At trial, he testified at length about the factual results of this analysis and compilation The evidence Falkinham presented on infringement is such that without weighing the credibility of Falkinham's testimony, the only reasonable conclusion to reach is that his testimony stands uncontradicted. *Weese v. Schukman,* 98 F.3d 542, 547 (10th Cir.1996) ("The court must take as true testimony concerning a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached and in no way discredited by cross examination.").

For every one of the above accused genes and gene products, Mycogen presented evidence, detailed below, showing that a particular codon usage table was used to design each accused gene in a way that infringes the '600 and '862 patents. Defendants did not challenge this evidence.

Specifically, Mycogen presented evidence to establish that the accused genes and gene products literally infringe the asserted claims of the '600 and '862 patents as follows.

#### i. *Monsanto's NewLeaf® potato gene and gene products*

The parties do not dispute that since October 22, 1996, Monsanto has made, used, sold or offered for sale plants, plant cells, or plant seeds containing the NewLeaf® potato gene. Mycogen proved that a dicot codon usage table from the '365 patent was used to design Monsanto's

NewLeaf® potato gene and gene products. Mycogen presented evidence comparing the nucleotide sequence of the NewLeaf® potato gene to the native *Bt* sequence using the dicot codon usage table shown in Table I of the '365 patent. This evidence shows that according to the dicot codon usage table of the '365 patent, Monsanto's NewLeaf® potato gene meets the following claim elements:

(1) The number of plant preferred codons has been increased from 150 to 397;

(2) The overall frequency of codon usage of the synthetic *Bt* gene more closely resembles that of the intended plant host than did the native *Bt* gene;

(3) The number of XCG codons between plant polyadenylation signals has been reduced by 19;

(4) In the synthetic *Bt* gene, at least 11% of the nucleotides have been changed, in this case, 22%; and

(5) In the synthetic *Bt* gene, at least 32% of the codons have been changed, in this case, 58%.

This evidence establishes that Monsanto's NewLeaf® potato gene and gene products literally infringe Claims 2, 5, 6, 8, 11 and 12 of the '600 patent and Claims 1, 2, 3, 4, 5, 7, 8, 9, 10 and 11 of the '862 patent. Based upon this evidence and the lack of evidence to the contrary, the court finds the only reasonable conclusion is that Monsanto's NewLeaf® potato gene and gene products are infringing. Therefore, Mycogen is entitled to JMOL of infringement on Monsanto's NewLeaf® potato gene and gene products.

### ii. *Monsanto's Cry3B2 corn gene and gene products*

The parties do not dispute that Monsanto designed and made three Cry3B2 variant genes, known as the 11084, 11231.mvl and 11231.vl. Mycogen proved that the "maize.cod" codon usage table was used in designing the three Cry3B2 genes. Mycogen presented evidence comparing the nucleotide sequence of the three accused Cry3B2 variant corn genes, to the native *Bt* sequence using the "maize.cod" codon usage table. This evidence shows that according to the "maize.cod" codon usage table, the three Monsanto's Cry3B2 corn genes meet the following claim elements:

(1) In each of the Cry3B2 variant genes, the number of plant preferred codons has been increased from 95 to 345, 95 to 591 and 95 to 635 respectively;

(2) The overall frequency of codon usage of the three synthetic *Bt* genes more closely resembles that of the intended plant host than did the native *Bt* gene;

(3) The number of AATGAA sequences has been reduced in two of the variant genes by 3, and in the third variant gene by 2;

(4) At least 11% of the nucleotides have been changed in each of the three variant genes, in this case, nucleotide changes of 27%, 31% and 33% respectively; and

(5) At least 32% of the codons have been changed in each of the three variant genes, in this case, codon changes of 67%, 81% and 86% respectively.

This evidence establishes that Monsanto's Cry3B2 corn genes and gene products literally infringe Claims 2, 5, 6, 8, 11, 12, 14, 17, 18, 20, 23 and 24 of the '600 patent and Claims 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 19, 20, 21, 22 and 23 of the '862 patent. Based upon this evidence and the lack of evidence to the contrary, the court finds the only reasonable conclusion is that Monsanto's Cry3B2 corn genes and gene products are infringing. Therefore, Mycogen is entitled to JMOL of infringement on Monsanto's Cry3B2 corn gene and gene products.

### iii. *Monsanto's Cry2B corn gene and gene products*

Mycogen proved that the "maize.cod" codon usage table was used in designing Monsanto's Cry2B2 corn gene and gene products. Mycogen presented evidence comparing the nucleotide sequence of the Cry2B2 corn gene to the native *Bt* se-

quence using the "maize.cod" codon usage table. This evidence shows that according to the "maize.cod" codon usage table, Monsanto's Cry2B2 corn gene meets the following claim elements:

(1) The number of plant preferred codons has been increased from 104 to 511;

(2) The overall frequency of codon usage of the synthetic *Bt* gene more closely resembles that of the intended plant host than did the native *Bt* gene;

(3) The number of XCG codons between plant polyadenylation signals has been reduced by 10;

(4) In the synthetic *Bt* gene, at least 11% of the nucleotides have been changed, in this case, 32%; and

(5) In the synthetic *Bt* gene, at least 32% of the codons have been changed, in this case, 81%.

This evidence establishes that Monsanto's Cry2B corn gene and gene products literally infringe Claims 2, 5, 6, 8, 11, 12, 14, 17, 18, 20, 23 and 24 of the '600 patent and Claims 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 19, 20, 21, 22 and 23 of the '862 patent. Based upon this evidence and the lack of evidence to the contrary, the court finds the only reasonable conclusion is that Monsanto's Cry2B corn genes and gene products are infringing. Therefore, Mycogen is entitled to JMOL of infringement on Monsanto's Cry2B2 corn gene and gene products.

### iv. *Monsanto's Cry1A(c)/Cry1F gene and gene products*

The parties do not dispute that Monsanto has designed and produced three Cry1A(c)/Cry1F genes, known as EG11751, EG11063 and EG11768, and gene products. Mycogen proved that a dicot codon usage table was used in designing these three genes. Mycogen presented evidence comparing the nucleotide sequences of the three Cry1A(c)/Cry1F genes to the native *Bt* sequence using the dicot codon usage table. This evidence shows that Monsanto's Cry1A(c)/Cry1F genes meet the following claim elements:

(1) In each of the three Cry1A(c)/Cry1F synthetic genes and gene products, the number of plant preferred codons has been increased from 379 to 801, 381 to 805, and 380 to 826 respectively;

(2) The overall frequency of codon usage of the Cry1A(c)/Cry1F synthetic genes and gene products more closely resembles that of the intended plant host than did the native *Bt* gene;

(3) The number of XCG codons between plant polyadenylation signals has been reduced by 38 in each of the genes and the number of AATGAA sequences was reduced by 1 in each of these genes;

(4) In each of the three Cry1A(c)/Cry1F synthetic genes, at least 11% of the nucleotides have been changed; in this case, 18%, 19% and 20% respectively; and

(5) In each of the three Cry1A(c)/Cry1F synthetic genes, at least 32% of the codons have been changed in each of the three Cry1A(c)/Cry1F synthetic genes, in this case, 50%, 50% and 54% respectively.

This evidence establishes that Monsanto's Cry1A(c)/Cry1F gene and gene products literally infringe Claims 2, 5, 6, 8, 11, 12, 14, 17, 18, 20, 23 and 24 of the '600 patent and Claims 1, 2, 3, 7, 8, 9, 13, 14, 15, 19, 20 and 21 of the '862 patent. Based upon this evidence and the lack of evidence to the contrary, the court finds the only reasonable conclusion is that Monsanto's Cry1A(c)/Cry1F genes and gene products are infringing. Therefore, Mycogen is entitled to JMOL of infringement on Monsanto's Cry1A(c)/Cry1F gene and gene products.

### v. *Monsanto's IRM1 corn gene and gene products*

The parties do not dispute that Monsanto has designed and produced the IRM1 corn gene. Mycogen proved that the gene designers employed a "maize.cod" codon usage table in designing Monsanto's IRM1

corn gene and gene products. Mycogen presented evidence comparing the nucleotide sequence of the IRM1 corn gene to the native *Bt* sequence using the "maize.cod" codon usage table. This evidence shows that according to the "maize.cod" codon usage table, Monsanto's IRM1 corn gene meets the following claim elements:

(1) The number of plant preferred codons has been increased from 254 to 1155;

(2) The overall frequency of codon usage of the synthetic *Bt* gene more closely resembles that of the intended plant host than did the native *Bt* gene;

(3) The number of XCG codons between plant polyadenylation signals has been reduced by 1;

(4) In the synthetic *Bt* gene, at least 11% of the nucleotides have been changed, in this case, 30%; and

(5) In the synthetic *Bt* gene, at least 32% of the codons have been changed, in this case, 44%.

This evidence establishes that Monsanto's IRM1 corn gene and gene products literally infringe Claims 2, 5, 6, 8, 11 and 12 of the '600 patent and Claims 1, 2, 3, 7, 8 and 9 of the '862 patent. Based upon this evidence and the lack of evidence to the contrary, the court finds the only reasonable conclusion is that Monsanto's IRM1 corn genes and gene products are infringing. Therefore, Mycogen is entitled to JMOL of infringement on Monsanto's IRM1 corn gene and gene products.

### vi. *Delta and Pine Land's BollGard® cotton gene and gene products*

The parties do not dispute that since October 22, 1996, Delta and Pine Land has sold, or offered for sale, plants, plant cells, or plant seeds containing Monsanto's BollGard® genes. Mycogen proved that gene designers employed a dicot codon usage table shown in Monsanto's '365 patent in designing the BollGard® cotton gene and gene products. Mycogen presented evidence comparing the nucleotide sequence of the Delta and Pine Land's BollGard® cotton gene to the native *Bt* sequence using the dicot codon usage table in the '365 patent. This evidence shows that the BollGard® cotton gene meets the following claim elements:

(1) The number of plant preferred codons has been increased from 350 to 802;

(2) The overall frequency of codon usage of the synthetic *Bt* gene more closely resembles that of the intended plant host than did the native *Bt* gene;

(3) The number of XCG codons between plant polyadenylation signals has been reduced by 41;

(4) In the synthetic gene, at least 11% of the nucleotides have been changed, in this case, 19%; and

(5) In the synthetic gene, at least 32% of the codons have been changed, in this case, 58%.

This evidence establishes that Delta and Pine Land's BollGard® cotton gene and gene products literally infringe Claims 2, 5, 6, 8, 11, 12, 14, 17, 18, 20, 23 and 24 of the '600 patent and Claims 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 19, 20, 21, 22 and 23 of the '862 patent. Based upon this evidence and the lack of evidence to the contrary, the court finds the only reasonable conclusion is that Delta and Pine Land's BollGard® cotton genes and gene products are infringing. Therefore, Mycogen is entitled to JMOL of infringement on Delta and Pine Land's BollGard® cotton gene and gene products.

### vii. *Third parties' Cargill Hybrid Seeds, Golden Harvest Seeds, Inc. and Pioneer Hi–Bred Int'l genes and gene products containing Monsanto's YieldGard® genes*

The parties do not dispute that since October 22, 1996, Monsanto's licensees Cargill, Golden Harvest and Pioneer Hi–Bred Int'l. have sold, or offered for sale, plants, plant cells, or plant seeds containing Monsanto's YieldGard® genes. Mycogen proved that gene designers employed

the maize codon usage table from Murray's 1989 article in designing the Yield-Gard® gene. Mycogen presented evidence comparing the nucleotide sequence of the YieldGard® gene to the native *Bt* sequence using the maize codon usage table. This evidence shows that according to the maize codon usage table, this Yield-Gard® gene meets the following claim elements:

(1) The number of plant preferred codons has been increased from 295 to 1001;

(2) The overall frequency of codon usage of the synthetic *Bt* gene more closely resembles that of the intended plant host than did the native *Bt* gene;

(3) The number of XCG codons between plant polyadenylation signals has been reduced by 31;

(4) In the synthetic gene, at least 11% of the nucleotides have been changed, in this case, 29%; and

(5) In the synthetic gene, at least 32% of the codons have been changed, in this case, 75%.

This evidence establishes that various third parties' genes and gene products including Cargill Hybrid Seeds, Golden Harvest Seeds, Inc. and Pioneer Hi–Bred Int'l. containing Monsanto's YieldGard® genes literally infringe Claims 2, 5, 6, 8, 11, 12, 14, 17, 18, 20, 23 and 24 of the '600 patent and Claims 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 20, 21, 22 and 23 of the '862 patent. Based upon this evidence and the lack of evidence to the contrary, the court finds the only reasonable conclusion is that these products are infringing. Therefore, Mycogen is entitled to JMOL of infringement on various third parties' genes and gene products including Cargill Hybrid Seeds, Golden Harvest Seeds, Inc. and Pioneer Hi–Bred Int'l.

viii. *Third party's Northrup King's genes and gene products containing Monsanto's YieldGard® genes*

The parties do not dispute that since October 22, 1996, Monsanto's licensee Northrup King has sold, or offered for sale, plants, plant cells, or plant seeds containing Monsanto's YieldGard® gene. The parties do not dispute that this Yield-Gard® gene differs from the YieldGard® gene contained in the Cargill Hybrid Seeds, Golden Harvest Seeds, Inc. and Pioneer Hi–Bred Int'l gene products discussed above.

Mycogen proved that gene designers employed the dicot codon usage table shown in the '365 patent in designing this YieldGard® gene. Mycogen presented evidence comparing the nucleotide sequence of this YieldGard® gene to the native *Bt* sequence using the dicot codon usage table. This evidence shows that according to the dicot codon usage table in the '365 patent, Monsanto's YieldGard® gene contained in Northrup King gene products meets the following claim elements:

(1) The number of plant preferred codons has been increased from 159 to 410;

(2) The overall frequency of codon usage of the synthetic *Bt* gene more closely resembles that of the intended plant host than did the native *Bt* gene;

(3) The number of XCG codons between plant polyadenylation signals was reduced by 16;

(4) In the synthetic gene, at least 11% of the nucleotides have been changed, in this case, 21%; and

(5) In the synthetic gene, at least 32% of the codon have been changed, in this case, 57%.

This evidence establishes that Northrup King genes and gene products containing Monsanto's YieldGard® gene literally infringe Claims 2, 5, 6, 8, 11, 12, 14, 17, 18, 20, 23 and 24 of the '600 patent and Claims 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 20, 21, 22 and 23 of the '862 patent. Based upon this evidence and the lack of evidence to the contrary, the court finds the only reasonable conclusion ·is that Northrup King genes and gene products containing Monsanto's YieldGard® gene are infring-

ing. Therefore, Mycogen is entitled to JMOL of infringement on Northrup King's genes and gene products.

Mycogen also introduced evidence to establish that Monsanto has induced infringement by third parties Cargill Hybrid Seeds, Golden Harvest Seeds, Inc., Northrup King Co. and Pioneer in the form of various activities including: Monsanto's commercial licensing, marketing and sales efforts; its contractual relations with farmers; its participation in trade shows and educational events and its packaging and labeling requirements. The defendants did not dispute this evidence of inducement.

### ix. *Monsanto's Stoneville cotton gene and gene products*

The parties do not dispute that Monsanto has designed and produced the Stoneville cotton gene. Mycogen proved that the gene designers used a rubisco codon usage table in designing the Stoneville cotton gene and gene products. Mycogen presented evidence comparing the nucleotide sequence of the Stoneville cotton gene to the native *Bt* sequence using the rubisco codon usage table. This evidence shows that according to the rubisco codon usage table, the Stoneville cotton gene and gene products meets the following claim elements:

(1) The number of plant preferred codons has been increased from 142 to 502;

(2) The overall frequency of codon usage of the Stoneville cotton gene more closely resembles that of the intended plant host than did the native *Bt* gene;

(3) The number of XCG codons between plant polyadenylation signals has been reduced by 6;

(4) In the synthetic *Bt* gene, at least 11% of the nucleotides have been changed, in this case, 30%; and

(5) In the synthetic *Bt* gene, at least 32% of the codons have been changed, in this case, 76%.

This evidence establishes that Monsanto's Stoneville cotton gene and gene products literally infringe Claims 2, 5, 6, 8, 11 and 12 of the '600 patent and Claims 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 19, 20, 21, 22 and 23 of the '862 patent. Therefore, Mycogen is entitled to JMOL of infringement on Monsanto's Stoneville cotton gene and gene products.

### x. *DEKALBt™ corn gene and gene products*

DeKalb argues that its DEKALBt™ gene does not infringe the claims of the '600 and '862 patents because according to the "all plants" codon usage table, the DEKALBt™ gene does not infringe the '600 and '862 patents.

The evidence shows that Michael Stephens, the DeKalb designer, used three codon usage tables to design his synthetic *Bt* gene, including: (1) the CAB table, (2) the rubisco table and (3) the "all plants" table published in Murray's 1989 article. DeKalb argues that by comparing the nucleotide sequence of its synthetic gene with the nucleotide sequence of the native Bt gene using the "all plants" codon usage table, DeKalb's synthetic gene is less plant-like than the native *Bt* gene. Thus, DeKalb argues it does not infringe any of the asserted claims of the '600 and '862 patents.

DeKalb's argument overlooks Stephens's testimony that in designing his gene, he "used the CAB and rubisco tables to pick those codons [more frequently used by plants] out." Accordingly, the court applies the information contained in these tables to determine infringement.

The parties do not dispute that since October 22, 1996, DeKalb has sold, or offered for sale, plants, plant cells, or plant seeds containing DeKalb's DEKALBt™ gene. Mycogen proved that gene designers employed CAB and rubisco codon usage tables from Murray's 1989 article in designing DeKalb's DEKALBt™ corn gene and gene products. Mycogen presented evidence comparing the nucleotide

sequence of the DEKALBt ™ corn gene to the native *Bt* sequence using the CAB and *rubisco codon usage table.* This evidence shows that according to the CAB and rubisco codon usage tables, the DE-KALBt ™ corn gene and gene products meets the following claim elements:

(1) The number of plant preferred codons has been increased from 139 to 398 using the CAB codon usage table and from 139 to 366 using the rubisco codon usage table respectively;

(2) The overall frequency of codon usage of the synthetic genes and gene products more closely resembles that of the intended plant host than did the native *Bt* gene;

(3) The number of XCG codons between plant polyadenylation signals has been reduced by 14;

(4) In the synthetic *Bt* gene, at least 11% of the nucleotides have been changed, in this case, 18%; and

(5) In the synthetic *Bt* gene, at least 32% of the codons have been changed, in this case, 47%.

The evidence shows that Stephens designed the DEKALBt ™ gene using the CAB and rubisco tables so that it is more plant-like compared to the native *Bt* gene. Furthermore, this evidence establishes that DEKALBt ™ corn gene and gene products literally infringe Claims 2, 5, 6, 8, 11 and 12 of the '600 patent and Claims 1, 2, 3, 4, 5, 7, 8, 9, 10 and 11 of the '862 patent. Therefore, Mycogen is entitled to JMOL of infringement on DEKALBt ™ corn gene and gene products.

D. *Are the Asserted Claims of the '600 and '862 Patents Invalid for Obviousness and Anticipation?*

The jury was not asked to determine whether the asserted claims of the '600 and '862 patents are invalid for obviousness and anticipation. Mycogen now moves for JMOL that the claims of the '600 and '862 patents are not invalid for obviousness and anticipation under 35 U.S.C. § 103 and anticipation under 35 U.S.C. § 102(b). Mycogen argues it is entitled to JMOL on obviousness and anticipation because defendants asserted these as affirmative defenses but did not present evidence in support of these issues at trial. Because defendants presented no evidence to support these affirmative defenses, the court did not submit these issues to the jury.

### 1. What is the applicable legal standard?

■ Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Johns Hopkins Univ. v. Cellpro. Inc.,* 152 F.3d 1342, 1353 (Fed.Cir.1998) (quoting *Fed.R.Civ.P.* 50(a)(1)).

2. *What is the court's decision as to whether Mycogen is entitled to judgment as a matter of law on obviousness and anticipation?*

In the joint pre-trial order, defendants asserted the defenses that the '600 and '862 patents were invalid due to obviousness and anticipation. The parties' early versions of proposed jury instructions included jury instructions on these two issues. During trial, however, defendants presented no evidence on obviousness or anticipation.

During a January 28, 1998 conference with counsel concerning the verdict form, the court noted that defendants had not presented any evidence on obviousness or anticipation during the trial. During a January 29, 1998 conference with counsel, the court said that having heard no evidence from the defendants on obviousness or anticipation, the court would not charge the jury on these issues. Counsel did not object. The court removed these issues from the verdict form and did not submit these issues to the jury.

■ A patent is presumed to be valid. 35 U.S.C. § 282. Thus, a party

asserting invalidity has the burden of establishing by clear and convincing evidence that the patent is invalid. *Id. See U.S. Gypsum Co. v. National Gypsum Co.,* 74 F.3d 1209, 1212 (Fed.Cir.1996). During the trial, defendants had the opportunity to present evidence on invalidity due to obviousness and anticipation. They did not present such evidence. By failing to object that invalidity due to obviousness and anticipation would not be decided by the jury, defendants acknowledged that they had not met their burden of proof for these issues. As defendants presented no evidence on these issues, as a matter of law, there was no legally sufficient evidentiary basis for a reasonable jury to find that defendants proved their case by clear and convincing evidence with respect to invalidity due to obviousness and anticipation. Accordingly, the court finds Mycogen is entitled to judgment as a matter of law on these issues and the court did not charge the jury. Therefore, the court will enter judgment that the '600 and '862 patents are not invalid due to obviousness and anticipation.

### E. *Are the Claims of the '600 and '862 Patents Invalid for Failure to Satisfy the Best Mode Requirement?*

The jury deliberated but did not reach a verdict on whether the defendants showed by clear and convincing evidence that Mycogen failed to satisfy the "best mode" requirement of 35 U.S.C. § 112. The defendants have moved for JMOL that Mycogen failed to satisfy the "best mode" requirement.

██ Where the jury is not able to reach a verdict on an invalidity defense, the Federal Circuit teaches that the trial court should act "to obtain a decision" if a party has moved for JMOL on the undecided defense. *Baxter Healthcare Corp. v. Spectramed, Inc.,* 49 F.3d 1575, 1585 (Fed. Cir.), *cert. denied,* 516 U.S. 906, 116 S.Ct. 272, 133 L.Ed.2d 194 (1995). Therefore, the court will resolve this issue by deciding defendants' motion for JMOL. According-

ly, the court the court will grant defendants' motion for JMOL if the defendants have shown by clear and convincing evidence that the claims of the '600 and '862 patents are invalid for failure to satisfy the best mode requirement of 35 U.S.C. § 112.

Defendants contend that when Agrigenetics filed its patent applications in September 1988, Murray and Adang considered a synthetic *Bt* gene with the ATTTA sequence removed to be a better synthetic *Bt* gene than any other, and thus, the best mode. According to defendants, a person of ordinary skill in the art would not have understood from Mycogen's patents that the removal of the ATTTA sequence was desirable. Accordingly, defendants argue that the patents are invalid for failure to satisfy the "best mode" requirement of 35 U.S.C. § 112.

#### 1. *What is the applicable legal standard?*

██ The specification must "set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. The best mode requirement applies to all classes of inventions. The Federal Circuit teaches that determining whether a patent fails to comply with the best mode requirement involves two factual inquiries. First, the fact finder must determine whether at the time the applicant filed his patent application, he had a best mode of practicing the invention. Second, if the inventor had a best mode, the fact finder must determine whether the best mode was disclosed in sufficient detail to allow a skilled artisan to practice it without undue experimentation. *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1064 (Fed.Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998) (citation omitted).

Section 112 requires disclosure of the best mode "contemplated by the inventor," not the best mode in any absolute or ideal sense. *See Chemcast Corp. v. Arco Industries Corp.,* 913 F.2d 923 (Fed.Cir.1990); *Benger Labs., Ltd. v. R.K. Laros Co.,* 209

F.Supp. 639, 644 (E.D.Pa.1962), *aff'd*, 317 F.2d 455 (3d Cir.1963), *cert. denied*, 375 U.S. 833, 84 S.Ct. 69, 11 L.Ed.2d 64 (1963). Therefore, the first factual inquiry is a subjective determination focusing on the inventor's state of mind at the time he filed his application. Thus, the inventor's intent controls. *Minco, Inc. v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1115 (Fed. Cir.1996).

■■■ A best mode defense can be established when the evidence shows that: (1) the inventor knew of a best mode at the time of his application and concealed it; or (2) the inventor knew of a best mode and there was failure to disclose, regardless of whether the inventor specifically intended to conceal it. *United States Gypsum Co.*, 74 F.3d at 1215–16 (upholding invalidity determination where an executive directed deletion of inventor's best mode for the specification); *Minco, Inc.*, 95 F.3d at 1115.

2. *Did Murray and Adang have a best mode of practicing their claimed invention at the time they filed their patent application?*

The court first considers whether Murray and Adang, had a best mode of practicing their claimed invention at the time they filed their patent application in September 1988. *See United States Gypsum Co.*, 74 F.3d at 1212.

Murray testified that she did not consider ATTTA to be the best mode of carrying out their invention in 1988 "[b]ecause if you modify a plant gene for codon usage, you have a [tendency] to change those sequences anyway." She testified that she "felt the broadest claim of the patent would be to overall change the AT richness of the gene by changing the codon usage and ... it [ATTTA] was included within the original conception of the idea that ... these sequences would be changed." Murray also testified that at the time the application was filed, she believed that the ATTTA sequence could contribute to RNA instability in the *Bt* gene. She testified

that she "thought that [ATTTA] was one of the reasons the AT richness of the genes might be unstable."

Murray also testified that she saw the February 29, 1988 memorandum in which Hoffman, Murray's colleague, wrote that he planned to "test the functionality of suspected AT-rich motifs in the *Bt* gene," and that Murray favored the approach he proposed. While she testified that Hoffman referred to ATTTA as the "sudden death sequence;" she did not state that she personally accepted that characterization of ATTTA.

Adang testified that "it was a good idea to remove the ATTTA sequence." He removed all thirteen ATTTA sequences from the native *Bt* gene, which is confirmed in Figure 1 of the '600 and '862 patents. On April 22, 1988, he wrote in his laboratory notebook that he scanned a *Btt* sequence for sequences including ATTTA "that should be eliminated." Adang testified that at the time he signed his patent application, he did not know that ATTTA was not included in the text of the '600 patent. In retrospect, he testified that he "probably would have put it in there." Subsequently, in 1993, Adang published an academic paper identifying ATTTA "as a eukaryotic messenger RNA degradation signal" and as an element "which might destabilize the messenger RNA."

Adang testified that he does not believe that removal of the ATTTA sequence from a *Bt* gene is necessary to achieve higher *Bt* expression in plants. By way of example, he referred to a *Bt* HD73 gene which Agrigenetics constructed as an example of a synthetic *Bt* gene containing one ATTTA sequence that still has high *Bt* expression.

Murray's testimony indicates that she believed ATTTA could contribute to RNA instability in the *Bt* gene and that she included ATTTA in her idea to change the gene's AT richness. While Murray saw Hoffman's memorandum, she did not draft it. While Hoffman referred to ATTTA as

the "sudden death sequence," that phrase is his. Hoffman is not an inventor of the '600 and '862 patents. Therefore his beliefs are significant only to the extent they were accepted or adopted by Murray or Adang. In his memorandum, Hoffman noted Murray favored his proposal. This proposal, however, primarily addressed scientific testing of AT-rich sequences. The court finds evidence on this point lacking.

Adang located and removed all thirteen ATTTA sequences from his synthetic *Bt* gene. He testified that it was a "good idea" to do so, although he testified that removing ATTTA is not necessary to achieve higher expression for at least the HD73 gene. Later, as an academic, he wrote a scholarly paper published in 1993 referring to ATTTA as a "messenger RNA degradation signal." The question here, however, is what the inventors thought at the time they filed their patent application, not at some later time.

■ The court finds that defendants have not shown by clear and convincing evidence that, at the time of their application, the inventors knew that a synthetic *Bt* gene with ATTTA sequences removed is the best mode of their invention. Thus, defendants' case has not passed the first factual inquiry and the court will not proceed with further analysis on this issue. Accordingly, the court finds the '600 and '862 patents are not invalid for failure to satisfy the "best mode" requirement of 35 U.S.C. § 112. Accordingly, the court will not grant defendants' motion for JMOL on this issue.

### F. Are the Claims of the '600 and '862 Patents Invalid Due to Indefiniteness Pursuant to 35 U.S.C. § 112?

The jury deliberated but did not reach a verdict on whether the '600 and '862 patents are indefinite pursuant to 35 U.S.C. § 112. The defendants have moved for JMOL that Mycogen failed to satisfy the definiteness requirement of 35 U.S.C. § 112.

Just as with the preceding "best mode" issue, when the jury is not able to reach a verdict on an invalidity defense, the trial court should act "to obtain a decision" on it. *Baxter Healthcare Corp.*, 49 F.3d at 1585. Therefore, the court will resolve this issue by deciding defendants' motion for JMOL. The court will grant defendant's motion for JMOL if the defendants have shown by clear and convincing evidence that the claims of the '600 and '862 patents are indefinite pursuant to 35 U.S.C. § 112.

Defendants argue that the claims of the '600 and '862 patents are invalid for failure to satisfy the requirement of definiteness in claims pursuant to 35 U.S.C. § 112. Defendants argue the claims are indefinite because nothing in the '600 and '862 patents indicates which codon usage table should be employed to calculate the frequency deviation value, which is used to determine infringement.

Specifically, the frequency deviation value determines whether the overall frequency of codon usage of the synthetic *Bt* gene more closely resembles that of the intended plant host than did the native *Bt* gene. The frequency deviation value, also known as the A-value, is a mathematical formula found in the '600 and '862 patents. The formula contains several variables including the frequency of usage of a given codon in the intended plant host and the frequency of usage of the same codon in the synthetic *Bt* gene. *See* '600 Patent, column 7, lines 30–35; '862 Patent, column 7, lines 30–35.

According to defendants, the court has construed the '600 and '862 patents to mean that no claims of either are infringed by a synthetic *Bt* gene unless the frequency deviation value of the synthetic *Bt* gene is lower than the frequency deviation value of the native *Bt* gene.

The parties do not dispute that: (1) a codon usage table must be employed to calculate the frequency deviation value; and (2) the frequency deviation value will

differ depending on the particular codon usage table employed to calculate it.

According to defendants, Mycogen asserts that the codon usage table employed should be the codon usage table employed by the designer of the synthetic *Bt* gene in his design of the gene, as opposed to the codon usage table found in Table 1 of the '600 and '862 patents. However, Monsanto and DeKalb argue that nothing in the patents supports Mycogen's assertion that the designer's particular codon usage table or tables should be employed.

Additionally, DeKalb argues that even if one assumes Mycogen is correct and uses the codon usage table employed by the gene designer to determine the frequency deviation value, the claims are still indefinite because the patents contain no explanation of how to judge infringement if the gene designer used multiple codon usage tables to design a synthetic *Bt* gene. DeKalb argues that "[u]sing different tables, the exact same gene can be found both to infringe and not to infringe."

Mycogen responds that the claims of the '600 and '862 patents are not indefinite, arguing that one of ordinary skill in the art would understand what is covered by these claims. According to Mycogen, the claims specify that modifications to the coding sequence of the gene are to be judged against the codon usage table employed by the designer of the synthetic *Bt* gene. Mycogen argues that this view is supported by the claim language and the specification of the patents-at-suit.

In response to DeKalb's argument, Mycogen answers that even if the gene designer uses multiple codon usage tables, the claims are not indefinite for two reasons: (1) as long as a designer modified a *Bt* gene using a particular codon usage table and these modifications infringe the claims, then there is infringement; and (2) DeKalb's assertion that the exact same gene can be found both to infringe and not to infringe depending on which codon usage table is employed, is factually incorrect.

### 1. *What is the applicable legal standard?*

■ While presumed valid, a patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *35 U.S.C. §§ 112, 282.* Section 112 requires claims to be particular and distinct. *See, e.g.,* 3 *Chisum on Patents* § 8.03 (1995). Where the evidence shows that the claims are not sufficiently precise to permit a potential competitor to determine whether or not he is infringing, the claims are invalid for failure to satisfy the definiteness requirement. *Morton International, Inc. v. Cardinal Chemical Co.,* 5 F.3d 1464, 1470 (Fed.Cir.1993); *see also* 3 *Chisum on Patents* § 8.03 (1995) (noting claims must be definite for primary purpose of providing clear warning to others as to what constitutes infringement of patent); *United Carbon Co. v. Binney & Smith Co.,* 317 U.S. 228, 236, 63 S.Ct. 165, 87 L.Ed. 232 (1942) ("A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement [of] claims would discourage invention only a little less than unequivocal foreclosure of the field.").

■ "If the claims, read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts·can demand no more." *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 624 (Fed.Cir.1985) (*quoting Georgia–Pacific Corp. v. United States Plywood Corp.,* 258 F.2d 124, 136, (2d Cir.), *cert. denied,* 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958)). The Federal Circuit teaches that defendants have the burden of showing by clear and convincing evidence that one of ordinary skill in the art would not understand what is included within the claims of the '600 and '862 patents read in light of the specifications. *North American Vaccine, Inc.*

*v. American Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed.Cir.1993), *cert. denied*, 511 U.S. 1069, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994).

2. *Did defendants show by clear and convincing evidence that the claims of the '600 and '862 patents are indefinite pursuant to 35 U.S.C. § 112?*

Here, the court determines whether the claims of the '600 and '862 patents are indefinite pursuant to 35 U.S.C. § 112.

Each claim of the '600 and '862 patents requires that modifications to the *Bt* gene be evaluated against the intended plant host. For example, Claims 1, 7, 13 and 19 of the '600 patent disclose a method of designing a synthetic *Bt* gene. Section (b) of these claims reads "modifying a portion of said coding sequence to yield a modified sequence which contains a greater number of codons preferred by the intended plant host." Similarly, section (b) of Claims 2, 8, 14 and 20 refer to modifications made in reference to "the intended plant host." In order to compare the modified codon sequence to that of the intended plant host, one needs to know what the designer of the synthetic *Bt* gene intended, and to use the codon usage table the designer used. Otherwise, infringement would be determined by comparing modifications to Table 1 of the '600 and '862 patents and not to the intended plant host.

Rather than limiting the codon usage table to Table 1, the '600 and '862 patents' specifications instruct one skilled in the art to compile a codon usage table of his own keyed to the intended plant host. In this respect, the specification states, "the frequency of preferred codon usage … can be calculated by averaging frequency of preferred codon usage in a large number of genes expressed by the host cell."

The specification also states, "Table 1, for example, gives the frequency of codon usage by highly expressed genes exhibited by dicotyledonous plants and monocotyledonous plants." This language clarifies that Table 1 is an example of a codon usage table, and not a benchmark. The Federal Circuit has found that a patent claim is not limited to a preferred embodiment disclosed in a patent. *See Transmatic, Inc. v. Gulton Industries*, 53 F.3d 1270, 1277 (Fed.Cir.1995). Accordingly, the court finds that the claim language, specification and the Federal Circuit's teachings support the view that Table 1 is more properly considered an example of a codon usage table and not the benchmark for determining infringement.

DeKalb argues that "using different tables, the exact same gene can be found both to infringe and not to infringe." Stephens, the designer of DeKalb's synthetic *Bt* gene, testified that he relied on several codon usage tables published in Murray's 1989 article. According to Stephens, he "used the CAB and rubisco tables to pick those codons [more frequently used by plants] out." The record shows that Stephens principally used the CAB and rubisco tables.

The evidentiary record does not indicate exactly what specific modifications, if any, Stephens made to the DeKalb gene based on the all-plants table. Stephens may have used the all-plants table peripherally, making no modifications based on its teachings. Because such evidence is absent from the record, the court finds that DeKalb has not shown by clear and convincing evidence that the exact same gene is found to infringe and not to infringe.

When a gene designer modifies a *Bt* gene using multiple codon usage tables, and one of the tables shows infringement under the frequency deviation value test while another does not, there are two options: there is infringement or no infringement.

The Federal Circuit teaches that steps or features added to a claimed invention do not necessarily avoid infringement. *See Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 731 F.2d 840, (Fed.Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984); *see also Discovision Assoc. v. Disc*

*Mfg., Inc.,* 25 F.Supp.2d 301 334 (D.Del. 1998) ("Infringement may not be avoided simply by adding features or components not required by the claims."). The absence in the record of what modifications, if any, Stephens made to his gene using the all-plants table makes it difficult to determine whether DeKalb has added a step or feature beyond the claims. The second option could have the unwelcome effect of encouraging inventors to include as many codon usage tables as possible in their design, even one barely used, because that might allow them to avoid a judgment of infringement.

■ The '600 and '862 patents' specifications teach ones practicing the invention to evaluate changes to the gene according to the codon usage table actually employed in designing the gene.

The court finds that defendants have not shown by clear and convincing evidence that the claims of the '600 and '862 patents are indefinite. Accordingly, the court denies defendants' motion for JMOL on this issue.

### G. *Are the Claims of the '600 and '862 Patents Invalid for Lack of Enablement?*

The jury deliberated but did not reach a verdict on whether the claims of the '600 and '862 patents are invalid for lack of enablement. The defendants have moved for JMOL that Mycogen failed to satisfy the enablement requirement of 35 U.S.C. § 112. As with the preceding issues, the court will resolve this issue by deciding defendants' motion for JMOL.

Defendants argue that the claims of the '600 and '862 patents are invalid because the specification of the patents would not enable a person of ordinary skill in the art as of September 9, 1988, to make use of the claimed invention without undue experimentation. Specifically, defendants contend that while the claims of the patents require removal and replacement of either XCG codons or AATGAA sequences, they do not provide any guidance on which XCG codons or which AATGAA sequence to remove. Thus, according to the defendants, the only way to determine which modifications are covered by the patent claims is to make modifications and test them to see if they work. As there are hundreds of millions of possible gene sequences and billions of possible codon replacements, Monsanto contends one could not use the claimed invention without undue experimentation and, consequently, the claims are invalid in that they do not provide an enabling disclosure.

Mycogen has responded by arguing that while the '600 and '862 patents may not describe the specific individual nucleotides to modify, they provide a general methodology which a person of ordinary skill in the art can follow without undue experimentation in order to make a synthetic *Bt* gene which is more highly expressed. In support of this argument, Mycogen cites testimony by Drs. Adang and Murray that they were able to design on their first try a working synthetic *Bt* gene using the general methodology described in their patent, and declarations in the file history of the '831 patent by Professor Kemp and Mr. Sutton that they designed and constructed a synthetic *Bt* gene using rules or strategies for maximizing preferred codon usage and achieving mRNA stability as described in the Mycogen patents and that this synthetic gene did express at significantly higher levels in tobacco than the native *Bt* gene.

#### 1. *What is the applicable legal standard?*

■ The first paragraph of 35 U.S.C. § 112 requires that the specification of a patent contain a written description of the claimed invention and the manner and process of making and using that invention in such full, clear, concise, and exact terms as to enable any person skilled in the art to which that invention pertains to make and use that invention. *In re Wright,* 999 F.2d 1557, 1561 (Fed.Cir.1993). The specification must be enabling when it is filed and must teach those skilled in the art how to make and use the full scope of the claimed

invention without undue experimentation. *Id; Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367 (Fed.Cir.1986), cert. denied, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Factors relevant to determining whether experimentation is undue, include (1) the quantity of experimentation, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (7) the breadth of the claims. *In re Wands,* 858 F.2d 731, 737 (Fed.Cir.1988).

To meet their burden of proof, defendants' must show by clear and convincing evidence that the specifications of the patents are not enabling. *Hybritech,* 802 F.2d at 1375.

2. *Did defendants show by clear and convincing evidence that the specifications of the patents are not enabling?*

At the trial, defendants sought to establish that while the claims of the patent identify certain steps to be taken in modifying the codon sequences in a gene (removing XCG codons and AATGAA sequences), they do not provide enough guidance for one of skill in the art to make it work. Dr. Messing laid the foundation for that position by testifying that while the claims direct one to remove XCG codons, they do not say how many or which codons should be removed. As each gene has 1,800 nucleotides, the claims purport to cover millions of permutations or combinations of codon arrangements. Dr. Messing noted that the gene described in the example in the specification had 19 XCG codons. As the patent did not specify which one or how many of the 19 to remove, he calculated that there were 9 billion possible combinations. Certain of the dependent claims set out percentages of codons or nucleotides to be changed (at least 32% or 11% of the nucleotides). Those percentages may reduce the total number of possible combinations, but they do not provide any additional guidance on which codons or nucleotides should be selected or which combination of codons or nucleotides would work.

Dr. Messing testified that as there was no data in the patent showing which combination would work, or which codons to remove. He testified there was no publication that would provide this information. It was his opinion that the information in the specification would not enable one skilled in the art to practice the claimed invention. Dr. Messing noted that Mycogen has no experimental data supporting the claims and testified that this is additional evidence suggesting the claims were not enabled.

In support of this opinion, Monsanto offered evidence showing it tested the proposition that the specifications were enabling. Dr. Fischhoff testified that Monsanto tested the method described in the claims by removing 10 of 19 CG's and all AATGAA's from four genes and putting them in to hundreds and hundreds of plants. After testing the plants, Monsanto found they were no different from the native genes in control plants.

Mycogen offered little evidence in response to the defendants case on enablement. It did not counter Dr. Messing's testimony on the possible combinations one might get in removing the XCG and AATGAA codons and the lack of guidance in the specifications on which ones or how many should be removed. Instead, Mycogen responded by arguing that while the patents may not describe the specific individual nucleotides to modify, they provide a general methodology which a person of ordinary skill in the art can follow without undue experimentation in order to make a synthetic *Bt* gene which is more highly expressed. Mycogen failed, however, to support that argument with evidence tending to show that one of ordinary skill in the art could in fact follow that methodology and make that gene. Nor did Mycogen call an expert witness to offer an opinion that the methodology is enabling, to explain the basis for that opinion on direct examination and defend it on cross.

Mycogen did not attempt to counter the evidence Monsanto offered on its tests of the methods described in the claims with evidence demonstrating that the claims were enabling. Rather, Mycogen limited its response to Monsanto's test to testimony by Dr. Falkinham that it was his opinion that the assay used by Monsanto would not have been sensitive enough to detect increases in the level of *Bt* protein produced when it was introduced in to plants.

Mycogen rested its response on enablement on two corroborating facts. First, Dr. Adang testified that after he left Agrigenetics he was able to prove his design for a synthetic gene worked when it was assembled and put into potatoes by scientists at CalGene, where it expressed well and killed millions of potato bugs. It appears this gene is the example set out in the patent.

Second, Mycogen relies a November 4, 1991 declaration of a Professor John Kemp and Dennis Sutton filed in the prosecution history of the '831 patent. Kemp and Sutton worked at Agrigenetics. In the declaration, Kemp and Sutton report:

4. Working as an independent group in the Plant Genetic Engineering Laboraatory [sic] at New Mexico State University, without knowledge of the Agrigenetics/University of Georgia effort, we designed and constructed a synthetic gene which codes for an insecticidal protein which is structurally and functionally identical to a native insecticidal protein of *Bacillus thuringiensis* var. *tenebrionis* (*Bt* t), having known toxicity to a coleopteran insect, e.g. Colorado potato Beetle. The said synthetic gene was designed and prepared using rules or strategies for maximizing preferred codon usage and achieving mRNA stability essentially as described in the patent application referenced above. The synthetic *Bt* t gene synthesized by us is encompassed by Claim 1 of the said U.S. patent application. We demonstrated that by resynthesizing the entire gene to remove wild-type signals

such as potential polyadenylation signals, A+T rich areas and ATTTA runs, while preserving the amino acid sequence, high levels of expression of the *Bt* t insecticidal protein were obtained in plants.

Monsanto objects to Mycogen relying on this declaration as it is hearsay, in that Mycogen is relying on it for the truth of the matters asserted by Kemp and Sutton. Further, Monsanto argues that, at most, the declaration establishes that some time after 1988, Kemp and Sutton designed a gene using rules and strategies described in Mycogen's specification and that Kemp and Sutton believed was encompassed within claim 1 of the '831 patent. Monsanto also argues that at most this declaration and Adang's testimony shows that the one example in the '600 and '862 patents works, but argues that this is irrelevant, as Mycogen could have claimed that gene in these patents but did not. Monsanto notes that Mycogen claimed that one gene in its '831 patent.

To the extent that the declaration is in evidence, the fact of Kemp and Sutton's declaration and the truth of the statements in that declaration are some evidence that the specification is enabling, but it is not strong or compelling evidence. If it were, one would have expected Mycogen to offer evidence on Kemp and Sutton's work more directly, where their work could be identified and their statements subjected to cross examination. It is difficult for the court to accept their statement for the truth of the matters asserted, as that would deny the defendants an opportunity to test the relevance and significance of these facts. Further, if the statements in the declaration were admissible, they would probably do no more than tend to confirm that what it is Murray and Adang had discovered and described in the example in the patents could work for its intended purpose. It would not, however, tend to show that what they discovered was fairly described in the claims or that the specifications of the patents would enable one skilled in the art to practice the subject matter they claimed.

Adang and Murray have identified a specific methodology for designing a gene by modifying codon sequences to reduce certain codons and have set out in their specification an example showing how they have implemented that methodology to design a synthetic *Bt* gene. In claiming their invention, they have identified the methodology, but have not identified which codons or how many should be removed. In light of the number of these codons in a gene, there are millions and even billions of ways to implement their methodology as claimed, almost all of which will not achieve the desired result. The example Adang and Murray have set out the specification may show an example of how they have implemented their methodology, but neither the example nor the specifications provides guidance to those skilled in the art on how the methodology should be implemented. That is, the claims and specifications do not identify which and how many codons should be removed.

■ Having reviewed and considered the matter, the court finds the defendants have offered clear and convincing evidence which establishes that the specifications of the '600 and '862 patents are not enabling. The court will, therefore, grant the defendants motions and entered an order directing the clerk to enter judgment in favor of defendants and against plaintiff on defendants' counterclaims that the claims of the patent are invalid for lack of enablement.

H. *Should the Court Grant Mycogen's Motion for a New Jury Trial?*

1. *On What Grounds Does Mycogen Seek a New Jury Trial?*

In support of its motion for a new trial, Mycogen alleges several grounds for the district court to grant a new trial. These grounds include prejudicial errors of law constituting harmful error and a verdict against the weight of the evidence.

2. *What is the Standard for Granting a New Jury Trial?*

"The decision to grant or deny a new trial is confided almost entirely to the dis-

cretion of the district court." *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir.1992) (*citing Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980)). Federal Rule of Civil Procedure 59(a) permits the court to order a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." *Fed.R.Civ.P.* 59(a). Although Rule 59(a) does not specify the grounds on which a district court can grant a new trial, Federal Rule of Civil Procedure 61 provides that the court should not order a new trial unless "substantial justice" so requires. *Fed.R.Civ.P.* 61. Rule 61 also instructs the court to disregard any "error or defect in the proceeding which does not affect the substantial rights of the parties." *Id.*

■ The following may be grounds for a district court to order a new trial: (1) a prejudicial error of law; (2) a verdict against the weight of the evidence; or (3) a jury's grossly excessive or inadequate award against the weight of the evidence. *See Maylie v. National R.R. Passenger Corp.*, 791 F.Supp. 477, 480 (E.D.Pa.1992), *aff'd*, 983 F.2d 1051 (3d Cir.1992) (*citing* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2805, at 38 (1973)); *Lee v. Consol., Rail Corp.*, 1995 WL 734108, *2 (E.D.Pa. Dec.5, 1995). The third category, (3) a jury's grossly excessive or inadequate award against the weight of the evidence, is not an issue before the court.

The Third Circuit provides for different standards of review for new trial motions depending on whether the motion is based on a prejudicial error of law or a verdict against the weight of the evidence.

■ When the district court commits a prejudicial error of law, it has wide discretion in deciding a motion for a new trial. *See Klein v. Hollings*, 992 F.2d 1285, 1289–90 (3d Cir.1993); *Lee v. Consol. Rail Corp.*, 1995 WL 734108, *2. When the verdict is against the weight of the evidence, the district court judge has much

narrower discretion in deciding a new trial motion. The Third Circuit teaches that granting a new trial motion "because the verdict is against the weight of the evidence [is] proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir.1991). This limit on the district court's power to grant a new trial seeks to ensure that a district court does not substitute its own "judgment of the facts and the credibility of the witnesses for that of the jury." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir.1992), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993) (*quoting Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir.) (en banc), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)).

 In considering a new trial motion, the district court must "view all the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict." *Marino v. Ballestas*, 749 F.2d 162, 167 (3d Cir.1984). To uphold the verdict, the district court only needs to determine that the record contains the minimum quantum of evidence from which a jury might reasonably afford relief. *See Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir.1980) (*quoting Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir.1969)), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418 (1981). The district court does not grant a new trial motion based on harmless error. *Fed.R.Civ.P. 61*.

3. *Should the court grant Mycogen's motion for a new trial based on Mycogen's allegations of prejudicial errors of law?*

a. *Should the court grant Mycogen's motion for a new trial because the court did not rule on two letter briefs to compel discovery of Monsanto's draft patent applications?*

 Mycogen moves for a new trial because the court did not rule on two letter briefs submitted by Mycogen to compel discovery of Monsanto's draft patent applications. Mycogen argues these draft patent applications are "highly relevant" to "three issues undermining the priority determination." These three issues include: (1) whether at the time of its alleged reduction to practice, Monsanto understood and appreciated all of the elements in the Mycogen patents; (2) whether Monsanto derived any of the claimed elements from Mycogen when Monsanto reviewed Mycogen's patent application in November 1988; and (3) whether Monsanto was spurred into activity after seeing Mycogen's patent application in November 1988.

Mycogen argues that these draft patent applications should be produced because Monsanto waived any applicable attorney-client privilege pertaining to these draft applications. According to Mycogen, Monsanto waived any privilege in a January 27, 1997 letter from Monsanto's outside counsel, Craig M. Lundell, Esquire, to Mycogen's outside counsel, Roland Smoot, Esquire. Mycogen contends that in the letter, Monsanto described the contents of these draft applications to prove that: (1) Monsanto independently derived the codon usage table; and (2) Monsanto independently realized the importance of including such a table in its patent application.

Lundell's letter concerned Federal Rule of Civil Procedure 30(b)(6) discovery matters in a related patent case, *Monsanto Co. v. Mycogen Plant Science, Inc.*, 61 F.Supp.2d 133 (D.Del. 1999). Federal Rule of Civil Procedure 30(b)(6) applies when a corporation is required to testify in a civil case. The corporation can designate a person to testify on its behalf.

Lundell described the October 5, 1988 draft as containing "a bibliographic-type reference that may refer to that named table [plant preferred codon table]. As

indicated above, the draft patent applications are immune from discovery as representing privileged communications." At least twice in this letter, Lundell indicated that Monsanto would assert attorney-client privilege with respect to the draft applications.

In the related patent case, *Monsanto Co. v. Mycogen Plant Science, Inc.*, 61 F.Supp.2d 133, the court addressed Mycogen's request for production of these drafts. During a July 21, 1997 conference, the court declined to compel Monsanto to produce these documents and stated it was not clear whether Monsanto waived attorney-client privilege. Although the court deferred a final ruling, it suggested that Mycogen obtain the information through discovery of nonprivileged information.

The court finds that Mycogen has not shown that Monsanto waived any applicable attorney-client privilege with respect to these draft patent applications. To the contrary, Lundell's letter shows that Monsanto asserted this privilege in communications with Mycogen. Thus, the court finds that it committed no prejudicial error of law by not ruling on Mycogen's two letter briefs. Accordingly, the court denies Mycogen's motion for a new trial on this ground.

b. *Should the court grant Mycogen's motion for a new trial because the court permitted Monsanto to submit to the jury a chronology as part of its verdict form?*

Mycogen moves for a new trial because the court allegedly committed harmful error when it permitted Monsanto to submit to the jury a chronology of events as part of its verdict form. Mycogen argues that Monsanto's chronology was argument which the jury could view during deliberations, and therefore, it was prejudicial error of law to allow Monsanto to submit it.

At the close of evidence on January 30, 1998, Monsanto sought to submit to the jury a filled-out verdict form with an attached one-page chronology setting out Monsanto's position on prior invention. Monsanto provided advance copies of the chronology to the parties. Mycogen's counsel objected to the submission of the chronology:

> This morning Mr. Marsden [Monsanto counsel] did show me a passage from the pretrial in which you [the court] did invite them to attach an appendix. We would, however, object to that. It is a demonstrative. It is going to go into the jury room .... But demonstratives do not go into the jury room.

The court overruled this objection and the jury received Monsanto's chronology.

Mycogen then apparently prepared its own chronology and attached it to its own filled-out verdict form distributed to the jury, without providing copies in advance to the parties or obtaining leave of the court. Shortly after the jury began deliberations, defendants learned that Mycogen had submitted a chronology to the jury when Mycogen proposed to amend both its proposed verdict form and its chronology. Defendants then objected to the submission of the Mycogen chronology. During the ensuing discussion, Mycogen's counsel stated: "Your honor, I think it would be highly prejudicial to allow Monsanto to do that [submit a chronology] and not to allow us to submit a similar chronology ...."

After listening to counsels' arguments, the court decided to recall both Monsanto's and Mycogen's chronologies from the jury. The court clerk retrieved these chronologies from the jurors and the court then gave the following curative instruction to the jury:

> In asking you to remove these [Monsanto's and Mycogen's chronologies] from the verdict form, I am instructing you to ignore the information that was in these papers and remove them from your thought processes and not rely on them in connection with your decision. Is everybody clear about that? You hear the words "strike it" from time to time. That is me saying "strike it" or remove

it from the record for the purpose of resolving this dispute.

 The Third Circuit has explained that "[a] trial court's errors are harmless only if it is 'highly probable' that they did not affect the outcome of the case." *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 924 (3d Cir.1985). The court must consider several factors in deciding whether error is harmless. These factors include: (1) whether erroneously admitted evidence was the primary evidence relied upon; (2) whether the aggrieved party was nonetheless able to present the substance of its claim; (3) the existence and usefulness of curative jury instructions; (4) the extent of jury argument based on tainted evidence; (5) whether erroneously-admitted evidence was merely cumulative; and (6) whether other evidence was overwhelming. *See, e.g., ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 549–550 (Fed.Cir.1998) (citations omitted); 11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2885 at 463–466 ("[E]rroneous admission of evidence may be found not to have been prejudicial if the fact already had been shown by admissible evidence, or prejudice may be avoided by a curative instruction."). *See generally Corbett v. Borandi*, 375 F.2d 265 (3d Cir.1967) ("Since the trial judge is in a far better position, by virtue of his familiarity with the atmosphere of the trial, to evaluate the effect of any statement on the jury, he may feel that an admonition to the jury to disregard the remarks is sufficient.").

 In light of the court's curative instruction, the court finds it is "highly probable" that the submission of the chronologies did not in any way affect the outcome of this case. Thus, Mycogen has not shown that prejudicial error occurred when these chronologies were given to the jury. Accordingly, the court denies Mycogen's motion for a new trial on this ground.

*c. Should the court grant Mycogen's motion for a new trial because the court responded to a jury inquiry by listing several Monsanto exhibits?*

 Mycogen moves for a new trial because the court responded to a jury inquiry by listing several Monsanto exhibits. Mycogen argues that since the jury did not request these exhibits, the court highlighted to the jury the documents on which Monsanto based its prior invention claim, thus severely prejudicing Mycogen's case. According to Mycogen, by "specifically directing the jury's attention to Monsanto's 'conception' documents—which the jury had not specifically requested—the court 'placed its imprimatur on the facts contained in' those documents and prejudicially 'tipped the scales in favor of' Monsanto's theory of the case," citing to *United States v. Rivera–Santiago*, 107 F.3d 960 (1st Cir.1997).

During jury deliberations on February 3, 1998, the jury submitted the following written question to the court: "Did Dr. Fischhoff have a notebook? If so, what exhibit number is it?" Over Mycogen's objection, the court identified to the jury the following eight exhibits, explaining to the jury that there were "both notebooks and there were certain exhibits that were pages from the notebooks" including: Defendant's Exhibit 1173, identified as a notebook; Defendant's Exhibit 1173A, identified as a one page from 1173; Defendant's Exhibit 132, identified as a computer printout page from a notebook; Defendant's Exhibit 811, identified as a computer directory page from a notebook; Defendant's Exhibit 1324, identified as a notebook; Defendant's Exhibit 1326, identified as a notebook; Defendant's Exhibit 1327, identified as a notebook; and Defendant's Exhibit 2011, identified as a notebook.

As soon as the exhibits were identified, the court gave the following instruction to the jury:

Now, I will repeat—you can probably say it with me—it is your obligation to

decide this case based on all the evidence presented. The fact that you focused on and we are showing you how to find certain exhibits doesn't mean your obligation is to focus on only those exhibits. You need to keep all the evidence in mind in reaching any judgments you make.

All eight exhibits met the jury's request, as they were all either Fischhoff's laboratory notebooks or pages from his laboratory notebooks. The court identified no extraneous material.

In support of its argument, Mycogen cites *United States v. Rivera–Santiago,* a federal criminal narcotics case in which the jury, during its deliberations, asked the court, among other things, "[w]e wish to obtain the following information from the transcription notes to clarify some doubts: If there were any sign of flashing lights from the suspect aircraft and suspect vessel." *United States v. Rivera–Santiago,* 107 F.3d at 964. The court finds Mycogen's reliance on *Rivera–Santiago* is misplaced. In that case, the court culled testimony in response to the jury's open-ended question; the court "selected only a part of [Government witness] Cruciger's testimony given on direct examination to be read in response to the jury's question ...." *Rivera–Santiago,* 107 F.3d at 965. The First Circuit explained that,

> in so doing, [the trial court] necessarily suggested to the jury that this testimony would provide 'the' answer to the jury's question .... The record contains evidence that was inconsistent with, if not contradictory to, Cruciger's assertion that he saw an exchange of lights during the airdrop between the suspicious aircraft and an object in the water.

*Rivera–Santiago,* 107 F.3d at 965–966.

To the contrary, in the present case, the court responded to the jury's written question by giving the jury a complete answer by identifying Fischhoff's laboratory notebooks and three pages from these laboratory notebooks. Moreover, the court

averted any chance of prejudice by providing a clear instruction to the jury, reminding the jury to consider "all the evidence presented." *See generally Markovich v. Bell Helicopter Textron, Inc.,* 805 F.Supp. 1231, 1240 (E.D.Pa.1992). Thus, Mycogen has not shown that the court's response to the jury's question requires the verdict to be set aside. Accordingly, the court denies Mycogen's motion for a new trial on this ground.

### d. Should the court grant Mycogen's motion for a new trial on other bases?

Mycogen moves for a new trial because the court allegedly provided jury instructions that were legally incorrect, misleading or inadequate. Mycogen alleges: (1) the court erred in giving its jury instruction on "simultaneous conception and reduction to practice;" (2) the court erred by deciding not to give Mycogen's proposed jury instructions on "derivation" and "spurring;" and (3) the court erred in its jury instruction which defined the phrase, "a greater number of codons preferred," incorrectly based on the court's claim construction.

### i. What is the applicable legal standard?

The court must review the alleged errors in the jury instructions to "determine whether, if taken as a whole, the [instructions] properly apprised the jury of the issues and the applicable law .... The charge, taken as a whole and viewed in light of the evidence, must fairly and adequately submit the issues in the case to the jury." *Tigg Corporation v. Dow Corning Corp.,* 962 F.2d 1119, 1126–27 (3d Cir. 1992). The court examines the jury instructions as a whole, considering the totality of the instructions, and not individual sentences or paragraphs in isolation. *Limbach Co. v. Sheet Metal Workers Int'l Ass'n, AFL–CIO,* 949 F.2d 1241, 1259 n. 15 (3d Cir.1991).

ii. *Should the court grant Mycogen a new trial based upon the court's jury instruction on "simultaneous conception and reduction to practice"?*

 The court's jury instruction on "simultaneous conception and reduction to practice" reads:

> In some instances, an inventor is unable to establish a conception until he or she has reduced to practice the invention through a successful experiment. This situation results in a simultaneous conception and reduction to practice. You may consider this possibility in reaching your decision on who is the first inventor.

The court based this jury instruction on the Federal Circuit's teachings. *See Amgen, Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 1206 (Fed.Cir.) (*citing* 3 D. Chisum, *Patents* § 10.04[5] (1990)), *cert. denied,* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). The court has reviewed this jury instruction, and finds that it gave the correct instruction on "simultaneous conception and reduction to practice." Accordingly, the court denies Mycogen's motion for a new trial on this ground.

iii. *Should the court grant Mycogen a new trial because the court did not instruct the jury on derivation and spurring?*

 The court did not instruct the jury on derivation, as proposed by the parties, and on spurring, as proposed by Mycogen. Instructions on these subjects were included in early drafts of jury instructions submitted by the parties but not in later drafts.

The court has found in this opinion, supra, that spurring and derivation are not at issue in this case. Accordingly, the court finds that it correctly declined to give jury instruction on spurring and derivation. Accordingly, the court denies Mycogen's motion for a new trial on this ground.

iv. *Should the court grant Mycogen a new trial based upon the court's jury instruction on "a greater number of codons preferred"?*

 Mycogen argues that the court erred in instructing the jury on the phrase "a greater number of codons preferred." Claims 1–6 and 13–18 of the '600 patent and Claims 1–6 and 13–18 of the '862 patent require that the modified *Bt* gene contain "a greater number of codons preferred" by the plant. The court construed this term in its claim construction opinion as follows:

> [T]he limitation "greater number of codons preferred" is satisfied where the newly-created synthetic gene has a higher number of those codons whose frequency in the native *Bt* gene was lower than their frequency in the intended plant host, and where the synthetic gene has an overall distribution of codon usage that is closer to that of the intended plant host.

*Mycogen v. Monsanto,* C.A. No. 96–505–RRM, memo. opin., McKelvie, J. (D.Del. December 29, 1997) (D.I.343).

In accordance with its previous construction of this term, the court instructed the jury that the element "a greater number of codons preferred" is satisfied:

> [W]here the newly-created synthetic gene has a higher number of those codons whose frequency in the native *Bt* gene was lower than their frequency in the intended plant host and where the synthetic gene has an overall distribution of codon usage that is closer to that of the intended plant host.

The court has reviewed its construction of the phrase "a greater number of codons preferred" which the court reached in its claim construction opinion. *See id.* For the reasons stated in its claim construction opinion, the court finds that its claim construction is correct as a matter of law. Thus, the court finds that its jury instruction based on its claim construction are also correct as a matter of law. Accord-

ingly, the court denies Mycogen's motion for a new trial on this ground.

5. *Should the court grant Mycogen's motion for a new trial based upon Mycogen's allegations of a jury verdict against the weight of the evidence?*

Mycogen moves for a new trial arguing that the jury decided the case based upon confusion, bias or emotion, and not upon the evidence and the court's instructions. Mycogen argues that "there are several indications that the jury was confused and unwilling to take the time necessary to reach a fair and thoughtful decision on the merits, including the inconsistent verdicts and the fact that the verdicts were against the substantial weight of the evidence." Mycogen argues a new trial is mandated by "substantial justice" pursuant to Federal Rules of Civil Procedure 59(a) and 61.

a. *Should the court grant Mycogen's motion for a new trial on the grounds that the jury's verdicts were inconsistent?*

Mycogen moves for a new trial because, it argues, the jury rendered inconsistent verdicts. Mycogen argues the jury's verdicts are inconsistent because, in one verdict, the jury found that the genes in the Northrup King YieldGard® product and the Delta and Pine Land BollGard® product do not infringe, while in another verdict, the jury found that these same genes anticipated Mycogen's invention. Mycogen argues that these two findings are inconsistent. According to Mycogen, either the genes satisfy each claim element of Mycogen's patents or they do not. If they satisfy the claims, they infringe. If they do not satisfy the claims, they do not infringe and cannot anticipate.

The Federal Circuit applies the law of the regional circuit to the issue of inconsistent verdicts. *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1563 (Fed.Cir. 1988) ("The issue of inconsistent jury findings or verdicts is not unique to patent law. In such procedural matters we apply the discernible law of the forum ...."),

*cert. denied*, 488 U.S. 850, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988). Accordingly, Third Circuit law applies.

According to the Third Circuit, inconsistent verdicts are grounds for ordering a new trial. *See, e.g., Malley–Duff & Assoc., Inc. v. Crown Life Ins. Co.*, 734 F.2d 133, 145 (3d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984). However, the Third Circuit teaches that the district court is under a constitutional mandate to search for a view of the case that makes the jury's verdicts consistent. *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 764 (3d Cir. 1990). A district court should uphold the jury's verdict if there exists some legal basis, supported by the evidence, upon which the verdict could be based. *GNB Battery Technologies, Inc. v. Exide Corp.*, 876 F.Supp. 605, 610 (D.Del.1995). The court is obligated to reconcile a jury's verdict independently of whether the jury likely reasoned in the same fashion and it is the court's duty to harmonize the jury's answers if it is at all possible to do so. *Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963); *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d at 1563.

In *American Casualty Co. v. B. Cianciolo, Inc.*, the Court of Appeals for the Seventh Circuit, found that "[a] judge may dissipate the inconsistency by setting aside one of the conflicting verdicts, if that verdict was unsupported by the evidence." *American Casualty Co. v. B. Cianciolo, Inc.*, 987 F.2d 1302, 1305 (7th Cir.1993). Judge Easterbrook, writing for a panel of three judges, wrote that "the court, having found an irrational part of the verdict, does not annul the rest on the ground that the jury has displayed ecumenical inability or unwillingness to follow its instructions. Instead the court excises the offending verdict while enforcing the remainder." *Id.* at 1305–06. The court finds the Seventh Circuit's approach in *American Casualty* is consistent with the Third Circuit's approach that, if possible, the court must

adopt a view of the jury's verdicts that renders them consistent.

The court has already granted Mycogen's motion for judgment as a matter of law as to infringement by setting aside the jury's verdict that the genes and gene products at issue do not infringe the '600 and '862 patents, and finding that the products do infringe these patents. Accordingly, the court finds that it has resolved any inconsistency in the jury's verdict alleged by Mycogen. Because the court has resolved any alleged inconsistency in the jury's verdict, the court need not further address Mycogen's motion for a new trial on these grounds. Accordingly, the court will not grant Mycogen's motion for a new trial on this ground.

b. *Should the court grant Mycogen's motion for a new trial on the ground that the jury's verdicts on the issues of prior invention and infringement are against the weight of the evidence?*

Mycogen contends that the jury's verdicts on the issues of invalidity due to prior invention and infringement are against the weight of the evidence. Accordingly, Mycogen argues that the court should grant a new trial on these issues if the court does not grant all or part of Mycogen's JMOL motions.

The court has granted Mycogen's JMOL motion on the issue of infringement. Accordingly, the court finds that there is no reason to grant Mycogen's motion for a new trial on this issue. Also, the court has already rejected Mycogen's JMOL motion on the issue of invalidity due to prior invention. Based upon the court's reasoning in rejecting this motion, the court rejects Mycogen's motion for a new trial on the same issue.

c. *Should the court grant Mycogen's motion for a new trial on the grounds that the jury failed to follow the court's clear instruction that they should attempt to answer all interrogatories in the verdict form?*

The jury did not complete questions 11 through 17 on the verdict form, other than noting "N/A." Mycogen contends that, in doing so, the jury failed to follow the court's clear instructions that the jurors should attempt to answer all interrogatories on the verdict form. Mycogen contends that the court should grant its motion for a new trial because "this single, egregious act of the jury's refusal to follow instructions renders the whole verdict in this complex case suspect and unreliable."

On February 3, 1998 at approximately 2:07 p.m., the court gave the jury the following information in response to a written question from the jury:

> We received another note from you, Note No. 5, I believe, which reads as follows: "On the verdict sheet, do we have to fill out pages 9, 10, 11 and 12 or is one reason of invalidity sufficient?"

> The answer to that is to the extent you can reach unanimous agreement on the other defenses on pages 10, 11, 12, that we would like you to do it, if you could. Alright? So that is the answer.

That same day, at approximately 2:38 p.m. the jury returned with a verdict. The court clerk read the verdict form that the jury had filled in. He indicated that "[Question] No. 10 is not filled in. No. 11 is not filled in. No. 12 is not filled in. No. 13, 14, 15, 16 and 17 are not filled in."

The following exchange then took place:

Court: Certain blank questions are here, including what we talked about before, that is certain of the affirmative defenses, they are blank. I take it that is an indication that the jury—and I am asking the foreperson—that the jury was unable to reach a unanimous agreement as to those blanks; is that correct?

Foreperson: Do I have to give a yes or no? What I mean is can I explain?

Court: .... We will take it as an indication that you were unable to reach a unanimous agreement as to enablement, best mode, indefiniteness and actually as to those blanks that Mr. Looby [court clerk] referred to that are under infringement. If you want an explanation—should we take an explanation?

DeKalb: I don't think it is needed, Your Honor.

Mycogen: I don't think it is needed, Your Honor.

Court: It makes lawyers more nervous than not. I will withdraw the question if you are uncomfortable answering it.

The court then thanked the jury for its service and excused it.

Mycogen argues that "[i]t is, of course, simply not possible for the jury to have given fair and thoughtful consideration in twenty-nine minutes to the affirmative defenses of enablement, best mode and indefiniteness" from the time the court answered the jury's question concerning filling out the verdict sheet until the jury returned the verdict. Mycogen also argues it did not know that the jury had written "N/A" next to the interrogatories it did not answer. Mycogen argues N/A "most likely stands for 'Not Applicable' and indicates that the jury did not follow the court's instructions to attempt to reach a decision as to all defenses."

The Third Circuit has explained that "[a] jury is presumed to have acted rationally. We must assume that the jury followed the court's instructions and arrived at a verdict based on those instructions." *United States v. Zauber,* 857 F.2d 137, 154 (3d Cir.1988) *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989); *see also City of Los Angeles v. Heller,* 475 U.S. 796, 798, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) ("[T]he theory under which jury instructions are given by trial courts and reviewed on appeal is that juries act in accordance with the instructions given them.").

Applying the Third Circuit's teachings that the court must assume the jury followed the court's instructions and arrived at a verdict based on those instructions. "N/A" as marked on the jury's verdict form could have been the jury's abbreviation for "Not Applicable" as Mycogen suggests, or the abbreviation could have another meaning. *See, e.g., Zeevi v. Union Bank of Switzerland,* 1993 WL 148871 *8 (S.D.N.Y. April 30, 1993) (noting that "N/A" written on F.R. 2230 Criminal Referral Form filed with Federal Reserve Bank of New York "may either indicate 'not applicable' or 'not available' "); *Smith v. Brock,* 698 F.Supp. 938 (CIT 1988) (noting use of "N/A" on certain forms without indication whether it means "not applicable" or "not available").

In light of the court's instructions on reaching unanimous agreement, "N/A" in the specific context of this case is likely the jury's abbreviation for "No Agreement." Thus, the jury followed the court's instructions on trying to reach a unanimous agreement and arrived at a verdict indicating "No Agreement." Similarly, "N/A" could indicate "Not Able" as the verdict form questions specifically began "Do you find ...," meaning the jury is not able to find by unanimous agreement. Or "N/A" could indicate "Not Applicable" in the sense that since the jury had not reached unanimous agreement on these questions, the questions were not applicable to the jury because it could not answer them by unanimous agreement. The court finds that any of these explanations account for the jury's behavior in accordance with the court's instructions. Thus, Mycogen has not demonstrated that fundamental and substantial justice requires the jury verdict to be set aside on this ground.

Accordingly, the court will not grant Mycogen's motion for a new trial on this ground.

### I. Should the Court Grant Defendants' Motion for Attorneys' Fees?

Defendants all move for attorneys' fees under 35 U.S.C. § 285, asserting this is an exceptional case and that as such, they are entitled to be awarded attorneys' fees. Defendants Monsanto and Delta and Pine Land Company have briefed their motion fully and plaintiffs have responded in kind. Due to Monsanto's acquisition of DeKalb in December 1998, DeKalb's position is incorporated in the briefs filed by Monsanto. Here, the court addresses defendants' motion for attorneys' fees.

#### 1. What is the applicable legal standard?

▆▆ Under the so-called "American Rule," each party generally bears its own attorneys' fees and expenses in litigation. *Sun–Tek Industries, Inc. v. Kennedy Sky Lites, Inc.,* 929 F.2d 676, 678 (Fed.Cir. 1991). As an exception to the American Rule, courts have long exercised their inherent equitable powers to make whole a party injured by an egregious abuse of the judicial process. *Id.*

Patent law provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Congress enacted 35 U.S.C. § 285 to codify in patent cases the "bad faith" equitable exception to the American Rule. Congress expressly limited such awards to exceptional cases. *Mathis v. Spears,* 857 F.2d 749, 758 (Fed.Cir.1988).

In determining whether to award attorneys' fees, the Federal Circuit teaches that the court should first determine whether the case is exceptional; if it is, then it is within the court's discretion to award attorneys' fees to the prevailing parties. *J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.,* 822 F.2d 1047, 1050, (Fed.Cir.1987). Examples of the types of conduct that can form a basis for finding a case exceptional include: willful infringement, inequitable conduct before the PTO, misconduct during litigation, vexatious or unjustified litigation and frivolous suit. *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 455 (Fed.Cir.1985). Parties seeking attorneys' fees must prove such conduct by clear and convincing evidence. *Reactive Metals and Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1582–83 (Fed.Cir.1985).

Defendants allege this is an exceptional case because Mycogen allegedly committed inequitable conduct before the PTO, and Mycogen allegedly manipulated the PTO to create an unnecessary lawsuit.

▆▆▆ To prove inequitable conduct, defendants must first establish that there was a material misrepresentation or omission of information to the PTO. *See, e.g., Akzo N.V. v. U.S. Intern. Trade Comm'n,* 808 F.2d 1471, 1480–1481 (Fed.Cir.1986), cert. denied, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). Specifically, patent applicants and their patent attorneys have a duty to disclose to the PTO information of which they are aware which is material to the examination of the application. *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.,* 168 F.3d 28, 30 (Fed.Cir.1999); *see also Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1256 (Fed.Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 1510, 140 L.Ed.2d 665 (1998). Inequitable conduct arising from failure to satisfy the duty to disclose requires clear and convincing proof of: (1) information that is material; (2) the patent applicant's knowledge of such information and its materiality; and (3) the applicant's failure to disclose such information resulting from an intent to mislead the PTO. *FMC Corp. v. Manitowoc Co., Inc.,* 835 F.2d 1411, 1415 (Fed.Cir.1987); *see also Critikon, Inc.,* 120 F.3d at 1256; *Key Pharmaceuticals v. Hercon Laboratories Corp.,* 161 F.3d 709, 719 (Fed.Cir.1998).

Once materiality and intent have been established, "the court conducts a balancing test and determines whether the scales tilt to a conclusion that 'inequitable con-

duct' occurred." *Critikon, Inc.*, 120 F.3d at 1256. In balancing materiality and intent, the more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and *vice versa. Id.*

### 2. *Is this an exceptional case?*

■ Monsanto argues that Mycogen committed inequitable conduct by: (a) intentionally misrepresenting to the PTO that Monsanto's application which led to the '365 patent did not support removal of XCGs and AATGAA when Mycogen knew that Monsanto's application supported this information; and (b) intentionally misrepresenting to the PTO that the synthetic genes in Monsanto's application were distinct from the genes in the applications which led to the '600 and '862 patents, and then suing Monsanto for infringement claiming Monsanto's genes infringe the '600 and '862 patents.

Monsanto argues that Mycogen created an unnecessary lawsuit. According to Monsanto, instead of letting the PTO determine inventorship issues in an interference proceeding, Mycogen "concocted a scheme in 1996 to mislead the PTO" into issuing the '600 and '862 patents, and then filed a lawsuit for strategic advantage in the federal district courts.

While Mycogen's applications which led to the '600 and '862 patents were pending, the PTO considered declaring an interference between Mycogen's '831 patent, which previously issued in January 1995, and Monsanto's application. As the subject matter of the '831 patent and Mycogen's pending applications were similar and the specifications nearly identical, the PTO suspended prosecution of Mycogen's applications in March 1996 so that inventorship issues related to the new pending claims contained in those applications could be decided in the interference as well. The PTO formally declared the interference in November 1996.

Monsanto alleges that Mycogen did not want to resolve the inventorship issues during an interference. Monsanto argues that Mycogen sought to convince the PTO to lift the suspension and issue the '600 and '862 patents so that Mycogen could file a lawsuit against Monsanto in the federal district courts. By filing a lawsuit, Mycogen afforded itself the statutory presumption of validity that goes with an issued patent. This presumption has forced Monsanto to prove invalidity due to prior invention by the clear and convincing evidence standard in a court of law, as opposed to the preponderance of evidence standard that applies in an interference.

On June 5, 1996, Mycogen's outside patent attorney, Jeff Lloyd, Esquire, met with PTO officials to discuss whether patents could issue from Mycogen's applications based on Mycogen's proposed new claims. The new claims were contained in a May 16, 1996 letter from Lloyd to the PTO. In this letter, Lloyd told the PTO that these new claims were claims "which Monsanto cannot make based upon the specification of [Monsanto's application]." Before the PTO would issue any new patents from Mycogen's applications, Mycogen would have to convince the examiner that the invention in the new claims was distinct from that described in Monsanto's application. Lloyd told the PTO that Monsanto's application did not disclose removal of XCG codons or AATGAA sequences. According to Monsanto, Lloyd knew that Monsanto's application disclosed removal of XCGs and AATGAA sequences. Monsanto argues Lloyd made this representation to the PTO with a deliberate intent to mislead the PTO into issuing the '600 and '862 patents.

Monsanto argues that Lloyd knew that Monsanto's application disclosed this information because Monsanto's application involved in the interference was identical to Monsanto's application to the European Patent Office which claimed Monsanto's BollGard® cotton and NewLeaf potato genes. These genes had XCGs and AATGAA sequences removed. Monsanto argues that Lloyd would have learned this

information from Fischhoff's August 1995 deposition, during which Fischhoff stated that Monsanto's application included the BollGard® and NewLeaf genes. Although attorneys from Lyon & Lyon, another law firm representing Mycogen, deposed Fischhoff and marked the deposition transcript, "Confidential, Outside Attorney's Eyes Only," Monsanto argues that "Mycogen's attempt to insulate the attorneys who prosecuted the new claims from the attorneys with access to Dr. Fischhoff's deposition transcript is a sheer fiction," because Lyon & Lyon attorneys were involved in the prosecution of Mycogen's applications.

Monsanto argues that Mycogen intentionally misrepresented to the PTO that the genes in Monsanto's application were distinct from the genes in the applications which led to the '600 and '862 patents. Monsanto argues that Mycogen did this knowing that once the '600 and '862 patents issued, Mycogen would sue defendants alleging that Monsanto's BollGard® and NewLeaf genes infringe these patents. According to Monsanto, since Mycogen argued before the PTO that Monsanto's genes are distinct, then Mycogen should not be able to argue now to a federal district court that Monsanto's genes infringe.

a. *Did defendants prove by clear and convincing evidence that Lloyd made intentional misrepresentations to the PTO?*

To prove that Lloyd made intentional misrepresentations to the PTO, the defendants must show by clear and convincing that Lloyd had knowledge of information that he knew was material and that he intentionally misrepresented this information to the PTO. *See Critikon, Inc.,* 120 F.3d at 1256.

b. *Did defendants prove by clear and convincing evidence that Lloyd had actual knowledge of any material information?*

Defendants contend this alleged material misrepresentation to the PTO took the form of Lloyd's telling the PTO that Monsanto's application did not disclose removal of XCG codons or AATGAA sequences when, in fact, he knew it did. Defendants allege that Lloyd had learned from Lyon & Lyon attorneys that Monsanto's application disclosed removal of XCG codons or AATGAA sequences. Had the examiner known Monsanto's application disclosed the removal of these sequences, he would not have permitted the Mycogen patent to issue.

Defendants have shown that attorneys from Lyon & Lyon obtained information about the BollGard® and NewLeaf genes from Fischhoff's deposition. However, defendants have not established by clear and convincing evidence that Lyon & Lyon attorneys conveyed this information to Lloyd or that Lloyd knew that Monsanto's application disclosed removal of XCG codons or AATGAA sequences.

Even if the court assumes the information is material, defendants have not presented clear and convincing evidence that Lloyd knew the information on which he allegedly based his material misrepresentation, or that Lloyd made a material misrepresentation to the PTO. *See FMC Corp.,* 835 F.2d at 1415. Accordingly, defendants have not presented clear and convincing evidence of material misrepresentation and wrongful intent on Lloyd's part.

c. *Did defendants prove by clear and convincing evidence that Mycogen manipulated the PTO to create an unnecessary and wasteful lawsuit?*

In order to show that Mycogen manipulated the PTO to create an unnecessary and wasteful lawsuit, the defendants must prove by clear and convincing evidence that Mycogen engaged in "extraordinary misconduct" and acted "in bad faith" when it filed its complaint in this lawsuit. *See, e.g., Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1564 (Fed.Cir.1983); *CTS Corp. v. Piher Int'l Corp.,* 727 F.2d 1550, 1558 (Fed.Cir.) (noting that a motion "brought only for harassment or delay" could result

in exceptional case), *cert. denied*, 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984).

Monsanto argues that Mycogen manipulated the PTO to create an unnecessary and wasteful lawsuit. Underlying this argument is the assumption that parties are somehow bound to let the PTO decide inventorship issues in an interference proceeding. Federal district courts, however, have long heard infringement cases when a patent-at-issue is involved in an interference. *See, e.g., General Foods Corp. v. Struthers Scientific and Int'l Corp.*, 309 F.Supp. 161 (D.Del.1970) (holding that court actions should not be stayed pending conclusion of interference proceedings in Patent Office). For example, Mycogen filed a patent infringement case involving the '831 patent against Monsanto in the United States District Court for the Southern District of California. Furthermore, although Mycogen's seeking to obtain the '600 and '862 patents in order to exclude Monsanto's products from the commercial marketplace might be a hard-nosed business strategy, it is not contrary to law. *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). As the Federal Circuit has explained:

> [T]here is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application. Any such amendment or insertion must comply with all statutes and regulations, of course, but, if it does, its genesis in the marketplace is simply irrelevant and cannot of itself evidence deceitful intent.

*Id.*

It follows from this teaching that it is not illegal for a party to lawfully avoid an interference and obtain a patent. And once the party has the patent, it is not illegal for the party to sue competitors for infringement of that patent. 35 U.S.C. § 271. The court finds that Mycogen's conduct in the instant case does not rise to the level of egregious abuse of the judicial process. *See, e.g., Sun–Tek Industries, Inc. v. Kennedy Sky Lites*, 929 F.2d at 678. Nor have defendants shown by clear and convincing evidence that Mycogen engaged in "extraordinary misconduct" and acted "in bad faith" when it filed its complaint in this lawsuit. *Stickle v. Heublein, Inc.*, 716 F.2d at 1564.

For the reasons set forth above, the court finds that defendants have not shown by clear and convincing evidence that this case is an exceptional one under 35 U.S.C. § 285. Accordingly, the court will deny defendants' motion for attorneys' fees.

### J. *Should the Court Grant Defendants' Motion to Amend Judgment?*

Defendants move to amend judgment, pursuant to Federal Rule of Civil Procedure 59(e). Monsanto moves to amend the judgment so that it reads as follows: Judgment is entered "in favor of Monsanto and Delta and Pine Land and against the plaintiffs on Monsanto and Delta's first *and second* counterclaims that the claims of the '600 and '862 patents are invalid *and not infringed by Monsanto*." (Monsanto's amendments underscored.) DeKalb moves the court to amend its judgment so that judgment is entered "in favor of DeKalb and against the plaintiffs on DeKalb's counterclaim that the claims of the '600 and '862 patents are invalid *and not infringed by DeKalb*." (DeKalb's amendment underscored.) The defendants seek to have the court amend the judgment with respect to infringement issues. The court, however, has granted JMOL in favor of Mycogen and against defendants that the defendants products and genes infringe the '600 and '862 patents. Therefore, the court denies defendants' motions to amend judgment.

## III. CONCLUSION

For the reasons set forth above, the court grants Mycogen's motion for judgment as a matter of law that defendants literally infringe the '600 and '862 patents. The court grants Mycogen's motion for judgment as a matter of law that the '600 and '862 patents are not invalid due to obviousness and anticipation. The court denies Mycogen's motion for judgment as a matter of law that the '600 and '862 patents are not invalid due to prior invention. The court also denies Mycogen's motion for a new trial.

The court denies defendants' motion for judgment as a matter of law that the claims of the '600 and '862 patents are invalid for: (1) failure to satisfy the best mode requirement; and (2) indefiniteness. The court grants defendants' motion for judgment as a matter of law that the claims of the '600 and '862 patents are invalid for failure to comply with the enablement requirement.

The court denies defendants' motion to amend judgment.

The court denies defendants' motion for attorneys' fees.